**CHRISTOPHER BRUCKMANN**
**(SDNY Bar No. CB-7317)**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, N.E.**
**Washington, D.C. 20549**
**(202) 551-5986**
**BruckmannC@sec.gov**


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**AMERICAN RENAL ASSOCIATES HOLDINGS, INC., JONATHAN L. WILCOX, JASON M. BOUCHER, and KAREN J. SMITH,**<br>**Defendants.** | **COMPLAINT**<br><br>**Civil Action No. 21-CV-10366**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendants American Renal Associates Holdings, Inc. ("ARA"), Jonathan L. Wilcox

("Wilcox"), Jason M. Boucher ("Boucher") and Karen J. Smith ("Smith") (collectively "the

Defendants"), alleges as follows:

**OVERVIEW**

1.      This is an accounting fraud case arising from a multimillion dollar scheme by three

former ARA finance executives—Wilcox, Boucher, and Smith—to improperly manipulate

certain revenue adjustments to make it appear that ARA's financial performance was better than

it actually was.

1

2.     The fraudulent scheme lasted from approximately January 1, 2017 through at least November 9, 2018 (the "relevant period"). The scheme entailed entering a series of revenue adjustments to make it appear that ARA had beat, met, or come close to meeting various predetermined financial metrics, when in fact its financial performance was materially worse. Wilcox, Boucher, and Smith intentionally, recklessly, and negligently engaged in acts, practices, and courses of conduct related to those revenue adjustments that caused ARA to overstate its revenue, net income, and other financial metrics throughout this period.

3.     After ARA received an inquiry from the SEC, ARA undertook an internal investigation that resulted in the company restating its financial statements for year-to-date 2018, all of 2017, and earlier periods in a Form 10-K filed with the SEC on September 5, 2019 (the "Restatement"). In the Restatement, ARA admitted that it had "concluded that our previously issued consolidated financial statements and other financial data for the Restated Periods should be restated and should no longer be relied upon."

4.     Among other things, the Restatement reflected that ARA had overstated its net income for 2017 by more than $17 million and for the first three quarters of 2018 by more than $22 million, which respectively represent overstatements of more than 30% and 200%.

5.     The Restatement also acknowledged material weaknesses in ARA's internal controls regarding revenue, approval of journal entries, monitoring controls, and other areas.

6.     Wilcox served as ARA's Chief Financial Officer from 2011 through September 2018, when he resigned from ARA. Boucher served as ARA's Chief Accounting Officer from 2011 through September 2018, when he was promoted to Chief Financial Officer. Smith served as ARA's Controller from 2007 to September 2018, when she was promoted to Vice President of Finance. While working at ARA during the relevant period, Wilcox and Boucher were the

primary persons responsible for revenue recognition. Smith also had responsibility for revenue recognition, including ensuring that ARA's practices and SEC filings complied with required rules.

7.    ARA's business model is to partner with doctors across the United States to develop, own, and operate dialysis clinics as joint ventures. The joint ventures are structured such that the doctor-partners handle all patient care, and ARA handles billings, collections, revenue management, and dealing with patient insurance. A major component of ARA's revenue during the relevant period was insurance reimbursement for dialysis treatments.

8.    Because ARA could not always be certain what rate different insurance companies would pay for dialysis treatments, revenue recognition at ARA involved two critical steps: First, ARA made an initial estimate of revenue that it would receive. ARA personnel referred to this initial estimate as a "contractual allowance." The second step was to update the initial estimate after receiving information about the amount ARA was actually paid. These later updates, which could be positive or negative, were called "topside adjustments" at ARA, and these topside adjustments were at the center of the fraud perpetrated by Wilcox, Boucher, and Smith.

9.    Accounting standards—and ARA's own internal controls—called for ARA to base its topside adjustments on patient-level payment information. Obtaining this patient-level detail required making a comparison of the actual payments received for a particular patient's course of treatment to the prior estimates of what those payments would be.

10.    Rather than base ARA's topside adjustments on patient-level data, Wilcox, Boucher, and Smith implemented a fraudulent scheme, in which Wilcox and Boucher agreed on how much overall revenue they wanted ARA to have for a month or quarter, and then Boucher and Smith had staff enter different topside adjustments at specific clinics until this predetermined

number was met. ***This decision by Wilcox to use a top-down approach to book the revenue he wanted ARA to have, rather than building revenue up from actual patient-level data, was the heart of the topside scheme.***

11.    Over the course of this topside scheme, Wilcox, Boucher, and Smith used different metrics and different practices, but the overall scheme of manipulating topside adjustments to achieve pre-determined results remained the same. When Wilcox left ARA in September 2018, his involvement in the fraudulent scheme ceased, but Boucher and Smith were each promoted and carried on with the topside scheme.

12.    The financial metrics that Wilcox, Boucher, and Smith targeted included Days Sales Outstanding ("DSO"), which is a measure of how quickly ARA was collecting payment for its treatments, and Revenue Per Treatment ("RPT").

13.    Among the inherently deceptive practices that Wilcox, Boucher, and/or Smith engaged in in furtherance of the topside scheme were:

    a.    Entering topside adjustments that were not based on any analysis of patient-level detail, but instead were based on mathematical calculations to achieve a pre-determined DSO figure;

    b.    Manipulating which patients' payment histories were analyzed to make it appear that ARA had more revenue than it did so it could appear to meet a predetermined RPT figure;

    c.    Holding identified topside adjustment revenue in a "cookie-jar" called the "Contractual Adjustments" spreadsheet and only recognizing the revenue when needed;

    d.    Manufacturing false and misleading documents to provide to ARA's external auditors in an effort to conceal the ongoing topside scheme; and

    e.    Misstating or omitting descriptions of topside adjustments in discussions with ARA's CEO, Audit Committee and external auditors.

14.    Wilcox, Boucher, and Smith each personally benefitted from the scheme by a) receiving bonuses that were inflated by ARA's misstated metrics, b) selling stock at inflated prices, and/or c) receiving promotions to more senior positions at ARA.

15.    Through the actions of Wilcox, Boucher, and/or Smith, as well as more junior employees acting at the direction of Wilcox, Boucher, and/or Smith, ARA also engaged in this fraudulent scheme.

## JURISDICTION AND VENUE

16.    The SEC brings this action, and this Court has jurisdiction, pursuant to Sections 20 and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.

17.    The Defendants directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, transactions, and practices alleged in this Complaint.

18.    During the period of the fraud, ARA was engaged in the offer and/or sale of securities. This included offerings through stock options plans in which ARA employees (including ARA employees who were not involved in the fraud alleged in this Complaint) exercised options to purchase stock from ARA. At least some of these purchases occurred in the third quarter of 2018, when many of the false statements described in this Complaint had already been made in ARA's filings with the SEC and elsewhere. Additionally, on July 18, 2017, ARA filed a Form S-3 Registration with the SEC that stated it "relates to the possible resale, from time to time, by the selling stockholders identified in this prospectus of up to 19,017,413 shares of our

common stock." The selling stockholders identified in that Form S-3 included ARA's majority shareholder at the time. ARA's stock was also offered and sold by the public on the New York Stock Exchange throughout the period of the fraud.

19.    During the period of the fraud, Smith was engaged in the offer and/or sale of securities. On August 9, 2018, when many of the false statements described in this complaint had already been made in ARA's filings with the SEC and elsewhere, Smith sold over 8,200 shares of ARA stock.

20.    Venue is proper in this district pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the acts, practices, and courses of conduct constituting the violations alleged in this Complaint occurred in this district, including that from April 21, 2016 until January 25, 2021 ARA's common stock traded on the New York Stock Exchange, which has its headquarters in this district, and the materially false and misleading statements contained in ARA's public filings and other investor materials were communicated to persons located in this district.

## DEFENDANTS

21.    **American Renal Associates Holdings, Inc.** is a national provider of dialysis services, which is incorporated in Delaware and has its principal place of business in Beverly, Massachusetts. ARA's securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the ticker "ARA" from April 21, 2016 until January 25, 2021, when ARA was acquired by a private equity firm.

22.    **Jonathan L. Wilcox**, age 48, resides in Reading, Massachusetts. He was a certified public accountant ("CPA") licensed in Massachusetts from February 17, 2000 until June 30, 2017. Wilcox was ARA's Chief Financial Officer ("CFO") from 2011 to September 2018. He is

currently the COO at a private hospital. During the SEC's investigation, Wilcox provided sworn testimony to the SEC staff.

23.    **Jason M. Boucher**, age 49, resides in Boston, Massachusetts. He has been licensed as a CPA in the state of Massachusetts for several periods between approximately 2000 and the present. Boucher was ARA's Vice President of Finance and Chief Accounting Officer ("CAO") from 2011 to September 2018. Boucher was ARA's Vice President of Finance and CFO from October 2018 to March 2019, when he resigned at ARA's request in connection with the company's announcement of its planned restatement. He is currently the Controller at a private IT infrastructure company. During the SEC's investigation, Boucher provided sworn testimony to the SEC staff.

24.    **Karen J. Smith**, age 45, resides in Newburyport, Massachusetts. She has been a CPA in Massachusetts since 2004. Smith was ARA's Controller from 2007 to August 2018 and promoted to serve as Vice President of Finance from September 2018 to April 2019, when she resigned. She is currently the Controller at a private medical services company. While working at ARA, Smith sometimes used her maiden name, Karen Veilleux, for professional purposes including in her email address at ARA. During the SEC's investigation, Smith provided sworn testimony to the SEC staff.

25.    While working at ARA during the relevant period, Wilcox, Boucher, and Smith were Officers of ARA.

### OTHER RELEVANT PERSONS

26.    **Former CEO.** The Former CEO was Chief Executive Officer of ARA from September 1999 to January 25, 2021. During the SEC's investigation, the Former CEO provided sworn testimony to the SEC staff.

27.    **Former COO**. The Former COO was Chief Operating Officer of ARA from at least 2011 until December 31, 2016. Prior to that, the Former COO served as ARA's CFO. Starting before 2011 and continuing until December 31, 2016, the Former COO was the primary person responsible for revenue recognition and topside adjustments at ARA.

28.    **The Audit Firm**. The Audit Firm is a PCAOB-registered accounting firm that audited ARA's financial statements both during the relevant period and for several years prior.

FACTUAL ALLEGATIONS

## I.    BACKGROUND

### A.    Governing Accounting Principles and Relevant Accounting Terminology

29.    As a United States-based company with publicly traded stock from April 2016 through January 2021, ARA was required to conform with accounting principles generally accepted in the United States, or "GAAP," in compiling and filing its annual and interim financial statements with the SEC.

30.    GAAP is a series of authoritative standards set out by policy boards (including the Financial Accounting Standards Board, or "FASB"), that standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, consistent, and comparable.

31.    FASB's Accounting Standards Codification ("ASC") is the current source of GAAP. The relevant ASCs here changed from 2017 to 2018, but ARA's accounting did not conform with either standard.

32.    For 2017, ASC 954-605 (and its subsections) was the relevant governing source of GAAP for revenue recognition. ASC 954-605-25-6 states that revenues should be estimated when the service is performed even though actual amounts may not become known until a later date, such as when payment is received.  Pursuant to ASC 954-605-35-1, revisions to these

8

estimated revenues based on this new information should be recorded in the period in which the new information was obtained.

33. For 2018, ASC 606 (and its subsections) was the relevant governing source of GAAP for revenue recognition. ASC 606-10-32-8 states that variable consideration shall be estimated either based on the expected value or most likely amount, and updated faithfully based on the circumstances at the end of each reporting period pursuant to ASC 606-10-32-14. According to ASC 606-10-32-42, these circumstances include the resolution of uncertain events, and such changes should be reflected in the period of change per ASC 606-10-32-43.

34. Days Sales Outstanding, or DSO, is a calculation that reflects how many days, on average, it takes a company to collect payment after a service is rendered. As an illustration, a DSO of 30 days would mean that it takes a company, on average, 30 days to collect payment for a sale or service. DSO is a function of revenues and accounts receivable. The larger the accounts receivable compared to a given amount of revenues, the greater the DSO, and a larger DSO is often an indication that a larger portion of revenues has remained uncollected. Topside adjustments that increase (or credit) revenue will therefore lower DSO but increase metrics including net income, RPT, EBITDA, Adjusted EBITDA, and Adjusted EBITDA less Non-Controlling Interests ("Adjusted EBITDA-NCI").

