**United States District Court**
**District of Massachusetts**

————————————————————
                                                )
Securities and Exchange Commission, )
                                                )
            Plaintiff,                          )
                                                )
            v.                                  )    Civil Action No.
                                                )    22-10651-NMG
Jonathan L. Wilcox, et al.,                     )
                                                )
            Defendants.                         )
                                                )
————————————————————

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises out of the revenue recognition and accounting practices of a dialysis services company, American Renal Associates Holdings, Inc. ("ARA"). The Securities and Exchange Commission ("the SEC" or "the Commission") alleges that three, high-level employees of ARA, Jonathan L. Wilcox ("Wilcox"), Jason M. Boucher ("Boucher") and Karen J. Smith ("Smith") (collectively, "the defendants"), implemented a scheme to make improper and misleading adjustments to ARA's revenue and other financial metrics. The Commission has brought numerous claims against ARA and the individual defendants for violations of federal securities laws and the Sarbanes-Oxley Act for their actions taken during the period from January, 2017 to November, 2018.

Pending before the Court are separate motions to dismiss filed by all three of the individual defendants.  For the reasons that follow, all of the motions will be denied in their entirety.

I.  **Background**

    **A.  The Business**

ARA is a dialysis services company incorporated in Delaware with a principal place of business in Beverly, Massachusetts. It forms joint ventures with nephrologists at hundreds of clinics in partnerships in which nephrologists provide care to kidney patients and ARA administers the billing, accounts receivable and other matters related to revenue.  ARA's securities were registered under Section 12(b) of the Securities Exchange Act of 1934 and traded on public stock markets from April, 2016 until January, 2021, at which time it was acquired by a private equity firm.

The Commission's allegations concern the revenue recognition and accounting practices of ARA during the period from January, 2017 to November, 2018.  The three individual defendants each had significant responsibility for those functions during the relevant time period.  Wilcox was the Chief Financial Officer of ARA at all relevant times until his resignation in September, 2018.  Boucher was the Chief Accounting Officer of ARA until September, 2018, and the Chief

Financial Officer at all relevant times thereafter.  Smith was ARA's Controller until September, 2018, and the Vice President of Finance at all relevant times thereafter.

ARA received revenue primarily from three sources: 1) public payors such as Medicare, 2) commercial insurers with which it had negotiated contracts for various services and 3) commercial insurers with which it did not have contracts or agreed-upon rates ("non-contract insurers" or "NCIs").  Because ARA could not be certain of the consideration it would eventually receive from NCIs for the services it had provided to patients, such revenue was considered "variable consideration" under generally accepted accounting principles ("GAAP").

The pertinent GAAP standards required ARA to record an initial estimate of the revenue it expected to receive from NCIs and then update that estimate by the end of each reporting period based upon the resolution of uncertain events such as payment itself and/or other reductions in uncertainty even if payment had not yet been received.  Although there are slight differences between the GAAP provisions regarding variable consideration in 2017 and 2018, neither the SEC nor the defendants contend that such changes materially affected ARA's obligations or the import of the Commission's allegations.

When deriving its initial estimate of variable consideration for a given time period (i.e. expected revenue

from NCIs), ARA would record the full amount of the customary price for the services it provided but simultaneously record an offsetting "contractual allowance" to account for any reduction in the amount it actually expected to receive.  Those initial contractual allowances were based on ARA's experience with the given NCI as well as other factors and the Commission has not raised any issues with respect to that practice.

**B.  The Alleged Scheme**

The SEC does, however, find fault with the way that ARA updated its initial variable consideration estimates by making "topside adjustments" to revenue.  The topside adjustment process at ARA generally comprised of Boucher and Wilcox updating consolidated revenue in order to triangulate that amount with other financial metrics such as Days Sale Outstanding ("DSO") and Revenue Per Treatment ("RPT").  Wilcox and Boucher, working closely with Smith and occasionally others, would then allocate that newly adjusted revenue to individual clinics.  Although ARA would sometimes conduct what it called "waterfall analyses" by using patient-level data to make revenue adjustments or to record revenue at a particular clinic, it would often forego or even ignore such data in favor of the topside adjustments it had prepared.

DSO is an important metric in industries where there is a lag between the date when services are provided and the date when revenue for that service is received.  DSO is computed by determining the ratio of the accounts receivable balance compared to the average revenue in a day over a given time period, thereby allowing companies to determine the average number of days an invoice remains outstanding.  A low DSO means fast payment; a high DSO means slow payment.

