# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

v.

AMERICAN RENAL ASSOCIATES
HOLDINGS, INC., JONATHAN L.
WILCOX, JASON M. BOUCHER, and
KAREN J. SMITH,

     Defendants.

Civil Action No. 22-CV-10651-NMG

## DEFENDANT JASON M. BOUCHER'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Jason M. Boucher submits this Concise Statement of Undisputed Material Facts in support of his Motion for Summary Judgment. All documents cited herein are exhibits to the Declaration of John F. Sylvia filed herewith.

1.     American Renal Associates Holdings, Inc. ("ARA") was a Delaware corporation headquartered in Beverly, Massachusetts; it was a publicly traded company from April 21, 2016, until January 25, 2021, when it was acquired by a private equity company.[1]

---

[1] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 1; Amended Complaint, Dkt. No. 67, filed June 2, 2023 at ¶ 21.

2.     Jonathan L. Wilcox was ARA's Chief Financial Officer ("CFO") from 2011 until he resigned from ARA in September 2018.[2]

3.     Defendant Jason M. Boucher joined ARA in 2011. From January 2017 to September 2018, Mr. Boucher was ARA's Chief Accounting Officer; in October 2018, he succeeded Defendant Jonathan Wilcox as CFO and held that position until he resigned from ARA in March 2019.[3]

4.     Karen Smith was ARA's Controller from August 2009 until she became Vice President of Finance in September 2018, a role she held until she left ARA in April 2019.[4]

---

[2] Sylvia Decl., **Ex. 3** (ARA's Form 8-K, filed April 22, 2011) ("On April 21, 2011, the Board of Directors of [ARA], approved the appointment of John J. McDonough as the Company's Chief Operating Officer and the appointment of Jon Wilcox as the Company's Chief Financial Officer."); Sylvia Decl., **Ex. 4** (ARA's Form 8-K, filed July 26, 2018) ("On July 23, 2018, Jonathan L. Wilcox resigned as the Vice President and Chief Financial Officer of [ARA], effective as of September 30, 2018.").

[3] Sylvia Decl., **Ex. 5** (ARA's Form 8-K, filed January 25, 2017) ("On January 24, 2017, Jason M. Boucher was appointed Chief Accounting Officer and Treasurer of [ARA], in addition to his duties as the current Vice President of Finance. In his new capacity, Mr. Boucher will assume certain of the duties and responsibilities previously held by Jonathan L. Wilcox, Chief Financial Officer, and John J. McDonough, the former Treasurer of the Company, respectively. Mr. Boucher . . . has served as the Vice President of Finance at the Company since May, 2011 . . . ."); Sylvia Decl., **Ex. 4** (ARA's Form 8-K filed July 26, 2018) ("Effective October 1, 2018, Jason Boucher, the Company's current Vice President of Finance, Chief Accounting Officer and Treasurer will succeed Mr. Wilcox as Vice President and Chief Financial Officer. . . . Mr. Boucher . . . has served as the Company's Chief Accounting Officer and Treasurer since January 2017 and as its Vice President of Finance since May 2011."); Sylvia Decl., **Ex. 6** (ARA's Form 8-K filed March 27, 2019) ("On March 27, 2019, the Company announced that Jason Boucher has resigned as the Company's Vice President and Chief Financial Officer, effective March 26, 2019.").

[4] Sylvia Decl., **Ex. 7** (Depo. Ex. P-226 (Karen Smith's Background Questionnaire, dated April 6, 2021)) at 8; Sylvia Decl., **Ex. 8** (Karen Smith June 10, 2024 Depo. Tr.) at 22:13-23:10 ("A. I didn't notice it. Yeah. So it should—under controller, it should say August 2018 as the end date. Q. And I didn't catch that actually. Your promotion to VP of finance in 2019 would have been— that's actually 2018. So in September 2018, you became a VP—you became VP of finance? A. Yes. Yes.").

**ARA's Business Model**

5. ARA provided renal dialysis treatments and related services to patients suffering from end-stage renal disease ("ESRD"), partnering with nephrologists to operate dialysis clinics under a joint venture model.[5]

6. The nephrologists and clinic staff performed the dialysis treatments and generally managed patient care, and ARA handled, among other things, general accounting and financial reporting functions, and billing, collection, and payment of accounts receivable.[6]

7. As of December 31, 2018, ARA owned and operated 241 dialysis clinics in partnership with approximately 400 nephrologist joint venture partners.[7]

8. In 2018 alone ARA provided more than 2.3 million dialysis treatments to more than 16,500 patients across 27 states.[8]

**ARA's Revenue Recognition Process**

9. The Amended Complaint concerns ARA's revenue recognition from "approximately January 1, 2017 through at least November 9, 2018" (the "Relevant Period").[9]

---

[5] Sylvia Decl., **Ex. 2** (ARA's Form 10-K for fiscal year ended December 31, 2017, filed March 6, 2018) at 5, 10; Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 8, 13.

[6] Sylvia Decl., **Ex. 2** (ARA's Form 10-K for fiscal year ended December 31, 2017, filed March 6, 2018) at 15-16; Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 17-18.

[7] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 8, 67.

[8] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 8, 67.

[9] Amended Complaint, Dkt. No. 67, filed June 2, 2023 at ¶ 2.

10.     As a publicly traded company, ARA was required to prepare its financial statements in accordance with generally accepted accounting principles in the United States ("GAAP").[10]

11.     ARA generated revenue primarily by providing outpatient and inpatient dialysis treatments that were principally reimbursed by government-based programs (e.g., Medicare and Medicaid) and commercial insurers (some of which had contracted rates for services and others of which did not).[11]

12.     Because ARA had an often-significant lag between treatment and reimbursement, GAAP required ARA to recognize revenue based on the estimated amount expected to be received at the time of treatment, i.e., the net realizable rate.[12]

---

[10] Amended Complaint, Dkt. No. 67, filed June 2, 2023 at ¶ 29.

[11] Sylvia Decl., **Ex. 2** (ARA's Form 10-K for fiscal year ended December 31, 2017, filed March 6, 2018) at 16, 72 ("We derive our revenues from providing outpatient and inpatient dialysis treatments. The sources of these revenues are principally government-based programs, including Medicare, the Department of Veteran Affairs, Medicaid and Medicare-certified health maintenance organization plans and commercial insurance plans."); Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 19, 79 ("We derive our revenues from providing outpatient and inpatient dialysis treatments. The sources of these revenues are principally government-based programs, including Medicare, Medicaid and the Department of Veteran Affairs. Medicare and Medicaid may be provided through certified health maintenance organization plans and commercial insurance plans.").