35. "EBITDA" means Earnings Before Interest, Taxes, Depreciation and Amortization. It is a measure of profitability that adds back the cost of capital investments, debt-related costs, and taxes, and it is a common financial metric used by analysts to evaluate companies' financial performance. ARA also used two related financial metrics, "Adjusted EBITDA" and "Adjusted EBITDA-NCI." Adjusted EBITDA is a non-GAAP financial metric that adjusts the EBITDA figure for stock-based compensation and certain other costs, as described in ARA's Proxy

Statements filed with the SEC. Adjusted EBITDA-NCI is a non-GAAP financial metric that uses the Adjusted EBITDA measurement and further backs out non-controlling interests, which is the proportion of the company owned by minority shareholders in the business.

      **B.**    **Background on American Renal Associates and its Financial Metrics**

36.    As discussed above, ARA's business model centered on operating dialysis clinics primarily through joint ventures.

37.    While ARA was a public company, it made filings with the SEC, including annual reports on Form 10-K and quarterly reports on Form 10-Q. ARA also disseminated other information about the company and its financial performance to the public through investor conference calls, investor presentations, and through its website.

38.    ARA, analysts who followed ARA, and investors all used various financial metrics to track ARA's performance. Among the critical metrics for ARA were DSO, RPT, Adjusted EBITDA-NCI, and the number of new clinics opened.

*ARA Touted its Low DSO Figures During the Relevant Period*

39.    ARA calculated DSO by dividing the current net accounts receivable balance by the average daily revenue for the preceding three months. ARA sometimes referred to DSO using the phrase "accounts receivable, net of allowances, represented [number] days of revenue."

40.    DSO is a common metric in the dialysis services industry and was an important metric for ARA. As the Former CEO explained, DSO was "important because it's an indicator of your performance with regard to billing and collections and cash flow."

41.    From an investor perspective, a consistently low DSO indicates a company is successfully collecting payment for its goods and services, while a high or increasing DSO could indicate problems with the business in terms of cash flow or collections processes. Doctors who were in partnership or considering partnering with ARA were also interested in DSO, because a

low DSO would indicate that ARA was effectively handling insurance collections and revenue management, and getting doctors paid faster.

42.    ARA included a discussion of DSO in its SEC filings, earnings calls, and other materials to show it was outperforming its competitors. For example, in ARA's Q2 2017 earnings call, Wilcox explained that ARA's DSO for Q2 2017 was "38" and that it "remains relatively stable."

43.    ARA also publicized and touted its low and stable DSO, including that its DSO was consistently better than its two major competitors by wide margins of 25% to 45%. For example, in investor presentations published on the company website, in a section entitled "Strong and Consistent Cash Flow Generation," ARA touted that its "[r]evenue cycle capabilities lead to low DSOs."

44.    ARA also advertised its low DSO in marketing to potential physician partners. For example, in a presentation shown to potential partners in early 2017, ARA favorably compared its purported DSO of "39" to its two major competitors who had DSOs of "60" and "54":



45.    Thus, by claiming a low DSO, ARA had an advantage over its competitors when marketing to potential partners. And, by gaining more doctor-partners, ARA could show growth in the number of new clinics it operated, which was important to investors.

46.    Boucher knew that ARA promoted its DSO as being lower than its competitors, including to potential new doctor-partners, and that DSO was one of the key metrics that ARA disclosed in SEC filings and investor materials. Boucher believed that ARA's low DSO gave it a competitive advantage as compared to its competitors because, as he stated during his investigative testimony to the staff, "Doctors wanted to hear that the money is collected timely."

47.    Smith also knew that DSO was an important metric for ARA and was aware that DSO was published in ARA's SEC filings.

### *Consolidated DSO Versus Clinic DSO*

48.    ARA set up a system where clinic and consolidated DSO appeared to work at cross-purposes. At a consolidated level, a topside adjustment that increased ARA's revenue decreased its overall DSO. At a clinic level, a topside adjustment that increased revenue should have decreased that specific clinic's DSO. However, because the revenue portion of topside adjustments was excluded from the calculation of clinic-level DSO, those clinic-level calculations would show that a topside adjustment to a particular clinic that increased that clinic's revenue (and increased ARA's consolidated revenue) would *increase* the clinic's DSO but still would *decrease* the consolidated DSO.

### *RPT and Adjusted EBITDA-NCI Were Critical Metrics for ARA*

49.    Adjusted EBITDA-NCI was one of the most important financial metrics for ARA during the relevant period, and was one of the key metrics tracked by investment analysts who followed ARA's stock.

50.    RPT is another important financial metric in the dialysis services industry, measuring a company's revenue on a per-patient, per-treatment basis. Investors, market analysts, and doctor-partners closely monitored ARA's RPT. Analysts considered it a key metric in understanding the financial health and success of health care companies like ARA.

51.    During his investigative testimony with the SEC staff, Wilcox identified RPT and Adjusted EBITDA-NCI as some of the most important metrics for ARA's investors.

52.    In addition to its externally reported RPT, ARA closely tracked an internal core RPT, which excluded certain items, and was often referred to as "RPT w/o S&P." Wilcox, Boucher, and Smith were all involved in checking whether RPT w/o S&P was achieving internal budget predictions, and directed or caused revenue adjustments designed solely to make RPT w/o S&P equal the budgeted number. Even if RPT w/o S&P was not publicly reported, revenue adjustments made solely to achieve this internal number affected other publicly reported numbers, including Net Income and Adjusted EBITDA-NCI, as well as the publicly-reported, overall RPT.

**C.    Background on Wilcox, Boucher, and Smith and Their Responsibilities at ARA**

53.    Wilcox was ARA's CFO from April 2011 to September 2018. From January 1, 2017 through his resignation in September 2018, he was the ARA employee in charge of revenue recognition and topside adjustment decisions.

54.    As ARA's CFO, Wilcox was responsible during the relevant period for ensuring that revenue was reported accurately, that ARA's SEC filings were accurate and complete, that the accounting procedures were in accordance with GAAP, that ARA's books and records were accurate, and that internal accounting controls were operating effectively. Wilcox signed and certified many of the materially false and misleading periodic reports filed with the SEC.

55.    Boucher was ARA's Vice President of Finance from May 2011 to September 2018. He concurrently served as ARA's Chief Accounting Officer from May 2015 until March 2019, and he was ARA's CFO from October 2018 until March 2019, when he resigned at ARA's request. From January 1, 2017 through September 2018, Boucher had a senior decision-making role at ARA with respect to revenue recognition and topside adjustments, and he directed other employees to make accounting journal entries regarding these issues. In October and November 2018, Boucher was the ARA employee in charge of revenue recognition and topside adjustments decisions. Boucher signed at least two materially false and misleading SEC filings.

56.    As Chief Accounting Officer and later CFO, Boucher was responsible during the relevant period for overseeing accounting procedures, making sure that ARA's books and records followed GAAP, ensuring that the SEC filings were accurate and complete, and making sure that the accounting procedures were consistent with the procedures laid out in the company's internal controls.

57.    Smith was ARA's Controller from August 2009 until September 2018. She was then promoted to be ARA's Vice President of Finance from October 2018 to April 2019. During the relevant period, Smith had a managerial and decision-making role with respect to revenue recognition and topside adjustment decisions, and she directed other employees to make materially false and misleading accounting journal entries regarding these issues.

58.    As Controller and Vice-President of Finance, Smith's responsibilities during the relevant period included management of the general ledger, SEC financial reporting, revenue, and other accounting functions at ARA. She had oversight of the preparation of SEC documents and accuracy of reporting information and was responsible for accounting policies and the

application of GAAP to revenue recognition. She was responsible for ensuring that ARA's

financial reporting was in compliance with GAAP.

### D.    Background on ARA's Topside Accounting

#### *ARA's Stated Topside Accounting Methodology*

59.    As with other companies in the healthcare service industry, the people to whom

ARA provides a service are very rarely the parties paying for the service. ARA's payors include

Medicare, Medicaid, insurance companies, and other commercial payors. As these payors

generally do not pay the clinic's full billing rate for dialysis treatments, ARA is required to

record different amounts of revenue for each treatment. For Medicare, Medicaid, and insurance

companies with which ARA had a contract, this was a straightforward process, as there was a

pre-determined rate that ARA would receive for each treatment, and ARA could book revenue at

this known rate.

60.    For some commercial insurers, however, ARA did not have a contract and did not,

therefore, have an agreed upon rate. For these non-contracted commercial insurers, ARA used a

two-step process of initial revenue estimates (*i.e.*, "contractual allowances") and subsequent

adjustments (*i.e.*, "topside adjustments" or, colloquially, "topsides").

61.    ARA's stated methodology was to bill non-contracted commercial insurers at its

usual and customary rate, and then book the full amount of that rate as revenue.  ARA would

then simultaneously book an offsetting contractual allowance to reduce that revenue down to

what ARA estimated it would actually collect. This initial estimate was based primarily on

ARA's history with the insurance company, but could include other factors.

62.    Once ARA actually collected from the insurer, if the actual payment did not match the initial estimate, ARA's processes (and GAAP) called for it to make a revenue adjustment to true up the initial estimate to the amount actually collected.

63.    ARA's official stated methodology for determining topside adjustments, as described in the company's internal accounting controls, was based on a detailed patient-level analysis. ARA documented its internal accounting controls related to topside adjustments in a process narrative for revenue that was adopted in July 2016 (the "Revenue Controls"). As CFO, Wilcox was responsible for the adoption and implementation of these controls, and Boucher was a named process owner. As a process owner, Boucher reviewed the Revenue Controls for the purpose of verifying their accuracy. In her role as Controller, Smith was also responsible for ARA's accounting policies and the application of GAAP to revenue recognition.

64.    The Revenue Controls refer to topside adjustments as "True Ups" and read, in relevant part:

> 2.    True Ups
>     a.    A true up of the Contractual Allowance account is required when the estimated amount of revenue collected is different than the actual amount of revenue collected.  Management evaluates when an adjustment to the Contractual Allowance account is required by monitoring the Days Sales Outstanding (DSO) average.
>         i.    On average, ARA maintains a DSO average of 40 days.
>             1.    If the DSO is unusually high or low, the Revenue team is prompted to perform a Waterfall (aka Cash Tail) Analysis.
>             2.    The purpose of the Waterfall Analysis is to analyze the actual history of revenue received.
>             3.    The Waterfall Analysis is reviewed by the Chief Operating Officer to determine if a top side adjustment is needed.
>                 a.    If the COO determines an adjustment is needed to more accurately reflect revenue received, the Revenue team books a true up in Great Plains to GL account 551000.

65.    Under the Revenue Controls, ARA accounting personnel were to first examine DSO on a clinic-by-clinic basis and determine which clinics had DSOs that were unusually high or low compared to ARA's claimed typical DSO of "40." These "outlier" DSOs were not a sole reason to make topside adjustments, but were instead an indication of which clinics ARA should

16

examine on the patient-level, as they were more likely to need topside adjustments based on patient-level collection information. ARA's revenue group were to then perform a detailed analysis of patient-level collections (called a "waterfall") at these outlier clinics. The waterfall entailed looking at the payment history for each patient with a non-contracted commercial insurer and analyzing any over- or under-payments. If the patient-level data showed that a clinic had collected more (or less) cash than the revenue initially booked, this represented a potential positive (or negative) revenue adjustment, which ARA was to book as a topside adjustment through a journal entry in its general ledger. ARA's written policies did not provide that topside adjustments should be made based on DSO alone.

66.    Moreover, ARA's internal controls stated that "[a]ll journal entries require supporting documentation. Support for recurring and general journal entries resides on the Finance drive." Accordingly, all topside adjustments should have had supporting documentation that was maintained by ARA.

### *ARA's Actual Topside Process Prior to 2017*

67.    Prior to 2017, the Former COO was primarily responsible for revenue recognition, including making the initial contractual allowances and then determining whether any topside adjustments were necessary. The Former COO worked with ARA's accounts receivable department to analyze historical payments for the non-contracted insurers in order to determine the initial estimate for each treatment. This action does not allege fraudulent conduct during the period prior to the Former COO's resignation from ARA on December 31, 2016, though ARA's failure to devise and maintain a system of internal accounting controls, and the individual defendant's aiding and abetting of that, extend back to at least July 2016, if not earlier.