Based on prior experience, ARA's management expected its DSO at a consolidated and clinic level to be around 40 and proclaimed that number (which was relatively low, i.e. favorable) to prospective clinics considering a joint venture with ARA and in its public financial disclosures.  As stated above, ARA made topside adjustments to its consolidated revenue based, in part, upon its consolidated DSO and then allocated that revenue to individual clinics in order to improve their DSOs.

According to the complaint, the essence of the purported scheme was that ARA falsified financial performance information by making improper topside adjustments to revenue and by targeting a predetermined DSO average (and other desirable metrics) instead of undertaking a bottom-up analysis based upon actual revenue data.  A multitude of other allegedly improper practices supported those financial manipulations.  All of the

individual defendants allegedly had important roles in the fraudulent revenue recognition and accounting functions of ARA throughout the relevant period.

The impact of the purportedly wrongful topside adjustments on ARA's financial statements was revealed in September, 2019, after the company published a restatement of its financial statements from 2014 through the first three quarters of 2018 ("the Restatement").[1]  The Restatement was the result of an internal investigation prompted by an SEC inquiry and reported that ARA had overstated its net income by more than $17 million (and revenue by over $16 million) in 2017, and, by more than $22 million (and revenue by over $24 million) in 2018.

### C. Procedural History

The SEC filed the pending action in December, 2021, in the Southern District of New York, at which time ARA consented to the entry of a Final Judgment against it.  Defendant Smith moved to transfer the case to the District of Massachusetts in January, 2022, and defendants Wilcox and Boucher filed declarations in support of that motion.  The Commission opposed the motion but the assigned district judge allowed the motion

---

[1] The Restatement is one of several documents referred to in the complaint which the Court has considered in evaluating the defendants' motions to dismiss. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

and ordered the case transferred to this district in April, 2022.

The complaint alleges that each of the defendants violated multiple provisions of the Securities Exchange Act of 1934 ("the Exchange Act") and the Securities Act of 1933 ("the Securities Act") and further alleges that Wilcox and Boucher violated the Sarbanes-Oxley Act.  Due to the number and complexity of the claims brought by the SEC, this Court established an extended briefing schedule for defendants' motions to dismiss that permitted the SEC to file an enlarged, omnibus opposition and each of the defendants to submit a reply brief.

In June, 2022, the defendants individually moved to dismiss some or all of the claims asserted against them.  Wilcox moved for dismissal of Counts I—V, VII, IX, XII, XIII and XV; Boucher moved for dismissal of Counts I—V, VII, IX and XII; and Smith moved to dismiss all of the claims brought against her (Counts I—III, V, VII, IX, X and XII—XIV).

## II.  **Motions to Dismiss**

### A.  Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the subject pleading must contain sufficient factual matter to state a claim for relief that is actionable as a matter of law and "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the defendant is liable for the misconduct alleged. Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

When rendering that determination, a court may consider certain categories of documents extrinsic to the complaint "without converting a motion to dismiss into a motion for summary judgment." Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) (citing Watterson, 987 F.2d at 3).  For instance, a court may consider documents of undisputed authenticity, official public records, documents central to a plaintiff's claim and documents that were sufficiently referred to in the complaint. Watterson, 987 F.2d at 3.

A court may not disregard properly pled factual allegations in the complaint even if actual proof of those facts is improbable. Ocasio-Hernandez, 640 F.3d at 12.  Rather, the court's inquiry must focus on the reasonableness of the inference of liability that the plaintiff is asking the court to draw. Id. at 13.

### B.  Claims for Securities Fraud (Counts I, III and IV)

The SEC claims that each of the defendants engaged in a fraudulent scheme in violation of Section 17(a)(1) and (a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Rule

10b-5(a) and (c) thereunder (Counts I and III).  Defendants are further alleged to have violated Section 17(a)(2) of the Securities Act by obtaining money or property by means of an untrue statement or omission of material fact in the offer or sale of a security (Count I).  Finally, the SEC claims that defendants Wilcox and Boucher made fraudulent misstatements in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder (Count IV).

Section 17(a) of the Securities Act makes it unlawful for any person, in the offer or sale of any securities

> (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b) of the Exchange Act makes it unlawful for any person to

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

- 9 -

Rule 10b-5, in turn, makes it unlawful for any person, in connection with the purchase or sale of any security

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5.