[12] Sylvia Decl., **Ex. 35** (Defendant Jonathan L. Wilcox's Responses and Objections to Plaintiff Securities and Exchange Commission's Second Set of Interrogatories, dated January 5, 2024) at 10 ("Further complicating things, payments ARA received from third-party carriers were not necessarily revenues; it was common for third-party payors to seek refunds and retractions for months (and even years) after services were rendered. All of these factors required ARA to estimate its revenues based on factors such as its historical collections experience, ongoing trends, subsequent claims settlements or realizations, contract terms, and its professional judgment. Moreover, ARA was unquestionably **required** to estimate its revenues. It did not have the luxury of waiting months or years to report revenues based on actual cash receipts that payors had not sought to recoup. GAAP recognizes the complexities.") (emphasis in original)); Sylvia Decl., **Ex. 12** (John McDonough May 31, 2024 Depo. Tr.) at 134:6-9 ("Yeah. I believe it is GAAP that revenue is recorded at the estimated net realizable value, i.e., the amount that

13.     ARA's net realizable rates for government programs were based on rates

established by statutes or regulations; for contracted commercial payors, ARA's net realizable

rates were based on the contracted rates; and for non-contracted commercial payors, ARA's net

realizable rates were based on a "usual and customary rate," adjusted to ARA's expectation

based on experience, payor history, and other factors.[13]

---

ultimately you estimate will be collected."); Sylvia Decl., **Ex. 2** (ARA's Form 10-K for fiscal
year ended December 31, 2017, filed March 6, 2018) at 72 ("Patient service operating revenues
are recognized as services are provided to patients. . . . Net revenue recognition . . . require[s] the
use of estimates of the amounts that will actually be realized. Changes in estimates are reflected
in the then-current financial statements based on on-going actual experience trends, or
subsequent settlements and realizations depending on the nature and predictability of the
estimates and contingencies."), F-8 ("The preparation of financial statements in conformity with
U.S. GAAP requires the use of estimates and assumptions that affect the reported amounts of
revenues, expenses, assets, liabilities, and contingencies. Although actual results in subsequent
periods will differ from these estimates, such estimates are developed based on the best
information available to management and management's best judgments at the time made.");
Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31,
2018, filed September 5, 2019)) at 79 ("Net patient service operating revenues are reported at the
amounts that reflect the consideration to which we expect to be entitled in exchange for
providing dialysis treatments and related services."); F-9 ("The preparation of financial
statements in conformity with U.S. GAAP requires the use of estimates and assumptions that
affect the reported amounts of revenues, expenses, assets, liabilities, and contingencies. Although
actual results in subsequent periods will differ from these estimates, such estimates are
developed based on the best information available to management and management's best
judgments at the time made."), F-10 ("There are significant challenges associated with
estimating revenue, with certain transactions taking several years to resolve. Estimates are
subject to ongoing insurance coverage changes, geographic coverage differences, differing
interpretations of contract coverage and other payor issues, as well as other issues including
determining applicable primary and secondary coverage, changes in patient coverage and
coordination of benefits. As these estimates are refined over time, both positive and negative
adjustments to revenue are recognized in the current period.").

[13] Sylvia Decl., **Ex. 2** (ARA's Form 10-K for fiscal year ended December 31, 2017, filed March
6, 2018) at 72 ("Medicare and Medicaid programs are billed at predetermined net realizable rates
per treatment that are established by statute or regulation. Revenue for contracted payors is
recorded at contracted rates and other payors are billed at usual and customary rates, and a
contractual allowance is recorded to reflect the expected net realizable revenue for services
provided."); Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended
December 31, 2018, filed September 5, 2019)) at 40 ("[I]n recognizing revenue from non-
contracted payors, we estimate the transaction price based on usual and customary rates, reduced
by contractual adjustments provided to those payors, discounts provided to uninsured patients in

14.     ARA recognized revenue using a two-step process. First, for each patient, ARA made an initial estimate of the expected net realizable rate per treatment and recorded a "contractual allowance" or "contractual adjustment" to offset the difference between the usual and customary rate and the expected net realizable rate.[14]

---

accordance with our policy and/or implicit price concessions. In assessing the probability of claim payments, we review previous payment history and record a reserve, generally at the patient level. that results in an estimate of expected revenue such that it is probable that a significant revenue reversal will not occur in future periods. When we later receive cash with respect to prior period patient claims, we are required to reconcile our contractual allowance estimates for discounts and price concessions with the cash we subsequently receive."); 79 ("The transaction prices for Medicare and Medicaid programs are based on predetermined net realizable rates per treatment that are established by statutes or regulations. The transaction prices for contracted payors arc based on contracted rates. For other payors, we estimate the transaction price based on usual and customary rates for services provided, reduced by contractual adjustments provided to third-party payors, discounts provided to uninsured patients in accordance with our policy and/or implicit price concessions. We determine our estimates of contractual allowances and discounts based on contractual agreements, regulatory compliance, and historical collection experience. We determine our estimate of implicit price concessions based on our historical collection experience with each payor, and where no prior experience exists, we consider information from the patient's health plan."); Sylvia Decl., **Ex. 25** (Depo. Ex. P-13 (Internal Audit Process Narrative, dated July 2016) at 18-19).

[14] Sylvia Decl., **Ex. 25** ((Depo. Ex. P-13 (Internal Audit Process Narrative, July 2016) at 18-20 (describing contractual allowance and true-up processes)); Sylvia Decl., **Ex. 2** (ARA's Form 10-K for fiscal year ended December 31, 2017, filed March 6, 2018) at 72, 89, F-11; Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 40, 79, F-10; Sylvia Decl., **Ex. 15** ((Joseph Carullo May 10, 2024 Depo. Tr.) 39:12-24 ("Q. Let's focus specifically on the contractual reserve part. . . . what's the contractual reserve? A. A contractual reserve is setting an estimate on a patient level of what we were getting reimbursed. For example, if we billed out $1,000 and we were getting paid 500, I would set the reserve at 50 percent. Q. So the reserve is the amount that you expect not to be paid. Right? A. Exactly, yes."), 53:21-54:15 ("Q. The contractual reserve . . . that's essentially an initial value that's used to estimate the amount that ARA expects to receive for certain dialysis services. Is that right? A. Yes. Q. And it's established before you receive the payment for which those services will correlate. Right? A. For new patients. But for existing patients, the reserve still needs to be determined. So new patients, you estimate a value, but for existing patients . . . hopefully you have a history of payment where you can set a value as well. Q. And the reserve that you set, is it just looking . . . forward to what you expect to receive, or is it also looking backward in time . . . for what happened in prior times? A. I would set the reserve looking forward."); Sylvia Decl., **Ex. 12** ((John McDonough May 31, 2024 Depo. Tr.) at 83:5-15 (Q. You developed a process that you used at ARA to [make] topside adjustments during your time as CFO, correct? A. The process of recording revenue, accordance with GAAP, in a health

15.     Second, as needed, ARA would adjust its initial estimate (increasing or decreasing the estimate) to account for any changes in circumstances (e.g., if ARA collected more or less than expected). ARA referred to these adjustments as "topside adjustments." [15]

_____

care service company is to estimate revenue. Our process to estimate revenue included an adjustment process that had two steps. An initial adjustment, and a Step 2 adjustment, which was contractual, which was our process to record revenue estimates in accordance with GAAP."), 140:6-147:12; *see also* Sylvia Decl., **Ex. 31** ((Depo. Ex. D-178 (Material Weakness and Restatement Memorandum) at 3 ("The revenue recognition process at ARAH can be distilled into three distinct phases: 1.) Billing based on treatment provided to an existing patient; 2.) initial estimate of the amount expected to be received for each treatment from all relevant payors (initial contractual allowance); and 3.) subsequent adjustment of the contractual allowances for the amount expected to be received as additional information becomes known, including subsequent cash receipts and payor related information.")).