68.    ARA had a monthly closing process to determine final entries on its books and records for each month. At ARA, this typically took place in the first few weeks of the following

month (so the January close would take place in early to mid-February). Topside adjustments were typically made as part of the closing process. Prior to 2017, during the closing process, the Former COO would conduct a review to determine whether ARA should record topside adjustment for its clinics. The results of this review were only documented in the form of handwritten notes of what the topside adjustments should be, and did not include any supporting documentation of the analysis he performed that went into determining each topside adjustment. No one at ARA reviewed the Former COO's topside adjustments.

69.    The Former COO resigned from ARA on December 31, 2016, but he agreed to serve as a consultant to ARA for up to six months. For the topside adjustments for December 2016, Boucher emailed the Former COO on January 23, 2017 with a list of proposed topside adjustments (increasing total revenue by $3.15 million) that Boucher planned to book. The attached list of proposed topside adjustments included only positive topside adjustments, with a note for each that "Dso is below 40 days." This note indicated that Boucher based the revenue increases solely on DSO.

70.    For the topside adjustments for January 2017, Wilcox and Boucher asked the Former COO to propose topside adjustments, and he did so in a manner similar to what he had done previously—proposed handwritten topside adjustments that were emailed to Boucher on February 27, 2017.

71.    No one at ARA knew how the Former COO had determined topside adjustments or took sufficient efforts to determine this. Even during the later restatement process, ARA was unable to determine the specific details of how the Former COO had determined topside adjustments in 2016 and earlier.

72.    Throughout 2016, 2017, and 2018, Wilcox, Boucher, and Smith did not know how the Former COO had determined the topside adjustments when he was responsible for those adjustments.

## II.    The Topside Scheme in 2017 and 2018

### A.    Under Wilcox, Boucher, and Smith, ARA Manipulated Its Revenue to Hit a Predetermined Target for DSO

73.    Following the Former COO's resignation, Wilcox and Boucher took over primary responsibility for revenue recognition. Smith also became involved in the revenue recognition process and revenue recognition decisions at this time, and she had responsibility for supervising the revenue recognition manager hired by ARA a few months later.

### *Wilcox, Boucher, and Smith Did Not Know How*
### *Topside Adjustments Had Been Handled Previously*

74.    Wilcox and Boucher developed their own method and process for revenue recognition and topside adjustments. As Boucher explained in his sworn investigative testimony:

> Q:   Is it fair to say you kind of came up with your own method, but it was based on the materials you saw [the Former COO] asking for?
>
> A:   Yeah. It took me a period of time, but I developed my own process.
>
> Q:   And you're not aware of whether the process that you used is the process that [the Former COO] used?
>
> A:   Correct . . .

75.    Similarly, as Wilcox admitted to the SEC staff during the investigation, he also did not know how the Former COO determined the topside adjustments to input:

> Q:   And so [the Former COO] was responsible for determining the amount of the top-side adjustments?
>
> A:   Yes.
>
> Q:   How would he determine the amount of the top-side adjustments?

A:   I don't know.

Q:   Did DSO play a role in determining the amount of the top-side adjustments?

A:   For what period?

Q:   For [the Former COO]. Under [the Former COO].

A:   I don't know.

Q:   Was DSO one of the things that he looked at in determining the amount of top-side adjustments for a clinic?

A:   I don't know what [the Former COO] looked at.

76.   Wilcox and Boucher could have but did not sufficiently consult with the Former COO regarding this issue.

### Wilcox and Boucher Developed an Improper "Top-Down" System for Topside Adjustments

77.   Instead, Wilcox and Boucher developed their own system for topside adjustments, and their system was little more than a fraudulent scheme wherein Wilcox, Boucher, and Smith booked millions of dollars in topside adjustments that were not based on patient-level detail, but instead booked to meet predetermined financial metrics.

78.   The topside scheme developed by Wilcox and Boucher had three steps, which were undertaken on a monthly basis. First, Boucher made some initial topside adjustments on his own.

79.   Second, Wilcox and Boucher met and determined the "correct" amount of topside revenue to take for the company on a consolidated basis. This determination was made by "triangulating" between various metrics and deciding how much they should adjust revenue upward or downward. This "top-down" or "top consolidated" approach was not based on patient-level detail. There was no written explanation of this process, written support for the method, or documentation of the monthly determination. In his investigative testimony to the SEC staff, Wilcox explained these first two steps as follows:

20

So, Jason [Boucher] would make an estimate based on what I believe to be prior month's run rates or experience and so, he would already book topsides on his own. And then, when it came to me, Jason [Boucher] and I would book or calculate or figure out what the correct revenue was, we needed to book those topsides for.

80.    Third, Boucher, after deciding with Wilcox what the "correct" revenue figure was, then allocated the consolidated topside adjustment amount among ARA's various clinics by having Smith and junior personnel acting at her direction enter topside adjustments to equal what Wilcox and Boucher had determined ARA's revenue should be. In allocating the topside adjustments, Boucher and Smith examined the clinics' DSO, and if they were significantly higher or lower than "40," they assigned a revenue amount to those clinics to get their DSO closer to that target.

81.    According to Boucher's sworn testimony, Wilcox knew that Boucher was making DSO-based entries that did not have patient-level support. While not admitting that he knew Boucher's topside adjustments lacked patient-level support, even Wilcox has conceded that he did not know the basis, if any, for Boucher's entries. Wilcox was, therefore, at least reckless and/or negligent in failing to ascertain the bases for these adjustments to revenue.

82.    Wilcox and Boucher hid the fact that they were using this top-down approach from the Former CEO, who was not aware that Wilcox and Boucher used this approach until during the investigation that led to the Restatement.

83.    Wilcox and Boucher's decision to use this top-down approach, not based on any patient-level detail, was highly unreasonable and represented an extreme departure from the standards of ordinary care. The danger of misstating a company's financials when revenue is based only on consolidated-level analytics, rather than on actual patient-level information, was either known to them or so obvious that they must have been aware of it.

84.     Wilcox and Boucher failed to review or check information such as waterfall analyses containing actual patient-level detail that they had a duty to monitor. They also engaged in practices that contained obvious signs of fraud, as described above and below. Wilcox and Boucher knew, or were reckless or negligent in not knowing that this top-down approach would cause ARA to misstate its DSO, Net Income, Operating Income, Adjusted EBITDA-NCI and/or other important financial metrics in filings with the SEC and other statements to investors.

### B.     Wilcox, Boucher, and Smith Booked Topside Adjustments to Make it Appear ARA Had a DSO Near 40 and Did Not Base them on Patient-Level Support

#### *Wilcox, Boucher, and Smith All Directed Unsupported, Round-Number, Topside Adjustments*

85.     Throughout the relevant period, Wilcox, Boucher, and Smith made an effort to make it appear that ARA had a DSO at or near "40," at both the consolidated and clinic level. This target DSO number was the basis for many topside adjustments in 2017 and 2018.

86.     A significant number of topside adjustments in 2017 were made in round dollar amounts—typically in increments of $25,000—based solely on efforts to manipulate each clinics' DSO; they were not based upon examinations of actual collections or patient-level detail. The only support for many of these entries at the time that they were made was an entry in a spreadsheet noting that they were based on "DSO." This violated ARA's internal control that required supporting documentation for each journal entry.

87.     On October 27, 2017, an ARA employee sent Smith an updated version of ARA's monthly close process noting that as part of the monthly close, this employee would "do **DSO Adjustments** [and] [s]end to Jason [Boucher]/Karen [Smith] for review" (emphasis in original). The "DSO Adjustments" described in the monthly close process that were sent to Boucher and Smith to be reviewed were topside adjustments based solely on achieving a DSO near "40."

Smith also directed people who worked for her at ARA to make topside adjustments solely based on achieving this desired DSO, on both the clinic level and the consolidated level.

88.    As discussed above, ARA set up a system where clinic and consolidated DSO appeared to work at cross-purposes, because a topside adjustment to increase revenue simultaneously decreased *consolidated* DSO but made it appear that the relevant, affected *clinic's* DSO had increased. Nevertheless, Wilcox, Boucher, and Smith attempted to keep *both* consolidated DSO and individual clinic DSO near "40." This resulted in the Defendants taking unusual steps to perpetrate the topside scheme.

89.    For example, according to ARA's Revenue Controls, a clinic with a DSO significantly different from "40" should be examined to see if there were topside adjustments that should be taken. Logically, a clinic with a high DSO has many more days of unrecognized revenue than expected, and the payments to the clinic should be examined to see if additional revenue should be recognized. In contrast, a clinic with a low DSO has fewer days of unrecognized revenue than expected, and the revenue recorded should be examined to see whether it should be decreased.

90.    ARA's revenue recognition manager, at times, attempted to follow this procedure. For example, on April 11, 2018 he emailed Smith and suggested nine topside adjustments. Four of the adjustments called for recognizing additional revenue at clinics with DSOs higher than "40"; five of the adjustments called for reducing revenue at clinics with DSOs lower than "40." All of these adjustments were based on patient-level detail. In response, Smith countermanded his topside adjustments, instructing that two of the revenue increases should be eliminated saying "I would not book anything – why increase DSO," since the DSO was already above 40. She also ordered him to reduce two other positive topside adjustments at clinics with DSOs higher

than "40." For each of the five revenue decreases, Smith instructed "I would not book anything –
why decrease DSO," since each clinic already had a DSO below "40." Smith ignored the patient-
level detail that called for these adjustments. Below is an excerpt of a portion of the spreadsheet
attached to the email showing Smith directing the revenue recognition manager not to take the
identified adjustments:

| Acct. #<br>Description | Net Revenue | March Top-side | DSO | |
|---|---|---|---|---|
| Fort Valley | 129,027 | 4,914 | 116.55 | I would not book anything - why increase DSO |
| Fulton County | 1,142,385 | 882,026 | 95.41 | amount is to much $416k seems more reasonable |
| Athens, GA | 392,706 | 100,559 | 56.08 | I would not book anything - why increase DSO |
| Forest Park | 616,776 | 312,453 | 49.16 | amount seems to much 22k seems more reasonable |
| | | | | |
| Oakland | 15,417 | (11,629) | 11.76 | I would not book anything - why decrease DSO |
| Salisbury | 5,990 | (19,553) | 22.26 | I would not book anything - why decrease DSO |
| Sebastian | 63,533 | (44,307) | 26.60 | I would not book anything - why decrease DSO |
| Delano | 102,835 | (11,147) | 27.05 | I would not book anything - why decrease DSO |
| Cape Coral | 38,324 | (1,684) | 31.20 | I would not book anything - why decrease DSO |

91.    In his investigative testimony, while denying that ARA made accounting
adjustments in order to achieve a specific DSO number, Wilcox admitted that targeting a specific
DSO was wrong:

Q:    Mr. Wilcox, would it have been incorrect to target DSO of 40?

A:    It would have incorrect to have any targets. The business did what it did.

Q:    Explain why that is.

A:    The revenue and cash -- because DSO is an end result. DSO is AR divided
revenue in days. So, if the AR and revenue is what it is, then the DSO is what it
is. So, if the AR is correct and the revenue is correct, then the DSO is what it is.

92.    Wilcox also admitted in his testimony that making an entry to target a specific
metric violated ARA's internal controls: "If someone was making a target and making an entry
to get to a target versus understanding the business and making those entries then, yes. It would
have been a violation of the controls. Internal controls."

93.    But targeting DSO is what Defendants did, as Smith admitted to the SEC staff:

Q:    And so you continued to use a target of DSO at 40 in looking for topsides?

A:    Yes.

94.    Wilcox knew it was wrong to base a topside solely on the DSO of a clinic, but Smith admitted that is precisely what ARA did.

95.    At times in 2017, Boucher asked members of the finance group to create patient-level analyses—called "waterfalls"—to support some of the topside adjustments that had already been made to achieve certain DSO targets. Boucher, however, did nothing to verify that such post-hoc waterfalls were actually created or that any such reconciliation of the waterfalls' results were undertaken. Many, if not most, of the topside adjustments recognized in 2017 did not have any patient-level waterfall support, either when they were made or after the fact. Thus, not only did Boucher fail to adhere to the proper system of basing topside adjustments on patient-level detail, he also failed to even verify the entries with patient-level detail after the fact. And he violated ARA's internal control requiring supporting documentation for journal entries.