Claims brought under Section 17(a)(1) of the Securities Act and Rule 10b-5 require proof of scienter. SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008) (describing the requisite state of mind as one "of either conscious intent to defraud or a high degree of recklessness"). Claims brought under Section 17(a)(2) and (a)(3) of the Securities Act require proof of negligence. Id. To the extent that a court finds a complaint has adequately alleged scienter, those allegations are a fortiori adequate to plead negligence. SEC v. TelexFree, Inc., 301 F. Supp. 3d 266, 270 (D. Mass. 2018); see SEC v. Esposito, 260 F. Supp. 3d 79, 92 (D. Mass. 2017) (holding that allegations which established scienter were sufficient to show liability under Section 17(a)(3)).

When pleading an action that sounds in fraud, "a party must state with particularity the circumstances constituting" the fraud. Fed. R. Civ. P. 9(b). Particularity requires alleging

the "time, place, and content of the alleged misrepresentation with specificity." SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) ["Tambone II"] (en banc) (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999)).  With respect to scienter, however, the SEC need only plead it generally based upon the collective factual allegations in the complaint. See SEC v. Tambone, 550 F.3d 106, 119 (1st Cir. 2008) ["Tambone I"], superseded in part on other grounds, 597 F.3d 436 (1st Cir. 2010).

>        1.   **Wilcox and Boucher: Violations of Section 17(a) of the Securities Act and Violations of Section 10(b) of the Exchange Act & Rule 10b-5(a), (b) and (c)**

>             a.   **Scienter (Wilcox)**

Defendant Wilcox contends that the complaint fails to allege that he substantially participated in a fraudulent scheme with the requisite scienter. See, e.g., S.E.C. v. Durgarian, 477 F. Supp. 2d 342, 352-53 (D. Mass. 2007), aff'd sub nom., S.E.C. v. Papa, 555 F.3d 31 (1st Cir. 2009).  He asserts that the SEC has not plausibly suggested scienter because 1) the alleged scheme is belied by the financial results ARA contemporaneously reported, 2) the top-down approach to estimating revenues employed by Wilcox and ARA does not offend pertinent GAAP principles and 3) there is no basis for the notion that Wilcox benefited from the scheme or had some other motive to engage in securities fraud.  Wilcox further maintains that the

Commission's allegations lack the particularity demanded by Fed.
R. Civ. P. 9(b).

The alleged fraudulent scheme is neither refuted by ARA's
reported results in 2017 nor self-contradictory.  Wilcox
suggests that the beginning of the alleged scheme, in the first
quarter of 2017, coincides with a contemporaneous, publicly
reported decline in ARA's financial results.  He notes that
revenue declined, RPT declined and DSO increased, all of which
are negative indicators and thus incompatible with a scheme to
manufacture positive financial metrics.  To the contrary,
however, the opposite inference appears just as likely from the
complaint and may be drawn at this stage of the proceedings,
i.e. an actual decline in ARA's performance relative to prior
reporting periods motivated Wilcox and other key personnel to
carry out a fraudulent scheme to minimize the reported severity
of its financial condition.

Wilcox further contends that the alleged scheme relies upon
contradictory logic and thus militates against an inference of
wrongdoing and/or scienter.  He avers, for instance, that
topside adjustments which increased revenue would not decrease
DSO as suggested by the SEC.  According to Wilcox, an increase
in revenue would have also increased DSO but that is not
necessarily so.  If ARA made topside adjustments to increase
revenue but did not record corresponding increases to its

accounts receivable, DSO would decrease.  In any event, the SEC
rejoins that ARA's revenues were overstated in six of the seven
quarters at issue and DSO was understated in all seven.  Thus,
the purported self-contradiction of the alleged fraudulent
scheme amounts, at most, to a factual dispute.

Furthermore, unlike the private plaintiff cases which
Wilcox cites - Teamsters Local 617 Pension & Welfare Funds v.
Apollo Group, Inc., 2011 WL 1253250 (D. Ariz. Mar. 31, 2011) and
McCasland v. FormFactor Inc., 2009 WL 2086168 (N.D. Cal. July
14, 2009) – the minor discrepancy in a single quarter from the
otherwise consistent overstating of ARA's revenue alleged here
does not present the kind of "factual and logical
inconsistenc[y]" which undermines the overall structure of the
scheme. Cf. McCasland, 2009 WL 2086168, at *8 (explaining that
there was no "persuasive theory" of how the results matched the
alleged fraud).  In the pending case, for instance, revenue may
have been improperly deferred from the single under-reported
quarter to a subsequent period in order to improve DSO, RPT and
other aspects of ARA's financial reporting. See, e.g., In Re
CommVault Sys., Inc. Sec. Litig., 2016 WL 5745100, at *2-3
(D.N.J. Sept. 30, 2016) (noting the improper practice of
"smoothing" or deferring revenue from one reporting period to a
subsequent period in order to shore up the results in that later
period).