[15] Sylvia Decl., **Ex. 2** (ARA's Form 10-K for fiscal year ended December 31, 2017, filed March 6, 2018) at 72, 89, F-11; Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 40, 79, F-10; Sylvia Decl., **Ex. 11** (Jillian Bernard May 8, 2024 Depo. Tr.) at 45:5-25 ("Q. What are topside adjustments as they were used at ARA? A. At ARA, topside adjustments were journal entries recorded in an effort to true up a revenue amount, recognized revenue based on cash collections. Q. What do you mean by 'true up'? A. So the process for recognizing revenue is upon billing. An initial amount of revenue would be estimated. After such time, cash may or may not be received, and based on those cash receipts, revenue should be trued up, either recognized, increased or decreased. Q. And that is because you understood that ARA, operating as it does with third-party payors, it's required to do an initial estimate of what it thinks it will collect? A. Correct. Q. Which may or may not vary considerably from what it actually does collect if and when the third party pays? A. Correct."); Sylvia Decl., **Ex. 13** (Jonathan Wilcox May 29, 2024 Depo. Tr.) at 51:2-52:1 (Q. All right. When you were CFO of ARA, what did the term 'topside adjustment' mean? A. Any adjustment that was booked to the 551000 account. . . . Q. . . . Under what circumstances were topside adjustments made while you were CFO? A. Sure. So if there was ever a revision to an estimate that needed to be made post a date of service, either through subsequent information obtained, a cash receipt, facts and circumstances, those revisions to estimates were what was recorded . . . as a topside . . . ."); Sylvia Decl., **Ex. 15** ((Joseph Carullo May 10, 2024 Depo. Tr.) at 66:3-66:16 ("Q. What did you understand a topside adjustment to be there? A. My understanding of a topside was an adjustment made after I submitted my contractuals to increase or decrease revenue based on additional information. Q. And that's because, no matter how good the initial estimate is, you often get additional information after that estimate that requires some sort of adjustment. Right? A. That is correct."), 68:5-69:4 ("Q. Despite your best efforts in setting the contractual reserves, those estimates were inaccurate at times. Correct? A. Yes, but I did my best to get them as accurate as possible. Q. Okay. Because sometimes information would change after you set the reserve. Right? A. Correct. . . . Q. Were there instances in which you had little or no information on which to base your contractual reserve? A. Yes. Q. What kind of instances were those? A. When there was a brand-new patient where we had no payment history.

16.     ARA considered several factors in determining whether a topside adjustment might be needed, including a financial metric called Days Sales Outstanding ("DSO").[16]

17.     DSO reflects the average number of days to collect on billed treatments, which ARA tracked monthly at both the individual clinic and consolidated company levels.[17]

---

Q. And you understood at least in a general way that the revenue group would use topside adjustments to make some kind of corrections for some of those estimates that were inaccurate. Is that right? ATTORNEY LALLAS: Objection. A. Yes."); Sylvia Decl., **Ex. 12** ((John McDonough May 31, 2024 Depo. Tr.) at 147:13-151:16; *see also* Sylvia Decl., **Ex. 31** (Depo. Ex. D-178 (Material Weakness and Restatement Memorandum) at 3 ("The revenue recognition process at ARAH can be distilled into three distinct phases: 1.) Billing based on treatment provided to an existing patient; 2.) initial estimate of the amount expected to be received for each treatment from all relevant payors (initial contractual allowance); and 3.) subsequent adjustment of the contractual allowances for the amount expected to be received as additional information becomes known, including subsequent cash receipts and payor related information.")).

[16] Sylvia Decl., **Ex. 35** ((Defendant Jonathan L. Wilcox's Responses and Objections to Plaintiff Securities and Exchange Commission's Second Set of Interrogatories, dated January 5, 2024) at 12 ("ARA evaluated DSO as one factor, among others, in its revenue estimates. . . . ARA regularly generated reports showing DSO by clinic in connection with its revenue recognition process. In addition, however, ARA generated several other reports—beyond DSO—in connection with its estimated revenues. Furthermore, ARA considered other relevant information such as contract negotiations with insurers, changes in insurers' payment practices (including major shifts like Medicare's reimbursement practices for Sensibar and Parsibiv), changes in regulations covering government-sponsored plans, legal disputes or settlements, and patient- or clinic-specific information about the likelihood of collecting accounts receivable as well as the likelihood that payments received might need to be returned."); Sylvia Decl., **Ex. 9** (Jason Boucher June 6, 2024 Depo. Tr.) at 47:18-48:16 ("Q. Now, what role did DSO have in Mr. McDonough's determination of what topside adjustments to make? A. I don't know. Q. What was your role in the process of determining topsides? A. To review to see if the AR was at the appropriate level. Q. How did you know what the appropriate level for AR was? A. Through communications with collectors and other analytics that I did. Q. Can you describe what those other analytics were? A. Sure. I'd compare DSO from one period to another to determine, you know, if it went up, can you explain the variance. I'd look at the overpayment liability. I'd look at the bad debt. I would look at revenue per treatment by financial class. I'd look at the aging of the receivables. Q. Anything else? A. There are other things, but I can't recall, you know, right now.").

[17] Sylvia Decl., **Ex. 12** ((John McDonough May 31, 2024 Depo. Tr.) at 154:18-155:12 ("Q. Are you familiar with a metric used within ARA called days sales outstanding? A. Yes. . . . It's a financial metric which, in the numerator, is the receivable, the net receivable, which is the net realizable value, and the denominator would be revenue. Q. And is the goal of that metric to capture what the name implies, which is essentially how long ARA was taking to collect

18.     ARA's historical experience was that typical consolidated DSO averaged around

40 days.[18]

---

revenue? MR. ROFFMAN: Objection. A. That is correct."); Sylvia Decl., **Ex. 13** ((Jonathan
Wilcox, May 29, 2024 Depo. Tr.) at 53:17-22 ("Q. All right. Are you familiar with the term 'day
sales outstanding'? A. I am. Q. What is that? A. That is a calculation of AR divided by revenue
times the number of days."); Sylvia Decl., **Ex. 19** ((Sean Reale May 3, 2024 Depo. Tr.) at 43:9-
45:7 ("A. [DSO is] supposed to be a representation of how many receivables are out there to be
collected; so your sum total of your outstanding claims. . . . you can derive DSO from looking at
the balance sheet. Q. How do you do that? A. . . . So a way to do it would be you would look at
an average run rate of revenue. So in this example, we would look at three months of revenue.
You would take those three months of revenue dollars divided by the number of days. Over those
three months would get you your revenue per day, and then you divided that by what is in your
outstanding AR, and that gives you the number of days of your sales that are outstanding.");
Sylvia Decl., **Ex. 11** ((Jillian Bernard May 8, 2024 Depo. Tr.) at 40:17-42:19 ("Q. And what is
days sales outstanding? A. It is a financial metric, a key performance integrate indicator . . . It
essentially indicates how long it is taking you to collect cash. Q. Starting with date of service or
the date of billing or what? A. The precise calculation includes revenue and accounts receivable.
Both of those numbers would come into the equation upon being billed. Q. . . . When does the
clock start running? A. When it's billed. . . . Q. Do you recall the formula? A. I do not, precisely.
I recall the attributes included. Q. In general, what are those attributes? A. Revenue and accounts
receivable. Q. In your work as controller, would you periodically review ARA's clinic's DSO?
A. Yes. Q. Would you periodically review ARA's consolidated DSO? A. Yes. Q. And by
consolidated DSO, do you understand that what I'm referring to is the average across all the
clinics? A. Consolidated DSO could be the average among all the clinics. It could also be a
standalone calculation of total consolidated revenue in AR. . . . Q. As controller you would
receive regular reports including details as to clinic and consolidated level of DSO? A. Yes. Q.
I've seen documents that are referred to as DSO reports. Are those the documents that would
contain that information? A. Yes.").