96.    From January 2017 to July 2017, ARA regularly made significant amounts of round-dollar adjustments to revenue based on their DSO target and other financial metrics. In each month, the net effect of these round-dollar adjustments was to increase revenue by more than $1,000,000, and sometimes more than $2,700,000. Across this seven-month period, these adjustments increased ARA's reported revenue by more than $9,500,000.

97.    Boucher was aware of the continued use of round-dollar adjustments: on September 15, 2017, Boucher sent an email to Smith and others attaching a spreadsheet that included numerous round-dollar adjustments.

98.    Wilcox personally directed specific topside adjustments in order to achieve certain DSO targets. For example, on June 27, 2017, he emailed Smith and another ARA employee and

25

directed "Please book a $200,000 top-side to [the] Hazleton [clinic] and $125,000 top-side to [the] Lakewood [clinic]. DSO is too low there." Smith knew that Wilcox's request was a violation of ARA's internal controls, but she did not do anything to correct or address that violation.

### The Topside Adjustments Targeted a DSO of "40," but "40" Was Not ARA's Average Historical DSO

99.   Contrary to the statement in the Revenue Controls, ARA did not have a historical average DSO of 40. ARA's S-1 and Amended S-1s, filed with the SEC in connection with its April 2016 Initial Public Offering, show that ARA's historical DSO was not "40," but in fact fluctuated between "40" and "48" from 2012 to 2015. Wilcox, Boucher, and Smith knew, or were reckless or negligent in not knowing, that ARA's historical DSO was not "40."

### C.   The Defendants Adopted Other Improper Practices in the Topside Scheme

100.   In addition to recognizing topside adjustments discussed above, ARA, Wilcox, Boucher, and Smith employed a number of other improper accounting practices as part of this topside scheme. This included a) banking identified topside adjustments for use in future quarters, b) spreading out topside adjustments across multiple months, including across different quarters, and c) finding and/or creating offsetting topside adjustments between clinics in order to have a net zero effect on overall revenue and DSO.

101.   During the SEC's investigation, Smith admitted that there were occasions in which identified topside adjustments were not taken in the month identified. On at least one occasion, Wilcox asked Smith not to record identified revenue without providing a reason, and Smith did as instructed.

102.   There was also a practice at ARA of booking a topside adjustment at one clinic and then booking an offsetting adjustment for another clinic. For example, on June 2, 2017, Boucher

emailed an ARA employee and directed: "Can you please book $50k a month for the next 4 months for each clinic (North Main and Central Columbia) one increase one decrease."

103.  In another example, on June 14, 2017, an ARA employee informed Boucher that there was $1.4 million in identified topside adjustments at one clinic, but Boucher instructed that ARA should only book $500,000 of it.

104.  Wilcox, as CFO and a CPA, knew, or was reckless or negligent in not knowing that the practices described above were improper.

105.  Boucher understood that revenue must be timely recorded in the period it is identified. Thus, Boucher knew, or was reckless or negligent in not knowing, that the practices described above were improper.

106.  Smith also understood that revenue must be timely recorded in the period it is identified. Thus, Smith also knew, or was reckless or negligent in not knowing that the practices described above were improper.

### D.    The Topside Scheme Expands to Include a Revenue "Cookie Jar"

107.  Over the course of 2017-2018, ARA's topside adjustment process evolved, but improper accounting practices persisted. In the spring of 2017, ARA hired a revenue recognition manager. The revenue recognition manager reported to Smith, who reported to Boucher. For some matters, the revenue recognition manager worked directly with Boucher and was trained by Boucher on the process of booking topside adjustments based upon targeting DSO.

#### *The "Contractual Adjustments" Spreadsheet*

108.  Under the revenue recognition manager, the revenue group began to prepare more patient-level waterfall analyses, and some topside adjustments were based on specific patient over- or under-payments identified by such analyses.

109.  However, ARA continued to target a DSO near "40" and typically only booked enough topside adjustments to get DSO close to target both on a company-wide basis and for individual clinics. Thus, over- and under-payments were identified by the revenue recognition manager in the waterfall process, but they were not recorded as topside adjustments. Additionally, Boucher and Smith also continued to instruct the revenue recognition manager to book topside adjustments, again in $25,000 increments, that were not based upon any actual patient-level analysis in order to achieve the target DSO for the given clinic.

110.  In the fall of 2017, in an effort to more efficiently identify over and under-collections across all clinics and to respond to Boucher and Smith's requests to identify topside adjustments in order to achieve the target DSO for the company, the revenue recognition manager created an Excel spreadsheet called "Contractual Adjustments." The Contractual Adjustments spreadsheet was used to track all patient-level over- and under-collections that had been identified (and confirmed as appropriate for recognition), as well as whether they had or had not yet been booked by ARA as topside adjustments.

111.  Over time, the amount of over- and under-collections identified but not yet booked continued to increase, and the spreadsheet acted as a "cookie jar" from which ARA could find topside revenue when needed. As of July 2018, ARA had identified $35.7 million in net over-collections related to services performed in Q2 2018 or earlier, but had only recorded $29.6 million by the end of Q2 2018. The remaining $6.1 million, comprised of $10.2 million in un-booked over-collections and $4.1 million in un-booked under-collections, was carried forward into future quarters by means of the cookie jar Contractual Adjustments spreadsheet.

***Boucher and Smith Directed Which Topside Adjustments***
***ARA Should Book from the Cookie Jar***

112.  On a monthly basis, the revenue recognition manager reviewed patient cash collections and added the significant over- and under-collections to the cookie jar spreadsheet. He then reached out to ARA's accounts receivable department to determine whether ARA expected to be able to keep the overpayments and whether ARA expected to be able to collect any more cash for the underpayments—*i.e.*, whether each over- or under-payment should be recorded as a topside. However, in accordance with the instruction to target a particular DSO, the revenue recognition manager would propose to Smith and Boucher that ARA book only particular adjustments from the cookie jar that aligned with that goal.

113.  Smith or Boucher reviewed these proposals and made the final decisions as to which adjustments to book. These topside adjustments were then marked off in the cookie jar spreadsheet as booked, leaving an ongoing list of unbooked over- and under-collections for future use. Boucher also continued to request, at times, that additional topside adjustments be booked, which were not tied to particular patient payments and were typically in $25,000 increments, in order to bring DSO closer to "40.' These *ad hoc* adjustments were also tracked on the cookie jar spreadsheet.

114.  ARA, by and through Boucher and Smith, continued to use the Contractual Adjustments spreadsheet to spread identified revenue across multiple months. For example in November 2017, the revenue recognition manager highlighted to Smith that "You can tell the adjustment is spread over 3 months because the 'Month Booked' column (column J) has 10, 11, 12," referring to the fact that a particular topside adjustment was spread over October, November and December.

115.  The April 11, 2018 email exchange between the revenue recognition manager and Smith, discussed above, is indicative of the way ARA improperly used the cookie jar. The revenue recognition manager suggested nine topside adjustments based on patient-level detail. In response, Smith explained that after reviewing the revenue adjustments proposed from the cookie jar, she wanted certain of the adjustments reversed out--*i.e.*, not booked but instead held for future use, because of the negative effect booking the adjustments would have on DSO.

116.  In another example, an August 18, 2018 email between Smith, Boucher and another ARA employee regarding closing out the books for July 2018 discusses topside adjustments that had been identified for a particular clinic but not taken. The other ARA employee wrote: "All but 25K of it was taken in April. I'm suggesting to not take the 25K this month, and I can look into it for August and see if I can take the full adjustment then. Are you okay with this, rather than having adjustments span multiple months?" Boucher and Smith agreed, and ARA spread the identified revenue across two quarters.

117.  In that same August 18, 2018 email chain, Boucher instructed Smith and the other ARA employee to hold off on booking identified topside adjustments as revenue. As Smith explained in her sworn testimony during the SEC's investigation, this instruction violated GAAP:

> Q:  So Jason Boucher was asking for the proposed amount of topside to be decreased because of the effect that it would have on DSO?
>
> A:  That's what it looks like from what I see here.
>
> Q:  And this was after revenue had already been identified and confirmed and proposed at topside that should be taken?
>
> A:  I believe so.
>
> Q:  Do you believe that that's compliant with GAAP?
>
> A:  No.

Q:   What would happen to the revenue in the yellow -- what would happen to the revenue remaining that had been identified here but was not taken at Jason [Boucher]'s request?

A:   I don't recall.

Q:   Wouldn't that revenue be treated as unbooked revenue that could be taken at a later time?

A:   Yeah, it could.

118.  All of these practices with respect to the cookie jar violated ARA's then-existing internal controls, as described in the Revenue Controls. The use of a cookie jar to take or hold back revenue is at odds with the Revenue Controls' required procedures.

**E.    The Topside Scheme Expands Again to Include Targeting RPT**

119.  Beginning in the spring of 2018, ARA, Wilcox, Boucher, and Smith used ARA's improper topside process not just to target DSO, but also to achieve a specific target for consolidated RPT.

120.  Like many companies, ARA had a budget that established various goals for different financial metrics for each quarter and year.

121.  During the relevant period, Wilcox was primarily responsible for developing the budget, which was then approved by other ARA senior leadership and ARA's Board of Directors.

122.  ARA's budget included a budget for RPT in both 2017 and 2018. This RPT budget was based in part of actual performance for the prior year and in part on other factors.

123.  Wilcox tracked ARA's performance versus budget, including its RPT budget.

124.  Shifts in ARA's patient base over time resulted in a larger percentage of ARA's patient base using lower-paying in-network and managed care coverage, as opposed to higher-

paying out-of-network commercial coverage. As a result, by 2018, ARA's management was particularly concerned about ARA's RPT dropping.

125.  Also in or around 2018, Medicare and Medicaid changed how they paid for two medications used in connection with dialysis treatments, which also affected ARA's RPT. Because of this change, personnel at ARA often focused the internal core RPT figure, which excluded those two drugs, sometimes referring to this metric as "RPT w/o S&P" ("S&P" referring to the names of the drugs).

126.  As Smith testified during the SEC's investigation, ARA used the budget RPT as the basis for making certain topside adjustments:

> Q:    And did you also continue to target budget RPT in determining topsides to take as well?
>
> A:    I believe so, yes.

127.  And, in an email to another ARA employee on October 17, 2018, regarding revenue comments from Boucher, Smith complained that Boucher "changed the story on me a few times over this year, so it's been frustrating…..first it was trying to meet budget RPT w/o S&P (he will not admit this) along with DSO."

### *Boucher and Smith Direct ARA Employees to "Find" More Revenue*

128.  Boucher knew that ARA used RPT, or RPT w/o S&P, as a targeted metric in the topside adjustment process in May 2018. In mid-May 2018, Boucher instructed Smith to find enough revenue in topside adjustments to achieve ARA's budgeted RPT w/o S&P, which Smith calculated would require finding $3 million in topside adjustments. On the afternoon of May 10, 2018, the revenue recognition manager emailed Smith that he had identified $1.8 million in topside adjustments under their standard DSO targeting approach. In response, Smith emailed the revenue recognition manager, "Can you please find another $1-1.2m in topside?"

129.  Smith knew that to "find" this additional revenue, the revenue recognition manager would have to conduct a manipulated review where he examined payments at clinics that were likely to show revenue increases and ignored payments at clinics that were likely to show revenue decreases.

130.  Alarmed at the request to find a specific amount of additional revenue without any accounting basis, the revenue recognition manager asked Smith to confirm that he correctly understood her request. Smith expressed anger about the revenue recognition manager's questioning her directive and his reluctance to fulfill the request. Fearful for his job, the revenue recognition manager used the Contractual Adjustment cookie jar to find another $1.2 million in revenue through topside adjustments.

131.  Later that night, Smith informed Boucher by email that they had the $3.0 million in topside needed to reach ARA's budgeted RPT w/o S&P, and noted that they "could backoff $0.2m if you wanted" while still achieving this metric. ARA's financial records show that Boucher and Smith did, in fact, "back-off" approximately $95,000, thereby meeting the budget RPT w/o S&P goal with an extra approximately $100,000 in revenue remaining in the cookie jar for future use.

132.  Eight days after questioning the request to "find" more revenue, the revenue recognition manager was fired.

133.  After the revenue recognition manager was fired, and through at least August 2018, the finance group continued, at Boucher and Smith's direction, and under Wilcox's watch, to search for revenue to book as topside adjustments in order to achieve a target DSO and budget RPT w/o S&P.