The SEC alleges that Wilcox intentionally violated GAAP provisions through his participation in the purportedly fraudulent scheme.  Although Wilcox suggests that the allegations do not amount to a violation of GAAP, the complaint plausibly and sufficiently alleges that ARA and the individual defendants violated GAAP by revising estimated revenues through a process of topside adjustments that totally or partially excluded known, patient-level data. See In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 147 (D. Mass. 2001) (holding that it "would be improper at the motion to dismiss phase" to credit the defendants' interpretation of the evidence and the application of GAAP to it) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3d Cir. 1997)).

According to Wilcox, the SEC has digressed from alleging that defendants published improper revenue estimates to arguing that defendants intentionally misrepresented results despite knowing the actual amount of revenue it received.  Allegations that defendants made improper topside adjustments to ARA's estimated revenues and that they ignored or manipulated actual payment data are not, however, two separate theories of fraudulent misconduct.  If defendants made unfounded topside adjustments to ARA's estimated revenue instead of timely updating those estimates based upon revenue ARA actually received, the complaint states a claim under either

- 14 -

interpretation of its allegations.  The SEC plausibly and
consistently contends that the use of top-down estimates which
superseded information about actual payments was a fraudulent
scheme which violated GAAP.

Even assuming the existence of GAAP violations, the SEC
concedes that such allegations do not singlehandedly establish
scienter.  See Greebel, 194 F.3d at 203-04 (explaining that the
violation of GAAP standards will not support an inference of
scienter in the absence of any further, basic details).  The SEC
submits that additional conduct described in the complaint
demonstrates Wilcox's scienter.  See In re Cabletron Sys., Inc.,
311 F.3d 11, 38 (1st Cir. 2002) (rejecting "any rigid formula
for pleading scienter" in favor of a case and fact-specific
approach).  According to the complaint, Wilcox ignored internal
controls which mandated that he and Boucher analyze and document
actual revenue data when making adjustments to estimated
revenue.  Instead of complying with such controls, he concealed
the use of a contrary top-down approach from the CEO,
misrepresented the approach being used to external auditors and
obfuscated the true process in SEC filings which he signed.

All of that alleged conduct is relevant to a finding of
scienter.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82-83
(1st Cir. 2002) (taking "all the facts and circumstance into
consideration" and noting that the knowing publication of false

or misleading statements is "classic evidence of scienter").  It
is also relevant that Wilcox stood to receive a larger bonus
based upon the misstatement of ARA's financial results.  Id. at
82.  Although he takes issue with the relevance of individual
claims in the complaint and so-called "group pleading", such
isolated criticisms do not negate the overall inference of his
scienter.

Because the Commission's allegations are sufficient to
support an inference of Wilcox's scienter, the complaint also
adequately pleads negligence for purposes of Section 17(a)(2)
and (a)(3) of the Securities Act.  The Court will not therefore
dismiss Counts I, III and IV asserted against Wilcox.

### b.  Scienter (Boucher)

The briefing in support of Boucher's motion to dismiss
raises many of the same issues propounded by Wilcox.  The Court
has already addressed, inter alia, contentions that the alleged
fraudulent scheme is illogical, that the SEC has altered its
original theory of liability and that the complaint does not
suffice under Rule 9(b).  Boucher has raised, however, distinct
legal issues and has challenged the inference of scienter based
upon his individual conduct and thus the Court will address
those matters here.

Boucher contends that the complaint does not plead by
direct or indirect evidence that he knew ARA's revised revenue

estimates were false and misleading.  There are, in essence, two
elements to his argument.  First, Boucher submits that updating
estimates of financial performance is inherently uncertain and
there was nothing obviously deceptive about the topside
adjustments in which he participated.  Second, Boucher asserts
that there is no support in the complaint for the notion that
such adjustments failed to account for payments that ARA
received.

The Court is unpersuaded.  As already discussed, the
alleged scheme comprised of Boucher and the other defendants
creating and/or applying topside adjustments which ignored
actual revenue information in contravention of internal controls
and GAAP.  The SEC avers that Boucher made certain of those
initial topside adjustments on his own and others in conjunction
with Wilcox.  Such allegations provide an adequate foundation
for an inference of scienter and are further supported by the
SEC's recital of Boucher's specific conduct.  See, e.g.,
Aldridge, 284 F.3d at 82 ("[T]he plaintiff may combine various
facts and circumstances indicating fraudulent intent[.]").