[18] Sylvia Decl., **Ex. 34** ((Defendant Jason M. Boucher's Objections and Responses to Plaintiff
Securities and Exchange Commission's Second Set of Interrogatories, dated January 5, 2024) at
8-9 ("Boucher believes that ARA's contemporaneous financial information shows that on
average, for the period he was employed at ARA, the Company maintained an average DSO of
approximately 40 days. By way of example, the Amended Complaint references ARA's financial
data from January 2014 to September 2018, *see* Am. Compl. at ¶ 172, and over that entire period,
Boucher believes that ARA's contemporaneous financial information shows that on average
ARA's DSO was approximately 40.7 days. As another example, the Amended Complaint
references ARA's originally reported and restated DSO numbers for 2017 and the first three
quarters of 2018. *See* Am. Compl. at ¶ 179. Over that period, Boucher believes that ARA's
contemporaneous financial information shows that on average, ARA's average DSO was
approximately 38.2 days.")); Sylvia Decl., **Ex. 35** ((Defendant Jonathan L. Wilcox's Responses
and Objections to Plaintiff Securities and Exchange Commission's Second Set of Interrogatories,
dated January 5, 2024) at 9 ("ARA's publicly reported DSO for the year ended December 31,
2014 was 43, and for the year ended December 31, 2015, was 40. The DSO for the year about to

19.     If a particular clinic's DSO in a given month was unusually higher or lower than 40, meaning ARA was collecting significantly more or less than was typical, it was an indicator that a topside adjustment (either increasing or decreasing ARA's initial estimate) could, but might not necessarily, be appropriate.[19]

---

end on December 31, 2016 was 37. As a result, the average of the three, year-end (i.e., "historical") DSO numbers immediately before and just as Wilcox assumed responsibility for revenue was approximately 40 days.")); Sylvia Decl., **Ex. 25** ((Depo. Ex. P-13) (Internal Audit Process Narrative, July 2016) at 19 ("On average, ARA maintains a DSO average of 40 days.")).

[19] Sylvia Decl., **Ex. 25** ((Depo. Ex. P-13) (Internal Audit Process Narrative, July 2016) at 19 ("On average, ARA maintains a DSO average of 40 days. . . . If the DSO is unusually high or low, the Revenue team is prompted to perform a Waterfall (aka Cash Tail) Analysis."); Sylvia Decl., **Ex. 35** ((Defendant Jonathan L. Wilcox's Responses and Objections to Plaintiff Securities and Exchange Commission's Second Set of Interrogatories, dated January 5, 2024) at 9 ("[DSO average of 40 days] functioned as an indicator of a potential need to modify revenue estimates and a reference point to determine whether ARA should do further analyses."); Sylvia Decl., **Ex. 13** ((Jonathan Wilcox May 29, 2024 Depo. Tr.) at 53:31-54:15 ("Q. What role did DSO have in determining topside adjustments during the period you were CFO and John McDonough was COO? MR. KANE: Objection. A. Well, so as I just said, in terms of the process, it was a monitoring control. So DSO is a first—it's a—an indicator of the quality of the estimate that you're making for revenue first, cash. And so if—for example, from a monitoring control perspective, if you're recording too much revenue and the cash is not coming in, then the calculation would show a DSO that is too high. So you need to revisit the quality of your estimate that you're making with the revenue. So it was an indicator for further analysis."), 76:3-19 ("DSO was a benchmark. It was a benchmark for further analysis."); Sylvia Decl., **Ex. 11** ((Jillian Bernard May 8, 2024 Depo. Tr.) at 57:5-14; ("[W]e would use the DSO metric as kind of our benchmark to let us know if it appeared reasonable."), 117:13-17 ("Again, with a high DSO, it would insinuate that there are some aged receivable that exist for the clinic."), 273:2-17 ("Q. So you didn't think there was anything wrong with looking at clinics that had a high DSO over 60 or lower than 20. . . . . right? A. No. Q. And there is nothing wrong with doing a waterfall for those clinics to determine where the topside should be taken, right? A. Correct. Q. And if you had a good faith estimate to make those adjustments, you did, and if you didn't, you didn't, right? A. Correct. Q. And there is nothing wrong with adjusting those estimates? A. Correct."); Sylvia Decl., **Ex. 18** ((Milena Georgieva April 25, 2024 Depo. Tr.) at 160:14-161:5 ("Q. Should DSO ever have any relationship to a decision whether to take or not a topside adjustment? MR. SYLVIA: Objection. MR. TIGHE: Objection. A. A DSO should be a driver, an indicator for a clinic's receivables to be reviewed. Would it result in an adjustment, it could. . . . The DSO will trigger an analysis or review of a clinic's receivable collections and outstanding balances."); Sylvia Decl., **Ex. 9** (Jason Boucher June 6, 2024 Depo. Tr. 194:9-12 ("I'm saying DSO is a benchmark. We looked at clinics outside the benchmark to determine if adjustments were needed, and we did analysis and spoke to collectors."); Sylvia Decl., **Ex. 19** ((Sean Reale May 3, 2024 Depo. Tr.) at 148:6-23 ("Q. Okay. So what do you understand the [DSO 40] to be

20.     During 2017 and 2018, the vast majority of clinics managed by ARA—generally more than 75%—continued to have DSOs that were either lower than 35 or higher than 45.[20]

21.     The SEC admits that an adjustment to a clinic's DSO might produce either an increase or a decrease in revenues: "Topside adjustments that increased revenue and accounts receivable appeared to either increase ARA's DSO or decrease it, depending on the ratio of accounts receivable to revenue and the time period over which DSO was calculated, which was often 30 days at ARA. . . . On a consolidated basis, increases to revenue and accounts receivable from topside adjustments could therefore decrease DSO, while increasing DSO for some clinics."[21]

22.     Using DSO as a benchmark to help advise topside adjustments was a matter of long-standing practice that Mr. Boucher took over from his predecessor, Mr. McDonough, who the SEC has not accused of fraud or mismanagement in this case.[22]

---

other than just an assumption? A. [DSO 40 is] not an assumption. It's a . . . metric. Right? It's a . . . benchmark. . . . a clinic is operating what we would consider normally, if you consider 40 days to be normally, like I just explained, if you take the revenue and multiply it by 40, that would give you what you would expect this clinic's AR . . . Let's say you had no other information at all other than this piece of information. What would you expect the clinic's AR to look like? You would expect it to be normal. You would expect it to be 40 days. It's not 40 days; therefore, there could be this amount of problems.").

[20] Sylvia Decl., **Ex. 26** (January 2018 DSO Report, Bates stamped ARA_SEC_00293914) at "DSO Ranked" tab; Sylvia Decl., **Ex. 33** (September 2018 DSO Report, Bates stamped ARA_SEC_00186693) at "DSO Ranked" tab.

[21] Sylvia Decl., **Ex. 36** (Plaintiff Securities and Exchange Commission's Answers to Defendants' Joint First Set of Interrogatories, dated December 18, 2023) at 29-30.