134.  By July and August 2018, ARA had patient-level information to support its revenue adjustments and reported this in its SEC filing for the third quarter of 2018. Nevertheless, ARA, principally through Boucher and Smith continued to take a "top-down" approach by using a target RPT w/o S&P to determine the amount topside adjustments to make. Boucher knew, or was reckless or negligent in not knowing that, this approach violated GAAP and would result in ARA reporting inaccurate and misleading financial numbers in its SEC filings and elsewhere.

135.  Smith never questioned the process of targeting budget RPT w/o S&P for topside adjustments, nor asked why the practice was being adopted. Over time, Smith found it difficult to identify as much revenue through topside adjustments as was required to meet the target RPT w/o S&P, and became frustrated by the adjustments needed to find revenue—in some months totaling several million dollars in additional revenue. Still, she never questioned the decision to target RPT w/o S&P. Smith knew, or was reckless or negligent in not knowing that, this approach violated GAAP and would result in ARA reporting inaccurate and misleading financial numbers in its SEC filings and elsewhere.

136.  Although RPT w/o S&P was not publicly reported by ARA, overall RPT was reported. The Restatement shows that the scheme to manage RPT w/o S&P affected overall RPT, as the Restatement included new figures for ARA's RPT in Q2 2018, decreasing from $379 to $359, a 5.6% decrease, and Q3 2018 decreasing from $364 to $355, a 2.5% decrease.

### Wilcox, Boucher, and Smith Drove a Radical Increase in ARA's Use of Topside Adjustments

137.  Although ARA had used topside adjustments for many years (and GAAP required the use of some topside adjustments), the net amount of topside adjustments, both as a total and as a percentage of ARA's Net Income, greatly increased when Wilcox, Boucher, and Smith took over responsibility for topside adjustments in 2017, and again in 2018.

34

138.  As the chart below shows, as a percentage of Net Income, ARA's topside adjustments in 2017 were more than double the highest figure from the preceding three years, and more than triple the historical average over that same period. The 2018 topside adjustments were larger still. Moreover, the topside adjustments in 2017 and 2018 were not just larger than the preceding years as a percentage of Net Income, they were also larger as raw totals. For example, the average total topside adjustments for 2014 through 2016 was approximately $7.6 million. The 2018 topside adjustments were $31,609,292, more than four times that amount— and only represented the three quarters of adjustments before ARA began to investigate and halt this practice following an inquiry from the SEC.

| | Total Net Topside Adjustment | Net Topside Adjustment as % of ARA's Reported Net Income | Net Topside Adjustment as % of ARA's Restated Net Income |
|---|---|---|---|
| 2014 | $6,290,000 | 7.63% | 7.61% |
| 2015 | $2,550,000 | 2.74% | 2.66% |
| 2016 | $14,011,429 | 15.89% | 13.78% |
| 2017 | $25,141,210 | 33.22% | 43.25% |
| Q1-Q3 2018 | $31,609,292 | 92.20% | 279.90% |

***Wilcox and Boucher Failed to Correct a Significant Deficiency
Related to the Topside Scheme***

139.  Additionally, although ARA publicly touted its competitively low DSO and its effective revenue cycle management, billing, and collection, in actuality ARA had a significant number of old uncollected receivables for years, reflecting failures in its billing, collection, and revenue cycle management. The Audit Firm had identified ARA's failure to resolve this large amount of older receivables as a significant internal control deficiency since at least 2011 and continued to identify it as a deficiency every year through 2018. The Audit Firm also warned ARA every year that the volume and value of these uncollected old receivables increased the risk of misstating revenue. Wilcox and Boucher were aware of this deficiency and that it remained

unremediated through 2018. Their failure to remediate this deficiency is further evidence of their intent, recklessness and/or negligence with respect to misstating ARA's financial information.

### F.    Wilcox, Boucher, and Smith Concealed the Topside Scheme from the Audit Firm.

140.    In order to prevent discovery of ARA's improper accounting practices, Wilcox, Boucher, and Smith misled the Audit Firm regarding the topside scheme.

### *Wilcox, Boucher, and Smith Failed to Disclose Their Topside Adjustment Practices to the Audit Firm*

141.    ARA, Wilcox, Boucher, and Smith never disclosed to the Audit Firm the process by which Wilcox and Boucher determined a consolidated topside amount and then allocated topside adjustments to individual clinics based on their DSO target. Instead, ARA finance department personnel represented to the Audit Firm that ARA performed a detailed patient- or payor-level analysis of cash collections before making a topside adjustment. Wilcox, Boucher, and Smith took no efforts to ensure that the Audit Firm had a proper understanding of ARA's topside process; in fact, they actively concealed it.

142.    ARA represented in its internal documents and to the Audit Firm that DSO was only used in the topside adjustment process to determine clinics for which it would conduct a further detailed cash collections analysis and that the topside adjustments were based solely on the results of this detailed analysis. Smith knew that ARA provided the Audit Firm with the Revenue Controls procedure, but Smith also knew that the Revenue Controls did not accurately describe the actual method that ARA used for topside adjustments, at least for the large portion of topside adjustments in 2017 that were designed to manage DSO and had no patient support. Similarly, Boucher never told the Audit Firm that ARA was using a process for topside entries that was not based on patient-level information, and despite being the process owner for the Revenue Controls procedure, he did not take sufficient steps to ensure it was accurate. Also,

Wilcox never told the Audit Firm about his top-down method of determining ARA's topside

adjustments, and did not take sufficient efforts to ensure that his top-down method was reflected

in the Revenue Controls or any other documents provided to the Audit Firm.

143.  Likewise, ARA, Wilcox, Boucher, and Smith never disclosed to the Audit Firm the

practices of targeting budget RPT in making topside adjustments, banking revenue in a cookie

jar spreadsheet, spreading out revenue over months or quarters, or finding or creating offsetting

topside entries.

### *Boucher and Smith Manufactured False and Misleading Supporting Documents in Response to an Audit Request About Topside Adjustments*

144.  Additionally, when the Audit Firm conducted testing of topside journal entries as

part of its 2017 audit, ARA, principally through Boucher and Smith, created false and misleading

support for many of these journal entries in order to mislead the Audit Firm that there was, in

fact, patient-level support for every adjustment.

145.  As part of its audit of ARA's 2017 financial statements, in January 2018, the Audit

Firm sent to Smith and the revenue recognition manager a list of topside adjustments that they

wanted to "test." The Audit Firm intended to examine the contemporaneous documentary

support that ARA had for these topside adjustments. This audit request consisted of a list of 37

"credit" (or revenue increase) topside adjustments ranging in amounts from $25,000 to $700,000

and 17 "debit" (or revenue decrease) topside adjustments ranging in amounts from $2,717 to

$750,000. Boucher understood that the Audit Firm was looking for detailed support including

patient-level information and/or information with patient dates of service.

146.  Smith and Boucher instructed the revenue recognition manager and his team to

locate the support for each of the selected journal entries. However, for many of the selected

entries, the topside adjustment had been made in order to hit the DSO target, and thus the only

supporting documents were handwritten notes or lists, which merely documented the topside

adjustment to book but provided no details or information supporting the topside adjustment.

Smith and Boucher instructed their staff to withhold from the Audit Firm these handwritten notes

and lists of topside adjustment amounts and to instead manufacture patient-level support for the

topside adjustments. Smith and Boucher knew that the patient-level support they asked their staff

to create did not exist at the time that the topside adjustments were made. Smith and Boucher

also knew that the handwritten notes and other withheld documents were the actual,

contemporaneous support for the topside adjustments.

147.  At least two of the "credit" selections and one of the "debit" selections related to the

January 2017 close and were supported only by the handwritten notes of the Former COO.

148.  The handwritten notes should have been turned over, as Wilcox admitted during the

SEC's investigation: "If I were to assume that was the only support that was provided for the

entry at the time the entry was booked, then that is -- that handwritten entry is what had -- is

what should be, at a minimum, provided to the auditors."

### *The Support Was Not Only Post Hoc, But Fake*

149.  Smith and Boucher did not tell the Audit Firm that they ordered ARA employees to

create support for journal entries that did not exist when the Audit Firm made the request.

150.  Worse still, as explained in detail below, the support that Boucher and Smith had

the revenue recognition manager and his team create was not just after-the-fact; in many

instances they had no way of knowing whether the patient-level detail being provided was

actually what the topside adjustments had been based on. Stated another way, Boucher and Smith

directed their staff to manufacture fake support to make it appear that ARA had based certain

topside adjustments on patient-level data when, in fact, that data had not been the basis for those topside adjustments.

151.  After identifying all the selected journal entries for which ARA lacked support, Smith and Boucher directed their staff to prepare retroactive waterfalls for each clinic. These backward-looking waterfalls identified patient-level under- and over- payments at the time the journal entry was made. However, in many instances, the identified patient-level over- and under-payments did not add up to the journal entry that had been recorded. Thus, Smith and Boucher instructed their staff to cherry-pick a sub-set of the identified patient-level over- or under-payments to get as close as possible to the amount of the journal entry that had been recorded months earlier.

152.  After reviewing the adjustments for which the Audit Firm wanted support, the revenue recognition manager noted the difficulties ARA would have in providing support for some of them. He emailed Smith on February 1, 2018, and listed the following problems, identifying the selections by their numbering on the audit request:

> Credit Selection #s:
> - 6 – adj was March, had waterfall for June but no real way to get to $25k, which was clearly a DSO entry
> - 7 – adj was March, had waterfall for March, but no real way to get to $25k, which was clearly a DSO entry
> - 11 – no waterfall done for all of 2017
> - 16 – no waterfall done for all of 2017

153.  Thus, for the Audit Firm's sixth request, which was a March 2017 topside adjustment that increased revenue by $25,000, the topside adjustment was based solely on DSO at the time it was made. ARA did subsequently look for patient-level detail in June (which was in the following quarter), but that patient-level detail did not actually support the topside adjustment that had been made. Accordingly, Smith and Boucher directed the revenue recognition manager

to create fake support for this topside adjustment to conceal the topside scheme from the Audit

Firm, the Former CEO, ARA's Board of Directors, ARA's Audit Committee, and investors.

154.  Similarly, the Audit Firm's seventh request was a March 2017 topside adjustment

that increased revenue by $25,000 and was based solely on DSO. While ARA, principally

directed by Smith and Boucher, compiled patient-level detail at the time, that detail did not

support the topside adjustment. Accordingly, Smith and Boucher directed the revenue

recognition manager to create fake support for this topside adjustment to conceal the topside

scheme from the Audit Firm, the Former CEO, ARA's Board of Directors, ARA's Audit

Committee, and investors.

155.  For the 11th and 16th selections, which were $225,000 and $175,000 increases to

revenue, there was simply no support to be found. So Smith and Boucher directed the revenue

recognition manager to create fake support that could be provided to the Audit Firm.

156.  Boucher and Smith did not care whether or not the patient-level support

subsequently located by the revenue recognition manager was the actual basis for the selected

topside adjustments, as long as the amounts added up to be close enough that they could

convince the Audit Firm that it was the support. In fact, many of the entries were originally made

by Boucher, and he was well aware there was no patient-level support at the time of the entry.

For other entries, which were suggested by the Former COO when Boucher and Wilcox

consulted with him in early 2017, Smith has admitted that she and Boucher simply speculated

about the possible basis for the entries:

> Q:   So when the support is being created for [the Audit Firm], it's not just being
> created after the fact. People are just taking guesses at what [the Former COO]
> might have looked like; is that fair?
>
> A:   Yeah, we were taking a shot at like he may have been looking at this.

157.  When compiling the fake support, the revenue recognition manager (and other junior ARA employees working at his direction) were instructed to cherry-pick patient data until they were able to come up with a total that came as close to the DSO-based number as possible. Since they could not actually equal the round-number DSO-based adjustments, even when using the cherry-picked data, they described any differences as "various immaterial amounts" to conceal from the Audit Firm the fact that this support was created after the fact and based on cherry-picked data.

158.  After Boucher and Smith reviewed and finalized the purported support, Boucher asked Smith to do a final review of the support and send it to the Audit Firm. Smith sent the information in Excel spreadsheets to the Audit Firm. Boucher and Smith did not inform the Audit Firm that the purported support did not exist at the time the journal entries were made and was manufactured in response to the Audit Firm's requests. Importantly, this was not just an after-the-fact cover-up. The topside scheme was still ongoing, and the manufacture of these fake documents was a critical part of enabling the scheme to continue on a going-forward basis.