For instance, in May, 2018, Boucher purportedly instructed
Smith to find enough revenue to support topside adjustments
needed to reach a predetermined RPT target.  After Smith
complied with his request and informed Boucher thereof, they
purportedly decided not to report some of the revenue and

instead to defer it for future use.  The SEC also alleges that
Boucher, along with Smith, directed the activity of a revenue
recognition manager in his maintenance of a spreadsheet of
revenue adjustments which had been identified but not booked.
It is alleged that Boucher would frequently request that
unsubstantiated topside adjustments be made to revenue to bring
ARA's DSO closer to the target value of 40.

Furthermore, Boucher allegedly played a major role in
misleading the external auditor retained by ARA in 2017. See SEC
v. Duncan, 2021 WL 4197386, at *14 (D. Mass. Sept. 15, 2021)
(holding that "attempts to conceal" wrongdoing support an
inference of scienter).  He and Smith purportedly directed ARA
staff to manufacture post-hoc, patient-level support for topside
adjustments rather than provide the audit firm with the
handwritten notes about targeting DSO which had been the actual
source of the ARA adjustments.  Despite Boucher's knowledge of
the process ARA used to book topside adjustments and of the fact
that it had not been fully disclosed to the auditor, he signed
multiple management representation letters to that firm
affirming the accuracy and completeness of ARA's disclosures.

Boucher contends that the amount of the misstated revenue
was minor in comparison to total revenue and thus relatively
immaterial, weighing against an inference of scienter, citing
City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.

<u>Waters Corp.</u>, 632 F.3d 751, 757-58 (1st Cir. 2011) (holding that
marginal materiality undercuts the existence of "the requisite
intent or extreme recklessness" for scienter).  The SEC responds
that ARA's misstatements were material because they, <u>inter alia</u>,
had a significant impact on the operating and net income it
reported.  According to the Restatement, ARA overstated its
operating and net income in 2017 by 18% and 30%, respectively,
and its operating and net income in 2018 by more than 80% and
200%, respectively.  Boucher, in turn, disputes those figures as
"dividing apples into oranges" because they purportedly compare
income for a given year to overstated revenue in that year.

The Court finds that criticism unavailing because the SEC
has not compared disparate amounts.  Instead, it compares the
originally reported figures with the restated figures for
operating income and then, separately, repeats the comparison
for net income.  The notable differences between reported and
restated income figures in both 2017 and 2018 proclaim the
material effect of ARA's revenue misstatements.  For instance,
the district court in <u>SEC</u> v. <u>Thielbar</u>, a case cited by Boucher,
explains that the materiality of misstated revenue may be
assessed by a court

> look[ing] to the allegation in the complaint that the
> parent corporation overstated its net income for two
> years by 8% in deciding if the prematurely recognized
> revenue was a material misstatement.

- 19 -

2007 U.S. Dist. LEXIS 72986, at *21 (D.S.D. Sep. 28, 2007)
(describing the Eighth Circuit's analysis in Gebhardt v. ConAgra
Foods, Inc., 335 F.3d 824 (8th Cir. 2003)).

Finally, the claims brought against Boucher under Section
17(a)(2) and (a)(3) requiring only proof of negligence are
adequately supported because the SEC has over-pled scienter and
the violation of pertinent GAAP standards.  For the foregoing
reasons, Boucher's motion to dismiss Counts I, III and IV will
be denied.

> **2.  Smith: Violations of Section 17(a) of the
> Securities Act and Violations of Section 10(b) of
> the Exchange Act & Rules 10b-5(a) and (c)**

Defendant Smith contends that Counts I and III are subject
to dismissal for three reasons:

1) the claims under Section 17(a)(1) and (a)(3) of the
Securities Act and Rule 10b-5(a) and (c) for scheme liability
should be dismissed because she is not alleged to have engaged
in a deceptive act or fraudulent conduct distinct from the
purported misstatements to the public about ARA's financial
performance;

2) the claims under Section 17(a)(1) of the Securities Act
and Rule 10b-5(a) and (c) should be dismissed because she did
not participate in a fraudulent scheme with the requisite
scienter; and

3) the claims under Section 17(a)(2) and (a)(3) of the
Securities Act should be dismissed because she did not act
negligently in obtaining money or property based upon a
misstatement or omission or by engaging in a scheme which
perpetuated a fraud upon a securities purchaser.

### a.   Scheme Liability

Smith first contends that she cannot be held liable under
Section 17(a)(1) and (a)(3) or Rule 10b-5(a) and (c) because the
allegations in the case at bar are solely premised on her
purported acts of preparing and providing support for alleged
misstatements.  She suggests that such acts are not distinct
from any misstatements or misleading omissions and thus cannot
operate as the basis for scheme liability.