[22] Sylvia Decl., **Ex. 25** (Depo. Ex. P-13 (Internal Audit Process Narrative, July 2016) at 19-20 ("On average, ARA maintains a DSO average of 40 days. 1. If the DSO is unusually high or low, the Revenue team is prompted to perform a Waterfall (aka Cash Tail) Analysis 2. The purpose of the Waterfall Analysis is to analyze the actual history of revenue received. 3. The Waterfall Analysis is reviewed by the Chief Operating Officer [John McDonough] to determine if a top

23.     Insofar as Mr. Boucher refined the process after McDonough's departure, he

made it less DSO-dependent—encouraging or asking for detailed supporting analyses in many

cases.[23]

---

side adjustment is needed. a. If the COO determines an adjustment is needed to more accurately reflect revenue received , the Revenue team books a true up in Great Plains to GL account 551000.")); Sylvia Decl. **Ex. 12** (John McDonough May 31, 2024 Depo. Tr.) at 20:15-21:2 ("Q. And is [top side adjustments] something that you performed while you were at ARA, you developed a process through which you created—you calculated topside adjustments to ARA's revenue recognition, and those topside adjustments would be entered into the books and records of ARA? A. I was responsible for revenue recognition. And as we did at American Renal, it was a two-step process. One of the steps we call topside, the second step."), 133:15-18 ("A. In the 13 years I was at the company, the process to estimate net [] realizable value of revenue did not change. Pretty consistent through all 13 years."), 157:11-14 ("A. A DSO was an indicator of—to give further clarity to, Is the estimation process working as intended. But it was an indicator, it wasn't the driver."); Amended Complaint, Dkt. No. 67, filed June 2, 2023 at ¶ 67 ("Prior to 2017, the Former COO [John McDonough] was primarily responsible for revenue recognition, including making the initial contractual allowances and then determining whether any topside adjustments were necessary. . . . This action does not allege fraudulent conduct during the period prior to the Former COO's resignation from ARA on December 31, 2016 . . . .").

[23] Sylvia Decl. **Ex. 35** (Defendant Jonathan L. Wilcox's Responses and Objections to Plaintiff Securities and Exchange Commission's Second Set of Interrogatories, dated January 5, 2024) at 4 ("Following the departure of Chief Operating Officer John McDonough ("McDonough"), Wilcox and Jason Boucher ("Boucher") took over certain responsibilities for revenue recognition that McDonough had previously handled. Among other things, they sought to improve the control environment by enhancing documentation, increasing automation, and expanding the revenue team."); Sylvia Decl. **Ex. 18** ((Milena Georgieva April 25, 2024 Depo. Tr.) at 56:23-57:25 ("[I]t was, again coming from Jason, who says that my team will start doing more waterfalls, and it had to do with John McDonough going to be leaving the company."); 125:13-126:3 ("Q. Yeah. Are you aware of whether the topside adjustment process, after Mr. McDonough left, was at all different when Mr. Boucher and Mr. Wilcox were in charge of it? A. Was it all different? We still did do waterfall analysis. Jason wanted to find ways to improve the process so that it's—we have more information, more detailed information. He wanted us to reach out to the accounts receivable team for explanations of the waterfall analyses that we perform so that they can comment and weigh on whether these adjustments should be taken, or is there additional information that they know that we can't see from the analysis, and then record the waterfalls.").

24.     Mr. Boucher also sought to expand the revenue team, including adding a new position: a revenue recognition manager to provide an additional level of review and support in connection with ARA's revenue recognition.[24]

**ARA's Restatement**

25.     ARA former Revenue Recognition Manager Michael Dineen was terminated from ARA for poor performance on May 18, 2018 and filed a whistleblower complaint with the SEC about one week later.[25]

---

[24] Sylvia Decl. **Ex. 35** (Defendant Jonathan L. Wilcox's Responses and Objections to Plaintiff Securities and Exchange Commission's Second Set of Interrogatories, dated January 5, 2024) at 4 ("Among other things, [Mr. Boucher and Mr. Wilcox] sought to improve the control environment by . . . expanding the revenue team. For example, in early 2017, only a few months after McDonough's departure (and while he remained a consultant to the company), at Wilcox and Boucher's urging, ARA created a new position for a Revenue Recognition Manager, to provide an additional level of review and support in connection with ARA's revenue recognition. The Revenue Recognition Manager was a Certified Public Accountant ("CPA") with experience with preparing and supporting financial reporting, managing monthly financial reviews, and maintaining policies to ensure the correct application of accounting principles. At ARA, he was responsible for, among other things, analyzing cash collections, revenue recognized, and identifying, preparing and recording top-side adjustments. He was also tasked with leading the company's transition to ASC 606."); Sylvia Decl., **Ex. 21** ((ARA Revenue Recognition Manager Position Description, Bates stamped MDIN00006396) at MDIN00006399 ("We are seeking a dynamic professional to manage our revenue recognition process. This person will be responsible for the direction, coordination, and strategic planning of the company's activities to ensure accurate and timely revenue recognition. . . . Responsibilities: Direct all departmental activities related to the revenue recognition cycle. Establish policies and procedures to streamline month end close ensure revenue is recognized in accordance with US GAAP and ARA revenue recognition policies. Create and maintain Sarbanes-Oxley (SOX) related control documentation and narratives as they pertain to revenue recognition. Prepare reconciliations, analytical analyses and reserve calculations. Prepare revenue-related audit materials and coordinate with external audit staff. Aid in the continuing development of staff members and provide ongoing guidance, training and direction to developing and implementing ARA objectives.").

[25] Sylvia Decl., **Ex. 17** ((Micheal Dineen June 13, 2024 Depo. Tr.) at 295:12-13 ("Q. When was that? A. May 18th, when I was terminated."), 365:4-14 ("When you drafted the TCR, that was about a week after you were terminated; is that correct? A. The draft was done -- no, I think it started on like the Tuesday after—I was terminated on a Friday. I think it started on the Tuesday after. Q. Okay. It was about a week period between your being terminated and your filing of the TCR? Is that what you said? A. That's correct."); Sylvia Decl., **Ex. 8** ((Karen Smith June 10, 2024 Depo. Tr.) at 347:10-348:3 ("At some point, did—was Mr. Dineen fired from ARA? A.

26.    Prompted by the tip, the SEC began an investigation and in October 2018 asked

ARA to provide documents and information relating to certain revenue recognition, collections,

and related matters.[26]

---

Yes. Q. And tell me . . . were you involved in that process? A. Yes, I was involved in that process. Q. Tell me about the process. A. . . . I believe early in January 2018, I went to HR and started talking about his performance issues and problems that we were having with him. And then I believe I documented that to Brian Wahl in an e-mail. Overall, he was just a frustrating individual to work with. I had many times that I would ask him to do stuff that he should have been capable of doing, and he just—he wouldn't come back with any work product, or it was a very quick and lazy effort to get the answer."); Sylvia Decl., **Ex. 9** ((Jason Boucher June 6, 2024 Depo. Tr.) at 303:18-304:3 ("Q. Did you have a role in the decision to fire Mike Dineen? A. I did. Q. What was your role? A. Feedback that I didn't think his performance was where it needed to be. Q. . . . . who did you provide that feedback to? A. Who I remember is Jon Wilcox, Mike Dineen, and Karen Veilleux. And I believe I also made it vocal to Jillian Bernard."); Sylvia Decl., **Ex. 11** ((Jillian Bernard May 8, 2024 Depo. Tr.) at 166:23-167:24 ("Q. Did you personally have an opportunity to form any opinion as to the quality of [Mr. Dineen's] work? A. Yes. Q. What is that? A. My opinion was that he was not well versed in technical accounting, specifically ASC 606, and didn't have a strong understanding of his role. . . . he didn't have a strong understanding of healthcare and the related accounting, specifically in conjunction with having to analyze it for adoption of 606. Q. Do you know whether prior to ARA he ever had any healthcare accounting experience? A. I don't know. Q. It was your opinion at the time that he was not strong in that regard? A. Yes."); Sylvia Decl., **Ex. 13** ((Jonathan Wilcox May 29, 2024 Depo. Tr.) at 300:19-302:1 ("Q. Mr. Wilcox, did you have any role in the decision to fire Michael Dineen? A. Did I have any role? I'm not entirely sure what you mean, but I gave . . . verbal feedback to Jason that Mike's quality was poor. . . . Q. What informed your conclusion that Mike's quality was poor? A. Well, a couple things. First, part of the reason we brought on . . . this revenue accounting manager department, is we had this big ASC 606 implementation that we had to do. . . . And we initially tasked Mike with documenting that process and getting him kind of whatever resources he needed. And we were behind on that project primarily because of Mike's efforts. . . . That was not in the plan. . . . And also just day-to-day interactions I had. When I would ask him questions or ask requests, they often came back incomplete, erroneous. It would require a lot of back-and-forth just to get very simple tasks completed.").