159.  Boucher has admitted that he understood that the Audit Firm would have wanted to know that they were creating documents that did not exist in order to provide support for the audit. Indeed, compiling after-the-fact support based on cherry-picked data and providing it to auditors as though it were the actual, contemporaneous support for accounting decisions hampers auditors' ability to perform a meaningful audit.

160.  The manufactured support provided to the Audit Firm included the statement "Originally based on analytics - built better processes through out [sic] the year and add patient details." This confusing and oblique statement, if intended to alert the Audit Firm that the document and support in it were manufactured in response to their audit request, was utterly

insufficient to do so. And it failed to do so. This language failed to inform the senior manager from the Audit Firm or any other persons working on the audit of ARA that the documents had been created in the manner described above. Rather, the Audit Firm personnel understood during the relevant period, based on the Revenue Controls (and explanations provided to them in walk-throughs that were consistent with the Revenue Controls), that ARA based topside adjustments on patient-level detail.

161.  Even if Smith or Boucher had specifically told the Audit Firm how they had created the support, it still would have been improper for Boucher and Smith to provide this fake support. One of the purposes of an audit is to assure investors that a company's financials are sound. Executives at a company agreeing or conspiring with an auditor to use fake support in place of the insufficient actual support results in an audit that cannot properly give such assurances to investors.

162.  Smith admitted in her sworn testimony that it is not correct for a company to create fake support in response to a request from its auditors, and further admitted:

> Q:   Yeah. Even if [the Audit Firm] knew about the handwritten spreadsheets from [the Former COO], don't you think that ARA investors would want to know that in response to a request from its auditors, ARA had to create support that didn't exist?
>
> A:   I guess so.

### Wilcox, Boucher, and Smith Misled the Audit Firm in Management Representation Letters

163.  For every quarterly review and annual audit that the Audit Firm performed for ARA, ARA submitted a management representation letter. The purpose of these letters was for management to affirm certain representations made by ARA to the Audit Firm. The Audit Firm relied on the accuracy of these management representation letters as part of its audit responsibilities for ARA.

42

164.  ARA management submitted management representation letters to the Audit Firm on March 8, 2017, May 9, 2017, August 8, 2017, November 14, 2017, March 6, 2018, May 8, 2018, August 7, 2018, and November 9, 2018.

165.  Boucher signed each of these letters. Wilcox also signed each of these letters except the November 9, 2018 letter, which Smith signed.

166.  Each of these letters represented that ARA management had provided the Audit Firm with "access to all information of which we are aware that is relevant to the preparation and fair presentation of the consolidated financial statements, including all financial records and related data, documentation of internal control over financial reporting, and related information."

167.  This representation was false because ARA, by and through the individual defendants, did not inform the Audit Firm about their actual method for determining topside adjustments, described above. This representation was also false as to the 2018 letters because, in connection with the 2017 year-end audit in early 2018, Boucher and Smith did not provide the actual (albeit insufficient) support for topside entries and did not inform the Audit Firm that they had directed accounting personnel to manufacture support for the entries after the fact. Boucher and Smith knew the representation was false, because they understood ARA's actual topside adjustment process and that they had not provided the Audit Firm with access to the actual topside support but had, instead, commissioned its creation after the fact.

168.  Each of these letters also falsely represented that "there are no material transactions that have not been properly recorded in the accounting records underlying the consolidated financial statements."

169.  Again, the topside scheme described above led to transactions not being properly recorded, which had a material impact on ARA's financial statements. Wilcox, Boucher, and

Smith knew this representation was false because they knew that ARA's methodology led to transactions being improperly recorded in ARA's accounting records—indeed, that was the entire point of their scheme.

170.  Each of these letters also falsely represented that the "methods and significant assumptions used in making accounting estimates, including those measured at fair value, are reasonable, consistently applied, and result in a measurement appropriate for financial statement and disclosure purposes."

171.  The methods and assumptions for determining topside adjustments were not reasonable, consistently applied or appropriate, as described above. Wilcox, Boucher, and Smith knew this representation was false because they knew the methods and assumptions they were using, including targeting specific DSO and, later, RPT numbers, were not based on any analysis of whether those targets were reasonable or appropriate.

## III.    The Impact of the Topside Scheme

### A.    ARA's Restatement and Financial Impact of the Topside Scheme

172.  In October 2018, ARA's Audit Committee commenced an internal investigation into its revenue recognition methodology and related accounting matters. The company delayed the filing of its 2018 10-K, and on March 27, 2019, it announced that its financial statements and other financial data for 2014-September 2018 were not prepared in accordance with GAAP and "should be restated and should no longer be relied upon."  It also announced the resignation of Boucher and the appointment of an interim CFO. Shortly thereafter, Smith also resigned.

173.  On September 5, 2019, ARA filed its 2018 10-K and restated financial information showing material changes in almost every financial metric, including DSO, revenues, income and Adjusted EBIDTA-NCI. On that same date, ARA also filed a Form 8-K with the SEC, which attached a press release announcing that ARA had restated its financials.

174.  The Restatement admitted that ARA had not followed GAAP with respect to topside adjustments: "in recording revenue based on expected payments from third-party payors during the Restated Periods, we did not appropriately reconcile contractual allowance estimates for discounts and price concessions with cash subsequently received in respect of prior period patient claims."

175.  The Restatement further admitted that ARA had not based topside adjustments on patient-level details: "Our methodology for reserving for contractual allowances did not reconcile revenue and accounts receivable to our collection experience and actual cash collections."

176.  The Restatement also admitted that ARA had material weaknesses in its internal controls, and explained that there were internal control failures regarding revenue recognition:

> We did not maintain an effective control environment in connection with the revenue recognition process . . . and review and approval of journal entries. As our Company grew, this was evidenced by our failure to: (i)(a) invest in, prioritize and support an adequate environment of controls, (b) establish and support adequate controls relating to compliance with appropriate accounting policies and procedures, and (c) implement controls that were adequately designed and operating effectively, thereby enabling our preparation of financial statements to be in accordance with GAAP; and (ii) employ personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with the increasing size of the entity and nature and complexity of our financial reporting requirements.

177.  The Restatement also admitted material weaknesses in internal controls regarding journal entry support:

> We did not maintain effective internal control over the review and approval of journal entries. Specifically, our internal controls over journal entries were not operating effectively to ensure that journal entries included appropriate underlying supporting documentation to ensure the validity, accuracy, and completeness of recorded amounts.

178.  And the Restatement admitted material weaknesses in internal controls regarding monitoring controls and compliance:

We did not design and maintain effective monitoring controls over compliance with established accounting policies, procedures and controls related to: revenue recognition (including accounting for accounts receivable and related reserves and amounts due to payors);

179.  ARA's restated DSO numbers were uniformly higher than originally reported and much closer in line with, or worse than, its competitors for the time period 2017-2018:

|  | ARA DSO as Reported | ARA DSO as Restated | Percent Understated | [Competitor 1] DSO | [Competitor 2] DSO |
|---|---|---|---|---|---|
| 2017 Q1 | 39 | 64 | 39.06% | 54 | 60 |
| 2017 Q2 | 38 | 60 | 36.67% | 56 | 50 |
| 2017 Q3 | 39 | 59 | 33.90% | 60 | 52 |
| 2017 Q4 | 37 | 55 | 32.73% | 57 | 59 |
| 2018 Q1 | 40 | 53 | 24.53% | 59 | 73 |
| 2018 Q2 | 38 | 46 | 17.39% | 59 | 66 |
| 2018 Q3 | 40 | 44 | 9.09% | 61 | 60 |

180.  The Restatement included new figures for ARA's RPT in Q2 2018, decreasing from $379 to $359 (a 5.6% decrease), and Q3 2018 decreasing from $364 to $355 (a 2.5% decrease).

181.  The Restatement also included new annual figures for operating income, net income and Adjusted EBIDTA-NCI, among other, that were materially worse than previously reported:

| (in thousands) | Reported | Restated | Percent Overstated |
|---|---|---|---|
| **2017 Operating Income** | $106,458 | $90,208 | 18.01% |
| **2017 Net Income** | $75,683 | $58,136 | 30.18% |
| **2017 Adjusted EBITDA - NCI** | $105,531 | $98,126 | 7.55% |
|  |  |  |  |
| **YTD Sept-2018 Operating Income** | $58,901 | $32,373 | 81.94% |
| **YTD Sept-2018 Net Income** | $34,284 | $11,293 | 203.59% |
| **YTD Sept-2018 Adjusted EBITDA - NCI** | $80,877 | $65,312 | 23.83% |

182.  The Restatement also included new quarterly figures for operating income, net income and Adjusted EBIDTA-NCI, among other, that were materially worse than previously reported, and shown in the charts below:

| (in thousands) | Operating Income as Reported | Operating Income as Restated | Percent Overstated (Understated) |
|---|---|---|---|
| Q1 2017 | $    12,470 | $    11,674 | 7% |
| Q2 2017 | $    27,156 | $    18,277 | 49% |
| Q3 2017 | $    32,901 | $    33,224 | (1%) |
| Q4 2017 | $    33,931 | $    27,033 | 26% |
| Q1 2018 | $    21,399 | $    12,573 | 70% |
| Q2 2018 | $     7,453 | $    (4,310) | 273% |
| Q3 2018 | $    30,049 | $    24,110 | 25% |

| (in thousands) | Net Income as Reported | Net Income as Restated | Percent Overstated |
|---|---|---|---|
| Q1 2017 | $    12,902 | $    11,762 | 10% |
| Q2 2017 | $    16,391 | $     9,759 | 68% |
| Q3 2017 | $    26,672 | $    25,791 | 3% |
| Q4 2017 | $    19,718 | $    10,824 | 82% |
| Q1 2018 | $    13,713 | $     7,164 | 91% |
| Q2 2018 | $     2,277 | $    (8,383) | 127% |
| Q3 2018 | $    18,294 | $    12,512 | 46% |

| (in thousands) | Adjusted EBITDA - NCI as Reported | Adjusted EBITDA - NCI as Restated | Percent Overstated (Understated) |
|---|---|---|---|
| Q1 2017 | $    21,415 | $    20,954 | 2% |
| Q2 2017 | $    27,403 | $    22,543 | 22% |
| Q3 2017 | $    28,149 | $    28,644 | (2%) |
| Q4 2017 | $    28,564 | $    25,985 | 10% |
| Q1 2018 | $    22,738 | $    17,308 | 31% |
| Q2 2018 | $    31,508 | $    24,754 | 27% |
| Q3 2018 | $    26,631 | $    23,250 | 15% |

183. On March 8, 2019, ARA announced a delay in filing its 2018 10-K, related to the revenue recognition issues described above, which resulted in a drop in ARA's stock price of more than 16%, and ARA's stock price continued to decline the next trading day. On March 27, 2019, ARA announced its intent to restate its financials and the resignation of CFO Boucher, which resulted in a 38% drop in ARA's stock price.

**B.    ARA, Wilcox, Boucher, and Smith Received Benefits from the Topside Scheme**

184. As a result of the scheme orchestrated by Wilcox, Boucher and Smith, ARA received a corporate benefit through awarding share-based compensation at improperly inflated prices (as described above). ARA also received a corporate benefit from marketing false financial and operating results, including that it purportedly had a lower DSO than its competitors, in sales pitches to doctors that may have resulted in ARA getting an increased number of clinic joint venture partners.

185. Wilcox, Boucher, and Smith also personally benefited from the topside scheme in the form of inflated bonuses and stock sales. Both Wilcox and Boucher received bonuses that were based, at least in part, on the company's Adjusted EBITDA for 2017, and Boucher received a bonus that was based, at least in part, on the company's Adjusted EBITDA for 2018. As discussed above, these metrics were materially overstated.

186. Both Wilcox and Boucher had employment agreements that indicated that they would receive bonuses based, at least in part, on ARA reaching certain EBITDA or Adjusted EBITDA targets. Had ARA not used Wilcox's top-down approach to falsely report inflated Adjusted EBITDA figures for 2017 and 2018, Wilcox and Boucher would not have received bonuses as large as they did, if they received bonuses at all.