The United States Supreme Court has held that the
disseminator of false statements may be held liable under Rule
10b-5(a) and (c) even though that person did not make the
subject statements and thus could not be liable under Rule 10b-
5(b). See Lorenzo v. SEC, 139 S. Ct. 1094, 1100-01 (2019).  The
Supreme Court rejected the petitioner's argument that

> the only way to be liable for false statements is
> through those provisions that refer *specifically* to
> false statements.

Id. at 1101 (explaining that there is considerable overlap among
the subsections of Rule 10b-5 and the related securities laws).

Smith cites <u>SEC</u> v. <u>Rio Tinto</u> in support of her argument that, even after <u>Lorenzo</u>, scheme liability requires conduct that is separate and distinct from any alleged misstatement(s). 41 F.4th 47 (2d Cir. 2022).  The Second Circuit Court of Appeals ("Second Circuit") was clear that the dissemination of false statements present in <u>Lorenzo</u> is but "one example of something extra that makes a violation a scheme." <u>Id.</u> at 54.  In fact, the Second Circuit specifically noted that it was not deciding

> whether corruption of an auditing process is
> sufficient for scheme liability under <u>Lorenzo</u>, or
> allegations that a corporate officer concealed
> information from auditors.

<u>Id.</u>  Its holding was limited to the principle that "misstatements and omissions <u>alone</u> are not enough for scheme liability". <u>Id.</u> (emphasis added).

The SEC, in turn, points to a litany of post-<u>Lorenzo</u> cases in which courts have found that deceptive acts related to an alleged misstatement may form the basis for scheme liability. <u>See, e.g.</u>, <u>Malouf</u> v. <u>SEC</u>, 933 F.3d 1248, 1259 (10th Cir. 2019) (rejecting appellant's argument that scheme liability could not be based upon his failure to correct misstatements which he contended were "inseparable from the misstatements themselves"); <u>SEC</u> v. <u>Winemaster</u>, 529 F. Supp. 3d 880, 919 (N.D. Ill. 2021) (holding that defendant's failure to disclose information

"necessary for proper accounting" was a deceptive act sufficient for scheme liability following <u>Lorenzo</u>).

The Court concludes that the allegation that Smith provided false support to an external audit firm constitutes a deceptive act that, even if related to the making of a false statement by another, may establish her liability under Section 17(a)(1) and (a)(3) and Rule 10b-5(a) and (c).

### b. Scienter (Smith)

According to the complaint, Smith had a different role in the fraudulent scheme than did Wilcox or Boucher.  There are nevertheless multiple allegations that, if proven, would demonstrate her substantial participation in the scheme and scienter.

Although she was not part of the initial discussions during which Wilcox and Boucher triangulated various metrics to determine topside adjustments at a consolidated level, Smith was a high-level officer with significant responsibilities concerning revenue recognition.  She directly and indirectly implemented improper revenue recognition practices necessary for the scheme to function.  For example, the complaint alleges that Smith rejected suggested adjustments based on patient-level data because they would undermine ARA's efforts to falsify a DSO of 40.  Moreover, Smith purportedly directed an employee under her supervision to "find" additional revenue in order to reach

desired and predetermined financial metrics.  She was frustrated when that employee questioned her instructions and he was fired eight days later.  Smith is also alleged to have informed Boucher that she and her staff had found more revenue than needed and could back off (i.e. not report) some of that revenue while still reaching the desired RPT target.

Smith also purportedly played a key role in misleading the external audit firm that ARA hired.  Upon receiving a request from the auditor for information that supported various topside adjustments, Smith (along with Boucher) directed staff to cherry-pick available data to conceal the DSO-targeting rationale which had actually driven those adjustments.  Smith was aware that certain adjustments were "clearly a DSO entry" or had "no waterfall [support] for all of 2017".  The complaint alleges that Smith and Boucher directed staff to create fake support with respect to those adjustments.  She performed a final review of that so-called "support", emailed that information to the auditor and signed a representation letter falsely asserting that ARA followed certain revenue recognition processes. See Duncan, 2021 WL 4197386, at *14 (holding that attempts to conceal wrongdoing support an inference of scienter).

Finally, there is another factor that weighs in favor of a finding of scienter.  After the conduct described above, Smith

sold more than 8,000 shares of ARA stock at a profit of more than $160,000.  In view of the rest of her conduct at or around that time, such self-serving sales of stock are further evidence of her scienter.  In re Cabletron, 311 F.3d at 40 ("the insider trading allegations add some weight to the other evidence of scienter").