[26] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 4 ("In our Quarterly Report on Form 10-Q for the quarter ended September 30, 2018, we disclosed that in October 2018, the Staff of the SEC requested that we voluntarily provide documents and information relating to certain revenue recognition, collections and related matters. Following receipt of the SEC request, we responded by producing documents and information to the Staff.")).

27. ARA complied with this request and its Audit Committee independently reviewed ARA's revenue recognition methodology, among other things, with the assistance of legal counsel reporting to the Audit Committee and independent accounting advisors retained by the Audit Committee's counsel.[27]

28. In September 2019, ARA restated its financial statements from 2014 through the third quarter of 2018 (the "Restatement")[28] after concluding that some aspects of ARA's revenue recognition did not comply with GAAP and its financial statements going back to at least the year ended December 31, 2014 were materially misstated as a result.[29]

---

[27] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 4 ("In addition, as previously disclosed in our Current Report on Form 8-K filed March 8, 2019, the Audit Committee . . . began a review of our revenue recognition methodology and related accounting matters, including internal control over financial reporting related to revenue recognition and related matters, with the assistance of legal counsel that reports to the Audit Committee, as well as independent accounting advisors retained by the Audit Committee's counsel.")).

[28] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 4 ("In this Form 10-K for the year ended December 31, 2018, we are including audited amended and restated financial statements and other financial information for the fiscal years ended December 31, 2017 and 2016, unaudited restated financial information for the fiscal quarters and year-to-date periods ended March 31, June 30 and September 30, 2018; March 31, June 30 and September 30, 2017; and March 31, June 30 and September 30, 2016, and selected financial data (see 'Item 6. Selected Financial Data') for the years ended December 31, 2015 and 2014 derived from unaudited amended and restated financial statements (collectively, 'Restated Periods').")).

[29] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 4 ("In connection with the review of the matters described above, on March 21, 2019, the Board in conjunction with management concluded that our previously issued consolidated financial statements and other financial data for the Restated Periods should be restated and should no longer be relied upon for the reasons described below. . . . During the course of its review, the Audit Committee in conjunction with management concluded that our consolidated financial statements for the Restated Periods were not prepared in accordance with [GAAP] and required the adjustments described below under 'Effects of Restatement' for the Restated Periods. The Audit Committee also concluded that our lack of adequate internal control over financial reporting relating to these matters for the Restated Periods constituted the material weaknesses in internal control over financial reporting described below in 'Material Weaknesses.'")); Sylvia Decl., **Ex. 31** ((Depo. Ex. D-178) (Material

29.     In fact, the Audit Committee's counsel had "concluded that there was no intentional wrong-doing on the part of management, and that the misstatements [were] the result of inadequate processes and controls."[30]

---

Weakness and Restatement Memorandum) at 2 ("Upon the completion of the investigation, which occurred over a period of more than six-months, the Company concluded that the financial statements, going back to at least the year ended December 31, 2014 were materially misstated as a result of the manner in which the Company accounted for its contractual reserve estimates.").

[30] Sylvia Decl., **Ex. 31** ((Depo. Ex. D-178) (Material Weakness and Restatement Memorandum) at 2)).

30.     The Restatement affected the timing of ARA's revenue recognition, pushing

revenue recognized in 2017 and the first three quarters of 2018 back into 2016 and 2015;[31] it did

not conclude that anyone at ARA had fabricated revenue or committed fraud of any kind.[32]

---

[31] Sylvia Decl., **Ex. 22** ((Depo. Ex. 35) (Grant Thornton December 31, 2018 Memorandum) at 1
("Ankura analyzed the cash received and adjustments made for each claim, and assessed and
compared to the original contractual allowance estimate set by the Company contemporaneously.
Ankura then trued-up the contractual allowance estimate from the initial estimate to a revised
estimate based on actual payments or adjustments that had occurred for that claim, both prior to
and subsequent to each reporting date. Said differently, any adjustments occurring subsequent to
each reporting date were "pushed back" to the original period of treatment as if the Company had
anticipated such amounts from the beginning and there would be no difference in initial estimate
for revenue recognition.")); Sylvia Decl., **Ex. 16** (Mark Herbers May 7, 2024 Depo. Tr.) at
167:20-168:13 ("Q. And is it correct to say that the restatement was really about the timing of
recognizing the revenue as opposed to whether that revenue was earned at some point? A.
Correct. Q. And basically by the timing, so in this I'm looking at the push, so revenues that were
recognized in 2017 and 2018 really were moved into the 2015, 2014 time period, or maybe even
earlier? A I think it's the other way around. Q Okay. A That the understated reported revenues in
2014 and '15, or '15 and '16, got pushed into revenue recorded in '17 and '18, but when restated,
was put back to the appropriate period. Q Thank you. That was what I was trying to ask in my
question that was put much more eloquently."); Sylvia Decl., **Ex. 11** ((Jillian Bernard May 8,
2024 Depo. Tr.) at 230:12-232:5 ("Q. . . . The restatement . . . allocated revenue in different
periods than it had been recognized initially, right? A. Yes. Q. And it did that with the benefit of
hindsight, right? A. Yes. Q. And so what the restatement was really doing was allocating revenue
in different periods, right? A. Correct. . . . Q. Okay. And cash wasn't missing. Cash was the same
as reported and as restated, right? A. Correct. Q. And so what's really going on is that the
restatement is recognizing the same revenue, different periods? A. Yes. Q. With the benefit of
hindsight? A. Correct.")); Sylvia Decl., **Ex. 10** (Jeffrey Strassman May 21, 2024 Depo. Tr.) at
546:21-548:18.

[32] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December
31, 2018, filed September 5, 2019)); Sylvia Decl., **Ex. 11** ((Jillian Bernard May 8, 2024 Depo.
Tr.) at 230:25-232:3 ("Q. [The Restatement]—it did not find that the revenue wasn't valid or
services weren't rendered or cash was made up; it found that they were recognized in incorrect
periods. MR. AUSTIN: Objection. A. I think as it's presented on the financials it's that way. I
think the detailed level work, there might have been instances where it was not recognized
correctly on an individual claim level from historical topsides. Q. You weren't aware in your role
as controller that anybody was making up revenue, were you? A. No. Q. And you weren't aware
that anybody was advocating for adjustments that did not have a good faith basis? A. No. Q. You
thought that they did have a good faith basis, right? A. Yes. Q. Okay. And cash wasn't missing.
Cash was the same as reported and as restated, right? A. Correct. Q. And so what's really going
on is that the restatement is recognizing the same revenue, different periods? A. Yes.")); Sylvia
Decl., **Ex. 31** ((Depo. Ex. D-178) (Material Weakness and Restatement Memorandum) at 2)).