187. The topside scheme had a significant impact on the 2017 and 2018 bonuses for ARA's Former CEO and another ARA senior executive, as shown in the chart below:

| (in millions) | Budget Adjusted EBITDA | As Reported Adjusted EBITDA | As Reported Adjusted EBITDA as % of Budget | Resulting % of target bonus potential | Restated Adjusted EBITDA | Restated Adjusted EBITDA as % of Budget | Resulting % of target bonus potential |
|---|---|---|---|---|---|---|---|
| 2017 | $185.6 | $176.4 | 94% | 70% | $160.9 | 87% | 0% |
| 2018 | $186.4 | $168.05 | 90% | 50% | $141.3 | 75% | 0% |

188. Based on this, Wilcox and Boucher's bonuses—which were based at least in part on the same metric—were also inflated by the topside scheme.

189. In connection with the Restatement, the Former CEO repaid the company $880,223, representing amount of his overpaid bonuses that were attributable to the inaccurately stated financials. The returned money included the full amounts of bonuses paid to the Former CEO with respect to fiscal years 2017 and 2018.

190. Wilcox and Boucher did not return any money to ARA as a result of the Restatement.

191. In August 2018, during the fraud period, Smith sold over 8,200 shares of ARA at stock prices that were inflated due to the fraud described above. Smith received a total of $172,577 in sale proceeds and the profitable gain from this stock sale was $161,958. A significant portion of those gains were due to the inflated stock price.

192. In addition, in the fall of 2018, during the period of their fraudulent scheme, Boucher and Smith received promotions. Boucher was promoted to CFO to replace Wilcox when he left at the end of September 2018, and Smith was promoted to Vice President of Finance to replace Boucher.

C.    **ARA's Financial Statements and Disclosures Were Materially False and Misleading.**

193.    During the relevant period, ARA made the following periodic filings with the SEC, each of which was also disseminated through ARA's website and through other means, and which contained materially false and misleading financial information:

| Form type | Period / ending date | Date filed | Defendant who signed the filing as CFO |
|---|---|---|---|
| 10-Q | Q1 2017 / Mar. 31, 2017 | May 9, 2017 | Wilcox |
| 10-Q | Q2 2017 / Jun. 30, 2017 | Aug. 8, 2017 | Wilcox |
| 10-Q | Q3 2017 / Sept. 30, 2017 | Nov. 14, 2017 | Wilcox |
| 10-K | FY 2017 / Dec. 31, 2017 | Mar. 6, 2018 | Wilcox |
| 10-Q | Q1 2018 / Mar. 31, 2018 | May 8, 2018 | Wilcox |
| 10-Q | Q2 2018 / Jun. 30, 2018 | Aug. 7, 2018 | Wilcox |
| 10-Q | Q3 2018 / Sept. 30, 2018 | Nov. 9, 2018 | Boucher |

194.    Also during the same time period, ARA filed the following current reports on Form 8-K attaching press releases regarding earnings announcements, each of which were also disseminated through ARA's website and through other means, and which contained materially false and misleading financial information:

| Form type | Period / ending date | Date filed | Defendant who signed the filing as CFO |
|---|---|---|---|
| 8-K | Q1 2017 / Mar. 31, 2017 | May 9, 2017 | Wilcox |
| 8-K | Q2 2017 / Jun. 30, 2017 | Aug. 8, 2017 | Wilcox |
| 8-K | Q3 2017 / Sept. 30, 2017 | Nov. 14, 2017 | Wilcox |
| 8-K | FY 2017 / Dec. 31, 2017 | Mar. 6, 2018 | Wilcox |
| 8-K | Q1 2018 / Mar. 31, 2018 | May 8, 2018 | Wilcox |
| 8-K | Q2 2018 / Jun. 30, 2018 | Aug. 7, 2018 | Wilcox |
| 8-K | Q3 2018 / Sept. 30, 2018 | Nov. 8, 2018 | Boucher |

195.    The financial statements in these Forms 10-Q, 10-K, and 8-K filed with the SEC were materially false and misleading, because, as discussed above (and shown by the Restatement), they did not accurately represent ARA's financial information at the time, but instead reported figures that were materially different than what ARA's actual financial statements would have been if they had reported them in compliance with GAAP.

196.  Each of the Forms 10-Q and K listed above included a certification by the signer listed above, as required by Section 302 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. 7241], certifying the accuracy and completeness of the report. These certifications were false for the same reasons that the financial statements in those documents were false.

197.  Wilcox and Boucher knew, or were reckless or negligent in not knowing that these financial statements, and certifications regarding them, were materially false and misleading because Wilcox and Boucher had each actively participated in the scheme described herein.

198.  Each of the Forms 10-Q and K included a certification by the signer listed above, as required by Section 302 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. 7241], certifying the effectiveness of ARA's internal accounting controls. These certifications were false because ARA failed to devise and maintain a system of internal accounting controls sufficient to prevent Wilcox, Boucher, and Smith from carrying out the topside scheme.

199.  Wilcox and Boucher knew, or were reckless or negligent in not knowing that these certifications regarding internal controls were false because the way in which Wilcox and Boucher booked topside adjustments was inconsistent with the Revenue Controls and/or they had caused ARA to book journal entries without supporting documentation.

200.  In addition to the misstated financial results, ARA's SEC filings listed above also contained other material misstatements and omissions in light of the topside scheme. For example, ARA listed its DSO in the filings described above, but failed to disclose that those DSO figures had been achieved through the processes described above.

201.  ARA's Forms 10-Q for the first three quarters of 2017 were disseminated by ARA through its website and other means, and contained the following statement:

> Contractual allowances, along with provisions for uncollectible amounts, are
> estimated based upon contractual terms, regulatory compliance and historical

collection experience. Net revenue recognition and allowances for uncollectible billings require the use of estimates of the amounts that will actually be realized. Changes in estimates are reflected in the then-current financial statements based on on-going actual experience trends, or subsequent settlements and realizations depending on the nature and predictability of the estimates and contingencies.

202.  This statement is materially false and misleading because, as described above, "changes in estimates" (meaning topside adjustments) were not based on "on-going actual experience trends, or subsequent settlements and realizations" but instead were based on efforts to meet predetermined targets. Wilcox knew, or was reckless or negligent in not knowing, that this statement was false because of his participation in the scheme described above.

203.  ARA's Forms 10-Q for the first three quarters of 2018, signed and filed as described above, each contained the following statement:

Patient service operating revenues may be subject to adjustment of the estimated transaction price as a result of (i) new information obtained, such as actual payment receipt, (ii) examinations of the Company, or Medicare or Medicaid Managed Care programs that the Company serves, by government agencies or contractors, for which the resolution of any matters raised may take extended periods of time to finalize; (iii) differing interpretations of government regulations by different fiscal intermediaries or regulatory authorities; (iv) differing opinions regarding a patient's medical diagnosis or the medical necessity of service provided; (v) retroactive applications or interpretations of governmental requirements; and (vi) claims for refund from private payors, including as the result of government actions.

204.  This statement is materially false and misleading because Wilcox and Boucher in fact simply implemented the top-down system described above and booked topside entries to meet predetermined targets. Wilcox and Boucher each knew, or were reckless or negligent in not knowing, that this statement was false because of their participation in the scheme described above.

205.  Wilcox repeated and disseminated many of the false DSO figures on earnings calls that ARA held which were open to the public, including analysts and investors, on May 10, 2017, August 9, 2017, November 15, 2018, March 7, 2018, May 9, 2018 and August 8, 2018.

Boucher repeated and disseminated the false DSO figures for September 2017 and 2018 in an earnings call on November 9, 2018.

206.  ARA's Form 10-K for 2017, filed and signed as described above, contained the following statement:

> Based on our experience in the dialysis services industry, we will continue to follow a disciplined approach to enhancing performance in key areas such as: revenue cycle management; patient registration; facilitation and verification of insurance; payor interaction and arrangements; and billing and collection. We believe this has positively impacted our revenue per treatment and allowed us to maintain low levels of days' sales outstanding and bad debt expense.

207.  This statement was materially false and misleading because it attributes ARA's "low levels of days' sales outstanding" to its "disciplined approach" in certain "key areas" of its business, including revenue cycle management and billing and collection. In fact, as described above, ARA's low DSO was a result of a manipulated and undisclosed revenue methodology.

208.  Wilcox knew, or was reckless or negligent in not knowing, that the quote above from the 2017 Form 10-K was false because of his participation in the scheme described above.

209.  ARA's Form 10-K for 2017, filed and signed as described above, contained the following statement:

> Changes in estimates are reflected in the then current financial statements based on on-going actual experience trends, or subsequent settlements and realizations depending on the nature and predictability of the estimates and contingencies.

210.  This statement was materially false and misleading because, as discussed above, Wilcox and Boucher's undocumented and undefined methodology for topside adjustments was not based on "actual experience."

211.  In addition, ARA's practices of spreading out topside across quarters or banking topside adjustments for use in future quarters meant that changes in estimates were not reflected in the "then current financial statements."

212.  Wilcox knew, or was reckless or negligent in not knowing, that this statement was false because of his participation in the scheme described above.

213.  ARA's Form 10-K for 2017, filed and signed as described above, contained the following statement: "The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles."

214.  This statement was false and misleading because ARA's financial statements were not prepared in accordance with GAAP, as described above.

215.   Wilcox knew, or was reckless or negligent in not knowing, that this statement was false because of his participation in the scheme described above.

### *ARA Made False Statements in Investor Presentations*

216.  For each quarterly period in 2017 and 2018, ARA, by and through individuals including Wilcox and Boucher, created and disseminated a PowerPoint Presentation entitled "ARA Investor Presentation." ARA posted these presentations to the investor relations section of the company's website for purposes of making them available to investors and potential investors. As CFO, Wilcox (and later Boucher) was responsible for the accuracy of these presentations. The presentations were materially false and misleading because they repeated the incorrect DSO values described above and omitted the manipulation ARA engaged in to reach those values. Wilcox and Boucher knew, or were negligent or reckless in not knowing, that these statements were false by virtue of their participation in the topside scheme as described above.

### *The False and Misleading Statements Were Part of the Overall Scheme*

217.  All of the misstatements described above were part of the topside scheme, which also included the dissemination of the misstatements and the inherently deceptive conduct described above.

218.  ARA (prior to the announcement of the Restatement), Wilcox, and Boucher failed to correct the misstatements described above once they had been made.

### D. The Topside Scheme Resulted in Inaccurate Books and Records and Violated GAAP

219.  As a result of the topside scheme, and as shown by the Restatement, ARA's internal accounting records reflected incorrectly stated revenue. This is because the practices employed as part of the topside scheme were not in accordance with GAAP.

220.  The topside scheme practices were not in accordance with ASC 954-605-35-1, because ARA failed to revise initial revenue estimates based on actual amounts (subsequent payments) obtained and include adjustments to revenue in the period that new information was obtained.

221.  Additionally, the topside scheme practices were not in accordance with the relevant provisions of ASC 606-10-32-42&43, adopted in January 2018, because ARA failed to record revenue adjustments in the period in which the resolution of uncertain events occurred (when ARA received the actual patient payments).

### E. ARA's Topside Process Violated its Internal Accounting Controls From July 2016 Through 2018

222.  ARA failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

223.  The topside scheme from 2017 to 2018, as described above, was inconsistent with ARA's internal accounting controls, as documented in the July 2016 Revenue Controls quoted above.

224.  Additionally, prior to the topside scheme, ARA, Wilcox, Boucher, and Smith all failed to ensure that sufficient supporting documentation was maintained for the journal entries for the Former COO's topside adjustments during 2016. This was a violation of ARA's internal control requiring all journal entries to be supported by documentation.

### F.  Cooperation and Remediation

225.   ARA cooperated with the SEC staff in connection with the SEC staff's investigation.  ARA also implemented significant remedial measures, such as changes in management, corporate governance, and the remediation of internal controls deficiencies.

**FIRST CLAIM**
**Violations of Securities Act Section 17(a)**
**(*All Defendants*)**

226.  All of the foregoing paragraphs are incorporated by reference herein.

227.  By engaging in the conduct described above, Defendants ARA, Wilcox, Boucher, and Smith, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) while acting knowingly or recklessly, employed devices, schemes, and artifices to defraud;

(b) while acting knowingly, recklessly, or negligently, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) while acting knowingly, recklessly, or negligently, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of ARA stock.