The allegations in the complaint are sufficient under the Rule 9(b) standard to support an inference of Smith's liability and scienter and therefore of her negligence.  Thus, her motion to dismiss Counts I and III will be denied.

### C.  Claims for Aiding and Abetting (Counts II, V, VII, IX and XII)

All three defendants have moved to dismiss Counts II, V, VII, IX and XII with respect to the aiding and abetting violations.  An aiding and abetting violation requires that the aider and abettor knowingly or recklessly provided substantial assistance to the primary violator of the securities laws.  See Durgarian, 477 F. Supp. 2d at 357.  Defendants do not dispute that the SEC has stated a claim of primary violations by ARA but do dispute other prerequisites for liability.  For the reasons that follow, the Court will not dismiss any of the claims for aiding and abetting liability against Wilcox, Boucher or Smith.

Counts II and V are brought against the defendants for aiding and abetting ARA's primary violation of Section 17(a) of

the Securities Act and Section 10(b) of the Exchange Act & Rule 10b-5 thereunder.  Because the Court has already found that the SEC has adequately pled that each of the defendants violated those securities fraud provisions with the requisite scienter, it has stated a claim for aiding and abetting liability as well. See SEC v. Liberty, 2021 WL 664834, at *4 n.9 (D. Me. Feb. 19, 2021) (citing Lorenzo, 139 S. Ct. at 1103-04)).

The SEC brings Count VII against the defendants for aiding and abetting ARA's primary violation of Section 13(a) of the Exchange Act & Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.  Those provisions of the securities laws require publicly traded companies to file complete and accurate financial reports. See SEC v. e-Smart Techs., Inc., 31 F. Supp. 3d 69, 87 (D.D.C. 2014).  As discussed above, the contemporaneous financial reporting of ARA included purportedly overstated revenues and other manipulated financial metrics. Each of the defendants had significant responsibilities with respect to the preparation and accuracy of such reports and defendants Wilcox and Boucher signed many of them.  Thus, the complaint adequately alleges that each of their contributions to ARA's violations were knowing and substantial.

All three defendants also move to dismiss Count IX for aiding and abetting ARA's primary violation of Section 13(b)(2)(A) of the Exchange Act.  The bookkeeping requirements

of Section 13(b)(2)(A) require issuers of registered securities to

> make and keep books, records, and accounts, which, in
> reasonable detail, accurately and fairly reflect the
> transactions and dispositions of the assets of the
> issuer[.]

15 U.S.C. § 78m(b)(2)(A).

The filing of inaccurate financial statements and, e.g., the allegations that ARA maintained an improper spreadsheet of deferred and misreported revenue constitute inaccurate bookkeeping with which each of the defendants knowingly and substantially assisted.

Finally, Count XII is brought against each of the defendants for aiding and abetting ARA's primary violation of Section 13(b)(2)(B) of the Exchange Act. That section of the Exchange Act requires companies to "maintain a system of internal accounting controls" sufficient to assure that financial reports conform with GAAP standards and other accounting requirements. Wilcox and Boucher were responsible for implementing and maintaining ARA's internal accounting controls but allegedly violated that responsibility by, inter alia, implementing a process of topside adjustments without reference to patient-level revenue data. Their substantial and knowing participation in ARA's primary violation is clearly alleged.

Smith contends that she was not responsible for creating or implementing ARA's internal accounting controls despite her role as ARA's controller and that therefore she cannot be held liable for aiding and abetting its primary violation.  That legal assertion is unsupported by the caselaw she cites. See S.E.C. v. Cedric Kushner Promotions, Inc., 417 F. Supp. 2d 326, 337 (S.D.N.Y. 2006) (noting both that defendant was not "responsible for . . . maintaining adequate controls" and that there was no allegation that he had "aided or abetted any violation").  Among other allegations, the SEC asserts that Smith misrepresented ARA's compliance with its internal controls to the external audit firm and that she oversaw a blatantly improper spreadsheet of identified but deferred revenue.  Thus, her alleged assistance with ARA's failure to maintain a system of GAAP-compliant internal accounting controls was both knowing and substantial.

### D.  Count X for the Falsification of Books and Records

The SEC alleges that Wilcox, Boucher and Smith violated Exchange Act Rule 13b2-1 which provides that

> [n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account[.]

17 C.F.R. § 240.13b2-1.  In order to state a claim under Rule 13b2-1, the Commission must show that a defendant violated the rule as a result of unreasonable conduct. See S.E.C. v.