31.     Mr. Dineen conceded in sworn testimony that his concerns were related to revenue recognition timing—not fabricated revenue.[33]

32.     The Restatement was constructed using perfect hindsight,[34] meaning ARA retroactively set its initial estimates to be equal to the amounts ARA later collected, as if ARA had known with certainty what those amounts would be at the time of treatment.[35]

33.     For 2017 and 2018, the Restatement adjusted ARA's originally reported revenue downward by approximately $43 million; for 2016, 2015, 2014, and years prior, the Restatement adjusted ARA's originally reported revenue upward by approximately $50 million.[36]

---

[33] Sylvia Decl., **Ex. 17** ((Michael Dineen June 13, 2024 Depo. Tr.) at 48:18-49:2 ("Q. What did you mean by that? A. That the revenue they're recognizing is true revenue. It's just that they're manipulating when they choose to recognize it. For example . . . I'm not alleging that they are making up cash collections. The cash they recognize as collected is cash they actually collected. It's just that they are manipulating their revenue recognition—the timing of the revenue recognition.")).

[34] Sylvia Decl., **Ex. 32** ((Depo. Ex. D-173 (Material Weakness Internal Memorandum) at 4 ("The forensic reconstruction had perfect hindsight. . . . This hindsight perspective provides certainty of what ARA realized for each period . . . .")); Sylvia Decl., **Ex. 11** ((Jillian Bernard May 8, 2024 Depo. Tr.) at 230:12-232:5 ("Q. . . . The restatement . . . allocated revenue in different periods than it had been recognized initially, right? A. Yes. Q. And it did that with the benefit of hindsight, right? A. Yes. Q. And so what the restatement was really doing was allocating revenue in different periods, right? A. Correct. . . . Q. Okay. And cash wasn't missing. Cash was the same as reported and as restated, right? A. Correct. Q. And so what's really going on is that the restatement is recognizing the same revenue, different periods? A. Yes. Q. With the benefit of hindsight? A. Correct.")); Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 5 ("The restated amounts consider actual cash collections associated with the dates of service in each relevant period.").

[35] Sylvia Decl., **Ex. 31** ((Depo. Ex. D-178) (Material Weakness and Restatement Memorandum) at 12; Sylvia Decl., **Ex. 22** ((Depo. Ex. D-35) (Grant Thornton December 31, 2018 Memorandum) at 1.

[36] Sylvia Decl., **Ex. 1** ((Depo. Ex. P-45) (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 6.

34.     In total, the Restatement reflects an aggregate understatement of ARA's revenue for the restated periods of approximately $6.2 million. This adjustment represented 0.16% (i.e., less than one percent) of ARA's total revenues originally reported over that period.[37]

35.     According to defense expert Joseph Floyd, the authors of the Restatement, not ARA's in-house accountants, violated GAAP's guidelines for the timing of revenue recognition. Under the Restatement's approach, cash collections that differed from ARA's original estimates were recognized as revenue retroactively—i.e., shifted back from the period in which the cash was collected to the period in which the patient services were rendered and the ARA recognized its first estimate as revenue. In Mr. Floyd's opinion, that was the wrong method: GAAP requires that such differences between original estimates and cash collections should be accounted for in the period the event (i.e., the cash collection) occurs to record the change to the original estimate.[38]

---

[37] Sylvia Decl., **Ex. 1** (Depo. Ex. P-45 (ARA's Form 10-K for the fiscal year ended December 31, 2018, filed September 5, 2019)) at 6, F-21, F-22, and F-68 (the 0.16% was calculated as follows: (1) total revenue recognition and accounts receivable adjustments as a result of the restatement of $6.2 million for 2013 and prior through Q3 2018, divided by, (2) total 'as reported' net patient service operating revenues of $3.8 billion (equal to $495.9 + $560.7 + $653.0 + $749.8 + $745.1 + $622.9, in thousands) for the years ended December 31, 2013 through 2017, and the three quarters ended September 30, 2018)).

[38] Sylvia Decl., **Ex. 20** ((Joseph Floyd September 17, 2024 Depo. Tr.) at 18:19-20:12 ("A. My next opinion relates to the restated financial statements and that they are not presented in accordance with generally accepted accounting principles. Notably, the financial statements are based on hindsight in the use, the use of cash received in subsequent periods to record, to reset, if I may say, and restate the service revenue, net revenue, recognized in the period of service. That's a violation of generally accepted accounting principles because those facts were not in existence as of that reporting period. [] [T]he elimination of any change in estimate, revenues for changes in estimates during reporting periods is another violation of generally accepted accounting principles.")).

36.     Conceptually, if ARA recorded entries to report fictitious revenues based on a fabricated DSO measure as alleged by the SEC, such a process would necessarily create unsupported accounts receivable balances.[39]

**Mr. Boucher's Bonus Structure**

37.     Since at least 2010, ARA's Chief Executive Officer ("CEO") Joseph Carlucci had an employment agreement with ARA providing that Mr. Carlucci was eligible for an annual bonus based solely on ARA's achievement of annual budgeted earnings before interest, taxes, depreciation, and amortization ("EBITDA"):

> In addition to the Base Salary, with respect to each full fiscal year during the Term, the Executive shall be eligible to earn an annual cash bonus award (a "Bonus") with a minimum threshold of 50.0% of Base Salary, a target Bonus of 100% of Base Salary and a maximum Bonus amount of 150% of Base Salary (the "Maximum Bonus") based on the ARH Group's achievement of annual, fiscal year Consolidated EBITDA (as defined in Exhibit B) performance goals . . . .[40]

38.     Mr. Carlucci's bonus amount was calculated according to a specific mathematical formula detailed in his employment agreement based upon how close ARA came to achieving 100% of its budgeted EBITDA:

> If ARH Group's Consolidated EBITDA for a particular calendar year is equal to 90% of the budgeted Consolidated EBITDA for that calendar year, Executive shall receive a bonus amount of 50.0% of Base Salary; if ARH Group's Consolidated EBITDA is between 90%-100% of the budgeted Consolidated

---

[39] Sylvia Decl., **Ex. 20** (Joseph Floyd September 17, 2024 Depo. Tr.) at 298:12-299:15 ("A. []If you are using [DSO 40] as a benchmark during periods where there is an ongoing review and uncertainties, especially regarding what cash is going to ultimately be posted to the net AR so that it's worthy of revenue recognition . . . you don't use that, then, to create fictional revenue. Because if you have fictional revenue, you would have overstated AR. Keeping this—using the historical benchmark negates that.").

[40] Sylvia Decl., **Ex. 30** (Depo. Ex. D-106 (Joseph Carlucci November 14, 2017 Third Amendment to Employment Agreement)) at 1; Sylvia Decl., **Ex. 29** (Depo. Ex. D-215 (Joseph Carlucci March 22, 2010 Employment Agreement)) at 1-2; Sylvia Decl., **Ex. 14** (Joseph Carlucci May 14, 2024 Depo. Tr.) at 34:2-34:6 ("Q. And was it that projected EBITDA that was used as a metric for determining part of your bonus? A. It was the budgeted EBITDA. Q. Right.").