228.  By engaging in the foregoing conduct, Defendants ARA, Wilcox, Boucher, and Smith violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM**
**Aiding and Abetting Violations of Securities Act Section 17(a)**
*(Against Defendants Wilcox, Boucher, and Smith)*

229.  All of the foregoing paragraphs are incorporated by reference herein.

230.  As alleged above, Defendant ARA violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

231.  Through their improper revenue practices, violations of internal controls, false statements to the Audit Firm, and other means alleged above, Defendants Wilcox, Boucher, and Smith knowingly provided substantial assistance to, and thereby aided and abetted, ARA's violations of the securities laws.

232.  By engaging in the foregoing conduct, pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)], Defendants Wilcox, Smith, and Boucher violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**THIRD CLAIM**
**Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder**
*(Against all Defendants)*

233.  All of the foregoing paragraphs are incorporated by reference herein.

234.  By engaging in the foregoing conduct, Defendants ARA, Wilcox, Boucher, and Smith, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a) employed devices, schemes, or artifices to defraud; and

(c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of ARA stock, and other persons.

235.  By engaging in the foregoing conduct, Defendants ARA, Wilcox, Boucher, and Smith violated, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM
### Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder
### *(Against ARA, Wilcox, and Boucher)*

236.  All of the foregoing paragraphs are incorporated by reference herein.

237.  By engaging in the foregoing conduct, Defendants ARA, Wilcox, and Boucher, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

238.  By engaging in the foregoing conduct, Defendants ARA, Wilcox, and Boucher, violated, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

## FIFTH CLAIM
### Aiding and Abetting Violations of Exchange Act 10(b) and Rule 10b-5 Thereunder
### *(Against Defendants Wilcox, Boucher, and Smith)*

239.  All of the foregoing paragraphs are incorporated by reference herein.

240.  As alleged above, Defendant ARA violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

241.  Through their improper revenue practices, violations of internal controls, false statements to the Audit Firm, and other means alleged above, Defendants Wilcox, Boucher, and Smith knowingly provided substantial assistance to, and thereby aided and abetted, ARA's violations of the securities laws.

242.  By engaging in the foregoing conduct, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], Defendants Wilcox, Boucher, and Smith violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SIXTH CLAIM
### Violations of Exchange Act Section 13(a) and
### Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13
### *(Against ARA)*

243.  All of the foregoing paragraphs are incorporated by reference herein.

244.  Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] require issuers of registered securities to file with the SEC factually accurate annual reports (on Form 10-K), quarterly reports (on Form 10-Q), and current reports (on Form 8-K). Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

245.  By engaging in the foregoing conduct, Defendant ARA violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

**SEVENTH CLAIM**
**Aiding and Abetting Violations of Exchange Act Section 13(a) and**
**Rules 13a-1, 13a-11, 13a-13 and 12b-20**
*(Against Wilcox, Boucher, and Smith)*

246.  All of the foregoing paragraphs are incorporated by reference herein.

247.  As alleged above, Defendant ARA violated Exchange Act Section 13(a) and Rules 13a-1, 13a-11, 13a-13 and 12b-20.

248.   Through their improper revenue practices and other means alleged above, Defendants Wilcox, Boucher, and Smith knowingly provided substantial assistance to, and thereby aided and abetted, ARA's violations of the securities laws.

249.  By engaging in the foregoing conduct, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t], Defendants Wilcox, Boucher, and Smith violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

**EIGHTH CLAIM**
**Violations of Exchange Act Section 13(b)(2)(A)**
*(Against ARA)*

250.  All of the foregoing paragraphs are incorporated by reference herein.

251.  Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions of the company and dispositions of its assets.

252.  By engaging in the foregoing conduct, Defendant ARA violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

**NINTH CLAIM**
**Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)**
*(Against Wilcox, Boucher, and Smith)*

253.  All of the foregoing paragraphs are incorporated by reference herein.

254.  As alleged above, Defendant ARA violated Exchange Act Section 13(b)(2)(A).

255.   Through their improper revenue practices and other means alleged above, Defendants Wilcox, Boucher, and Smith knowingly provided substantial assistance to, and thereby aided and abetted, ARA's violations of the securities laws.

256.  By engaging in the foregoing conduct, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t], Defendants Wilcox, Boucher, and Smith violated Exchange Act Section 13(b)(2)(A).

### TENTH CLAIM
### Violations of Exchange Act Rule 13b2-1
### *(Against Wilcox, Boucher, and Smith)*

257.  All of the foregoing paragraphs are incorporated by reference herein.

258.  Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1] provides that no person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Exchange Act.

259.  By engaging in the foregoing conduct, Defendants Wilcox, Boucher, and Smith violated Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

### ELEVENTH CLAIM
### Violations of Exchange Act Section 13(b)(2)(B)
### *(Against ARA)*

260.  All of the foregoing paragraphs are incorporated by reference herein.

261.  Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

262.  By engaging in the foregoing conduct, Defendant ARA violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## TWELFTH CLAIM
### Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(B)
### *(Against Wilcox, Boucher, and Smith)*

263.  All of the foregoing paragraphs are incorporated by reference herein.

264.  As alleged above, Defendant ARA violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

265.  Through their improper revenue practices and other means alleged above, Defendants Wilcox, Boucher, and Smith knowingly provided substantial assistance to, and thereby aided and abetted, ARA's violations of the securities laws.

266.  By engaging in the foregoing conduct, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t], Defendants Wilcox, Boucher, and Smith violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

## THIRTEENTH CLAIM
### Violations of Exchange Act Section 13(b)(5)
### *(Against Wilcox, Boucher, and Smith)*

267.  All of the foregoing paragraphs are incorporated by reference herein.

268.  Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] provides that no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls.

269.  By engaging in the foregoing conduct, Defendants Wilcox, Boucher, and Smith violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

## FOURTEENTH CLAIM
### Violations of Exchange Act Rule 13b2-2(a)
### *(Against Wilcox, Boucher, and Smith)*

270.  All of the foregoing paragraphs are incorporated by reference herein.

271.  Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] provides that no director or officer of an issuer shall, directly or indirectly, make or cause to be made a materially false or misleading statement to an accountant or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with any audit, review, or examination of the financial statements of the issuer or the preparation or filing of any document or report required to be filed with the SEC.

272.  By engaging in the foregoing conduct, Defendants Wilcox, Boucher, and Smith violated Rule 13b2-2(a) under the Exchange Act [17 C.F.R. § 240.13b2-2(a)].

## FIFTEENTH CLAIM
### Aiding and Abetting Violations of Exchange Act Rule 13b2-2(a)
### *(Against Wilcox)*

273.  All of the foregoing paragraphs are incorporated by reference herein.

274.  As set forth above, defendants Boucher and Smith violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

275.  Through his supervisory role, signing of false and misleading management representation letters given to the Audit Firm, and other means alleged above, Defendant Wilcox knowingly provided substantial assistance to, and thereby aided and abetted, Boucher and Smith's violations of the securities laws.

276.  By engaging in the foregoing conduct, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t], Defendant Wilcox violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

## SIXTEENTH CLAIM
### Violations of Exchange Act Rule 13a-14
### *(Against Wilcox and Boucher)*

277.  All of the foregoing paragraphs are incorporated by reference herein.

278.  Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] provides that each principal executive and principal financial officer of a public company must sign a certification at the time that the company files its Forms 10-Q and 10-K certifying that the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading.

279.  By engaging in the foregoing conduct, Defendants Wilcox and Boucher violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## SEVENTEENTH CLAIM
### Violations of Sarbanes Oxley Act Section 304(a)
### *(Against Wilcox and Boucher)*

280.  All of the foregoing paragraphs are incorporated by reference herein.

281.  ARA, by engaging in the conduct described above, filed Forms 10-K for fiscal year 2017 and Forms 10-Q for each of the first three quarters of fiscal years 2017 and 2018 that were in material non-compliance with its financial reporting requirements under the securities laws.

282.  ARA's material non-compliance with its financial reporting requirements under the securities laws was the result of its misconduct described above.

283.  Due to ARA's material non-compliance with its financial reporting requirements under the securities laws, and as a result of its misconduct, ARA was required to prepare an accounting restatement for fiscal year 2017 and the first three quarters of 2018.

284.  Wilcox and Boucher received or obtained, during the statutory time periods established by the Sarbanes-Oxley Act of 2002, bonuses, incentives and/or equity-based compensation or profits from their sale of ARA stock, which they have failed to reimburse ARA.

285.  The Commission has not exempted Wilcox or Boucher, pursuant to Section 304(b) of the Act, 15 U.S.C. § 7243(b), from the application of Section 304(a) of the Act, 15 U.S.C. § 7243(a).

286.  By engaging in the conduct described above, Wilcox and Boucher violated Section 304(a) of the Sarbanes Oxley Act [15 U.S.C. § 7243(a)].

## PRAYER FOR RELIEF

Accordingly, the SEC respectfully requests that the Court enter a final judgment:

A.    Finding that Defendants ARA, Wilcox, Boucher, and Smith violated the federal securities laws as alleged above.

B.    Permanently enjoining ARA from further violations of Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Rules Rule 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. §§ 77q(a); 15 U.S.C. §§ 78j(b); § 78m(a); 78m(b)(2)(A); and 78m(b)(2)(B); 17 C.F.R. §§ 240.10b-5; 240.12b-20; 240.13a-1, 240.13a-11, and 240.13a-13];

C.    Permanently enjoining Wilcox from further violations of Section 17(a) of the Securities Act; Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act, Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1, 13b2-2(a), and 13a-14 thereunder, and

Section 304(a) of the Sarbanes Oxley Act [15 U.S.C. §§ 77q(a); 15 U.S.C. §§ 78j(b); § 78m(a); 78m(b)(2)(A); 78m(b)(2)(B); and 78m(b)(5); 17 C.F.R. §§ 240.10b-5; 240.12b-20; 240.13a-1, 240.13a-11, 240.13a-13; 240.13b2-1; 240.13b2-2(a); and 240.13a-14; and 15 U.S.C. § 7243(a)];

D.      Permanently enjoining Boucher from further violations of Section 17(a) of the Securities Act; Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act, Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1, 13b2-2(a), and 13a-14 thereunder, and Section 304(a) of the Sarbanes Oxley Act [15 U.S.C. §§ 77q(a); 15 U.S.C. §§ 78j(b); § 78m(a); 78m(b)(2)(A); 78m(b)(2)(B); and 78m(b)(5); 17 C.F.R. §§ 240.10b-5; 240.12b-20; 240.13a-1, 240.13a-11, 240.13a-13; 240.13b2-1; 240.13b2-2(a); and 240.13a-14; and 15 U.S.C. § 7243(a)];

E.      Permanently enjoining Smith from further violations of Section 17(a) of the Securities Act; Sections 10(b), 13(b)(2)(B), and 13(b)(5) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1, and 13b2-2(a) thereunder [15 U.S.C. §§ 77q(a); 15 U.S.C. §§ 78j(b); § 78m(a); 78m(b)(2)(A); 78m(b)(2)(B); and 78m(b)(5); 17 C.F.R. §§ 240.10b-5; 240.12b-20; 240.13a-1, 240.13a-11, 240.13a-13; 240.13b2-1; and 240.13b2-2(a)];

F.      Ordering ARA, Wilcox, Boucher, and Smith to disgorge their ill-gotten gains as a result of the conduct alleged in this Complaint, plus prejudgment interest thereon;

G.      Ordering ARA, Wilcox, Boucher, and Smith to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

H.      Ordering that Defendants Wilcox, Boucher, and Smith be barred from acting as officers or directors of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

I.      Ordering that Defendants Wilcox and Boucher reimburse ARA for all bonuses, incentive-based and equity-based compensation, and/or profits realized from their sale of ARA stock pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)]; and

J.      Granting such other and further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the SEC demands a trial by jury on all issues so triable.

Dated:  December 6, 2021                                    Respectfully submitted,

                                                           */s/ Christopher M. Bruckmann*
                                                           Christopher M. Bruckmann
                                                           (SDNY Bar No. CB-7317)
                                                           Pei Yuan Chung
                                                           (*pro hac vice* motion forthcoming)
                                                           Jonathan Austin
                                                           (SDNY Bar No. JA-2073)
                                                           Securities and Exchange Commission
                                                           100 F Street, NE
                                                           Washington, D.C. 20549
                                                           202-551-5986 (Bruckmann)
                                                           202-551-7713 (Chung)
                                                           202-551-3786 (Austin)
                                                           BruckmannC@sec.gov
                                                           ChungP@sec.gov
                                                           AustinJo@sec.gov

                                                           *Attorneys for Plaintiff Securities and*
                                                           *Exchange Commission*