Goldsworthy, 2008 WL 8901272, at *5-6 (D. Mass. June 11, 2008) ["Goldsworthy II"].  Only Smith has moved to dismiss Count X and her motion will be denied.

Courts within this circuit have held that evidence of unreasonable conduct which contributes to the "issuance of materially misleading financial statements" may establish a defendant's bookkeeping liability under Rule 13b2-1. S.E.C. v. Jaeger, 2011 WL 3665112, at *3 (D.N.H. Aug. 19, 2011) (citation omitted); see also Goldsworthy II, 2008 WL 8901272, at *6-7 (same).  Multiple allegations in the complaint with respect to Smith's participation in the fraudulent scheme, including her oversight of the spreadsheet containing identified but unreported revenue and her directions to make or ignore certain revenue adjustments for the purpose of targeting performance metrics, state a claim for unreasonable conduct resulting in materially misleading financial statements.

### E.  Count XIII for Violations of Internal Controls

Section 13(b)(5) of the Exchange Act probits any person from

> knowingly circumvent[ing] . . . a system of internal accounting controls or knowingly falsify[ing] any book, record, or account[.]

15 U.S.C. § 78m(b)(5).

The SEC relies on the same alleged conduct to support Claim XIII against Smith as it did with respect to Counts I, III and

XII.  Smith again responds that she did not implement or knowingly violate any of ARA's internal controls.  For the reasons already expounded, the Court finds that the Commission has adequately pled that Smith knowingly circumvented ARA's internal controls by carrying out improper and deceptive revenue recognition practices and misrepresenting ARA's compliance with its internal controls to the outside audit firm. See S.E.C. v. Goldsworthy, 2007 WL 4730345, at *15 (D. Mass. Dec. 4, 2007) ["Goldsworthy I"] (holding that allegations which were relied upon to state scienter-based claims under Rule 10b-5 were sufficient to state a claim under Section 13(b)(5)).

Although Wilcox does not address the substance of Count XIII in either the memorandum or reply in support of his motion to dismiss and the SEC suggests that only Smith has moved to dismiss the claim, the Court notes that Wilcox's motion does seek dismissal of Count XIII.  Nevertheless, the Court will deny the motion because the alleged conduct of Wilcox discussed with respect to Counts I, III, IV and XII is also sufficient to state a claim that he violated Section 13(b)(5) of the Exchange Act.

**F.  Claims for False Statements to Outside Auditors (Counts XIV and XV)**

The Commission further asserts that each of the defendants violated Exchange Act Rule 13b2-2(a) (Count XIV).  Rule 13b2-2(a)

> prohibits directors or officers from directly or
> indirectly making or causing to be made materially
> false or misleading statements or omissions to an
> accountant in connection with filings to the SEC or
> other regulatory compliance efforts.

S.E.C. v. Espuelas, 579 F. Supp. 2d 461, 487 (S.D.N.Y. 2008)

(quoting 17 CFR § 240.13b2-2) (internal quotation marks

omitted).  Once again, only Smith has moved to dismiss Count

XIV.

The Court has repeatedly referred to Smith's purported

misconduct and misrepresentations while dealing with the

external audit firm.  In brief, allegations that she created

post-hoc, false support for topside adjustments, reviewed such

"support", sent it to the audit firm and then signed a

misleading management representation letter, are sufficient to

state a claim that Smith violated Rule 13b2-2(a). See, e.g.,

S.E.C. v. RPM Int'l, Inc., 282 F. Supp. 3d 1, 35 (D.D.C. 2017);

S.E.C. v. DiMaria, 207 F. Supp. 3d 343, 361 (S.D.N.Y. 2016).

Thus, Smith's motion to dismiss Count XIV will be denied.

Finally, Wilcox has moved to dismiss Count XV under which

the SEC asserts that he aided and abetted violations of Rule

13b2-2(a).  He offers no argument for such a dismissal.  The

complaint alleges that Wilcox supervised and directed Boucher

and Smith as they created and provided false support for topside

adjustments to the external audit firm.  The Commission further

alleges that Wilcox signed multiple management representation

letters concerning prior audits that misrepresented the internal controls and accounting processes which ARA followed.  His motion to dismiss Count XV will be denied.

### ORDER

For the foregoing reasons, the motions to dismiss of defendant Wilcox (Docket No. 44), defendant Boucher (Docket No. 48) and defendant Smith (Docket No. 42) are **DENIED** in their entirety.

**So ordered.**

     /s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated:  March 23, 2023