EBITDA for that calendar year, for each full percentage point that Consolidated EBITDA exceeds 90%, the Bonus amount shall increase by 5.0% of Base Salary; if ARH Group's Consolidated EBITDA is between 100%-110% of the budgeted Consolidated EBITDA for that calendar year, for each full percentage point that Consolidated EBITDA exceeds 100%, the Bonus amount shall increase by 1.5% of Base Salary; and if ARH Group's Consolidated EBITDA is between 110%-127.00% of the budgeted Consolidated EBITDA for that calendar year, for each full percentage point that Consolidated EBITDA exceeds 110%, the Bonus amount shall increase by 2.0% of Base Salary (and an additional 1.0% of Base Salary if ARH Group's Consolidated EBITDA exceeds 127% by at least 0.33%)."[41]

39.    Mr. Boucher had no employment agreement with ARA before becoming CFO; his April 2011 offer letter provided only that Mr. Boucher would be eligible to receive up to 25% of his annual salary "based on the achievement of both Company and Personal objectives for 2011 and beyond."[42]

40.    Upon becoming CFO, Mr. Boucher executed an employment agreement providing that Mr. Boucher was eligible to receive as a bonus up to 75% of his annual salary "based on the achievement of objectives set by the Company."[43]

---

[41] Sylvia Decl., **Ex. 30** (Depo. Ex. D-106 (Joseph Carlucci November 14, 2017 Third Amendment to Employment Agreement)) at 1; Sylvia Decl., **Ex. 29** (Depo. Ex. D-215 (Joseph Carlucci March 22, 2010 Employment Agreement)) at 2.

[42] Sylvia Decl., **Ex. 27** (Depo. Ex. D-107 (Jason Boucher April 19, 2011 Offer Letter)) at 1.

[43] Sylvia Decl., **Ex. 9** (Jason Boucher June 6, 2024 Depo. Tr.) at 27:18-20 ("Q. When you became chief financial officer, did you execute an employment agreement? A. Yes."); Sylvia Decl., **Ex. 28** (Depo. Ex. P-149 (Jason Boucher August 1, 2018 Employment Agreement) at 1 ("In addition to the Base Salary, with respect to each full fiscal year during the Term, the Executive shall be eligible to earn an annual cash bonus award (a "Bonus") that is up to 75% of his annual salary based on the achievement of objectives set by the Company.")); Sylvia Decl., **Ex. 4** (ARA's Form 8-K, filed July 26, 2018) at 2 ("He will also be eligible to receive an annual cash incentive award of up to 75% of his annual base salary, based on achievement of objectives established by the Company.")).

41. Unlike Mr. Carlucci's bonus provision, the bonus provision in Mr. Boucher's employment agreement does not employ a mathematical calculation based upon ARA's EBITDA.[44]

42. For Mr. Boucher, ARA's EBITDA was at most just one factor in determining the amount of his bonus.[45]

43. In fact, in December 2017, Mr. Carlucci recommended that Mr. Boucher receive his full bonus and makes no mention of EBITDA as an achievement or contributing factor for Mr. Boucher's bonus: "Per our employment agreement *Syed and I are the only executives that have budgeted EBITDA as a contractual target*. . . . The following individuals have earned a full bonus award in my view at 50% of their salary and I am requesting early payments. I am listing some of their major achievements for your review: . . . Jason Boucher assumed contractual agreements processes, physician financial review meetings, debt refinancing."[46]

44. ARA did not achieve its budgeted EBITDA during the Relevant Period. In 2017 ARA achieved 95% of budgeted EBITDA. In 2018, ARA achieved 90% of budgeted EBITDA.[47]

---

[44] Sylvia Decl., **Ex. 28** (Depo. Ex. P-149 (Jason Boucher August 1, 2018 Employment Agreement)) at 1.

[45] Sylvia Decl., **Ex. 9** ((Jason Boucher June 6, 2024 Depo. Tr.) at 23:8-22 ("Q. When you were VP of finance, your bonus was tied, at least in part, to ARA's EBITDA for the year, right? A. I don't believe that was ever communicated to me. Q. Regardless of what was communicated to you, do you under—did you understand at the time that your bonus was tied, at least in part, to ARA's EBITDA? A. I thought it was one factor. Q. So you understood, while you were VP of finance, that one factor in determining your bonus was the company's EBITDA for the relevant year? A. It was a factor.")).

[46] Sylvia Decl., **Ex. 23** (Depo. Ex. D-104 (December 12, 2017 Email from Joseph Carlucci re: 2017 Bonuses) at 3 (emphasis added)).

[47] Sylvia Decl., **Ex. 24** (Depo. Ex. D-110 (Impact of Restatements Adjustments on EBITDA Bonus Achievement)) at 2.

45. The SEC does not allege that Mr. Boucher sold ARA stock during the Relevant Period, and in fact he did not.[48] Mr. Boucher forfeited his equity awards upon leaving ARA per the terms of his March 26, 2019 Separation Agreement.[49]

---

[48] Sylvia Decl., **Ex. 37** (Plaintiff Securities and Exchange Commission's Responses and Objections to Defendant Jason M. Boucher's Second Set of Interrogatories, dated December 18, 2023) at 13-15; Amended Complaint, Dkt. No. 67, filed June 2, 2023 at ¶¶ 184-192; Sylvia Decl., **Ex. 9** ((Jason Boucher June 6, 2024 Depo. Tr.) at 26:3-27:5 ("Q. Okay. Did you exercise any options while you were employed at ARA? A. Not that I recall. Q. How about the RSUs, did you—I'm not sure what the right term is to use for those, but did you sell or otherwise dispose of RSUs while you were employed at ARA? A. When the RSUs vested, there was a mechanic that some RSUs would net settle to cover taxes. It was—it was an auto-calculation. Q. Was it an auto-transaction also? A. Yes. Q. And that was while you were at ARA? A. Correct. Q. Okay. And how about after you left ARA, did you exercise or otherwise dispose of your stock options after you left ARA? A. I did not exercise any options at any time. Q. Were they purchased from you, or did you sell the options? A. No.")).

[49] Sylvia Decl., **Ex. 6** (ARA Form 8-K, filed March 27, 2019) at 8 ("Boucher agrees that all of his outstanding equity awards (including, without limitation, his unvested shares of restricted stock and any vested or unvested stock options under the American Renal Associates Holdings, Inc. 2016 Omnibus Incentive Plan (the '2016 Plan') and the 2010 American Renal Associates Holdings, Inc. Stock Incentive Plan (the '2010 Plan') will be forfeited to the Company as of the Separation Date without payment of consideration.")).

Dated:  September 30, 2024

Respectfully submitted,

JASON M. BOUCHER

By his attorneys,

_/s/ John F. Sylvia_
John F. Sylvia, BBO No. 555581
Matthew D. Levitt, BBO No. 660554
Catherine S. Lombardo, BBO No. 693414
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
JFSylvia@mintz.com
MDLevitt@mintz.com
CSLombardo@mintz.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and

paper copies will be sent to those indicated as non-registered participants, if any, on

September 30, 2024.

_/s/ John F. Sylvia_
John F. Sylvia, BBO No. 555581
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
JFSylvia@mintz.com