UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 22-cv-10651-NMG |
| AMERICAN RENAL ASSOCIATES HOLDINGS, INC. et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KAREN SMITH'S MOTION FOR SUMMARY JUDGMENT**

Jonathan L. Kotlier (BBO# 545491)
jkotlier@nutter.com
Ian D. Roffman (BBO# 637564)
iroffman@nutter.com
Alex Rothschild (BBO# 704521)
arothschild@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
 (617) 439-2000

*Counsel for Defendant Karen Smith*

## Table of Contents

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ................................................................................................................... 3

I.     REVENUE RECOGNITION AT ARA REQUIRED THE COMPANY TO ESTIMATE ITS REVENUE AND THIS CASE IS ONLY ABOUT ONE STEP IN THE ESTIMATION PROCESS: TOPSIDE ADJUSTMENTS ................... 3

II.    BEFORE 2017, ARA'S REVENUE RECOGNITION WAS THE SOLE RESPONSIBILITY OF A NON-PARTY, JOHN MCDONOUGH ............................ 4

III.   DURING THE RELEVANT PERIOD, SMITH WAS NEVER RESPONSIBLE FOR MAKING ARA'S TSA DECISIONS ....................... 5

IV.   DURING THE RELEVANT PERIOD, SMITH'S INVOLVEMENT WITH TSAS WAS MINIMAL ..................................................................... 6

     A.     In 2017, Smith Sometimes Ran Reports from ARA's Systems, But Did Not Analyze or Determine ARA's TSAs ..................................... 6

     B.     In 2018, Wilcox or Boucher Determined TSAs And All TSAs Were Based on Patient-Level Data ................................................................. 6

     C.     Between January and May 2018, Smith Became a Messenger Between Boucher and Dineen Because They Didn't Get Along, But She Still Did Not Determine ARA's TSAs .................................... 7

     D.     After Dineen Left ARA, Smith Still Did Not Determine ARA's TSAs ........................................................................................................ 8

V.     SMITH PROVIDED TRUTHFUL AND ACCURATE INFORMATION ABOUT TSAS TO ARA'S OUTSIDE AUDITORS ..................................... 8

ARGUMENT ....................................................................................................... 10

I.     NO REASONABLE JURY COULD FIND THAT SMITH PARTICIPATED IN A FRAUDULENT SCHEME TO MISSTATE ARA'S REVENUE ................................................................................... 11

     A.     The SEC Cannot Show that *Anyone* Intentionally Misstated Revenue at ARA ........................................................................... 11

     B.     The Isolated Events Involving Smith Do Not Support a Securities Fraud Claim Against Her ................................................................. 12

    1.    Smith Was Not Responsible for Determining TSAs ........................... 13

    2.    The Evidence Cannot Support a Fraud Verdict for 2017 TSAs ................................................................................................. 13

    3.    The Evidence Cannot Support a Fraud Verdict for 2018 TSAs ................................................................................................. 13

    4.    Smith Did Not Mislead Grant Thornton During its Audit Testing of ARA's 2017 TSAs ............................................. 14

II.     SCHEME LIABILITY AGAINST SMITH IS PRECLUDED AS A MATTER OF LAW BECAUSE THE LAW DOES NOT RECOGNIZE A SCHEME TO MISSTATE REVENUE ........................................................ 15

III.    JUDGMENT SHOULD BE ENTERED FOR SMITH ON THE SEC'S OTHER PRIMARY LIABILITY CLAIMS ................................................ 18

    A.    No Reasonable Jury Could Find That Smith Knowingly Circumvented ARA's Internal Controls .......................................... 18

    B.    No Reasonable Jury Could Find that Smith Falsified ARA's Books .............. 18

    C.    No Reasonable Jury Could Find that Smith Misled Auditors.......................... 19

IV.    SMITH DID NOT AID AND ABET SECURITIES LAW VIOLATIONS ................ 19

CONCLUSION ............................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ...................................................................11

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ...................................................................1

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999) ..................................................................11

*Iverson v. City of Boston*,
   452 F.3d 94 (1st Cir. 2006) ....................................................................10

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2010) ..................................................... 2-3, 16, 18, 19

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ...........................................................................16

*Medina-Rivera v. MVM, Inc.*,
   713 F.3d 132 (1st Cir. 2013) ....................................................................0

*In re Mindbody, Inc. Sec. Litig.*,
   489 F. Supp. 3d 188 (S.D.N.Y. 2020) ...............................................6, 19

*S.E.C. v. Lucent Techs., Inc.*,
   610 F. Supp. 2d 342 (D.N.J. 2009) .................................................19, 21

*SEC v. Durgarian*,
   477 F. Supp. 2d 342 (D. Mass. 2007) ...................................................12

*SEC v. Espuelas*,
   905 F. Supp. 2d 507 (S.D.N.Y. 2012) ...................................................18

*SEC v. Ficken*,
   546 F.3d 45 (1st Cir. 2008) ......................................................................1

*SEC v. Goldsworthy*,
   No. 06-10012-JGD, 2007 WL 4730345 (D. Mass. Dec. 4, 2007) ..........18

*SEC v. Hwang*,
   692 F. Supp. 3d 362 (S.D.N.Y. 2023) ...................................................17

*SEC v. Kelly*,
   765 F.Supp. 2d 301 (S.D.N.Y. 2011) ....................................................16

*SEC v. Kelly*,
  817 F. Supp. 2d 340 (S.D.N.Y. 2011)................................................................17, 18

*SEC v. Patel*,
  No. 07-39-SM, 2008 WL 781914 (D.N.H. Mar. 24, 2008).......................................19

*SEC v. SolarWinds Corp.*,
  2024 WL 3461952 (S.D.N.Y., July 18, 2024)................................................7, 19

*SEC v. Tambone*,
  417 F. Supp. 2d 127 (D. Mass. 2006).......................................................................20

**Statutes**

Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5) ...............................................19

Securities Act Sections 17(a), 15 U.S.C. § 77q(a).......................................12, 17, 19

**Other Authorities**

Exchange Act Rule 10b-5 ....................................................................................17, 19

Exchange Act Rule 13b2-1 ..........................................................................................20

Exchange Act Rule 13b2-2(a).......................................................................................20

## PRELIMINARY STATEMENT

Discovery has shown that this case should never have been brought against Karen Smith. The SEC lacks basic evidence that a fraudulent scheme to overstate revenue ever existed at American Renal Associates Holdings, Inc. ("ARA") or that Karen Smith, a controller who never was responsible for revenue, should be held personally liable for ARA's alleged revenue overstatements. Under the SEC's theory of the case, a corporate employee is responsible not only for doing her own job, but also for everyone else's as well. This theory is legally untenable, factually flawed, and should end here.

In September 2019, ARA, one of the nation's largest dialysis providers, restated its financial results for all periods from "2013 and prior" through the third quarter of 2018. ARA's total restated revenue during the restated periods was roughly the same as previously reported, but the timing of when it was recorded changed. According to the restatement, ARA had understated revenue in 2013, 2015, and 2016 and overstated revenue in 2014, 2017 and the first three quarters of 2018. The SEC's Amended Complaint followed, alleging that the revenue overstatements in 2017 and 2018 resulted from fraudulent conduct by three individual defendants, Jon Wilcox, ARA's Chief Financial Officer, Jason Boucher, ARA's Chief Accounting Officer, and Karen Smith, ARA's controller.

Of the three individual defendants, Smith was the most junior. She was not a member of ARA's executive management team. She never set ARA's policies or procedures for recognizing revenue. And she never had any responsibility for determining the amount of revenue ARA would recognize. Now, more than five years later and after extensive discovery, including nearly 30 fact and expert depositions, the record establishes that judgment should be entered for Smith because no reasonable jury could find that she violated the federal securities laws.

In summary, the SEC lacks evidence that ARA's revenue restatement resulted from fraud. The restatement does not state that revenue was misstated because of any intentional or negligent misconduct. ARA's Audit Committee investigation that led to the restatement concluded "there was no intentional wrong-doing" and that the misstatement "was the result of inadequate processes and controls." There is no evidence of any fictitious revenue at ARA. And the SEC's whistleblower – its star witness – claims that ARA maintained a "cookie jar" of revenue, which, if true, would have caused ARA to *understate* its revenue – a claim that directly contradicts the SEC's allegation that the company intentionally *overstated* its revenue.

As to Smith in particular, no reasonable jury could find that she recklessly or negligently participated in, or aided and abetted, a supposedly fraudulent scheme based on the isolated email chains cited by the SEC. Smith was never the decisionmaker on what revenue ARA recorded. She had no role in revenue recognition in 2017 whatsoever and only a limited role in 2018 to supervise more junior employees, whose substantive work was reviewed by executives above her in rank and experience. And all relevant revenue reported by ARA in 2018 was supported by patient-level detail of actual cash collections.

The undisputed evidence developed in discovery also proves that all data and information provided to ARA's auditors was truthful and accurate patient data that existed in ARA's books and records. The SEC's allegation that Smith improperly withheld a single piece of paper from the auditors – "McDonough's handwritten notes" – is directly contradicted by the testimony of *every witness* who testified about it, including the auditors and the purported whistleblower.

Additionally, judgment should be entered for Smith for the independent reason that there can be no "scheme" liability here. The SEC alleges that ARA overstated its revenue, but Smith did not make the alleged misstatement and thus under black-letter Supreme Court precedent from

2

*Janus Capital Group*, she cannot be liable for it. When pleading this case, the SEC sought to avoid the preclusive effect of *Janus Capital Group* by alleging that she engaged in a fraudulent scheme that was distinct from the misstatement. But the undisputed facts prove that Smith's conduct was part of ARA's alleged effort to misstatement revenue and thus, cannot form the basis for a separate scheme.

For these and other reasons, as detailed below, the Court should enter judgment for Karen Smith on all claims asserted against her.

## FACTS

I.  **REVENUE RECOGNITION AT ARA REQUIRED THE COMPANY TO ESTIMATE ITS REVENUE AND THIS CASE IS ONLY ABOUT ONE STEP IN THE ESTIMATION PROCESS: TOPSIDE ADJUSTMENTS**

ARA is a nationwide dialysis service provider. (SOF ¶¶ 1-2.)[1] Accounting for revenue in healthcare entities like ARA is unique and complex. (SOF ¶¶ 35-46.) Although ARA billed for services at a usual and customary rate ("UCR"), few (if any) payors actually pay the UCR. (SOF ¶¶ 36,42.) ARA was required to record revenue (and related accounts receivable) at the amount it estimated it would collect. (SOF ¶¶ 37,43-46.) ARA's estimation process was especially complex because of the large number of treatments it provided and because some patients had no insurance, changed insurance providers, or had insurance from companies with no standard contract with ARA. (SOF ¶¶ 35, 38, 39.)

Generally, ARA's revenue process involved three steps: first, recording the UCR for services; second, taking a "contractual allowance" to estimate of how much less ARA expected to collect on services; and third, recording a "topside adjustment" ("TSA") to hone its estimate

---

[1] Citations to Defendant Smith's Statement of Undisputed Facts in Support of her Motion for Summary Judgment are noted as "SOF ¶ __."

based on additional information obtained. (SOF ¶ 42.) TSAs could be positive or negative, and they were determined based on various factors, including collection history, changes in insurance rates, changes in patient carriers, overpayments, and others. (SOF ¶¶ 73-78, 80, 91, 159.)

This lawsuit involves only the third step: recording TSAs.

## II.    BEFORE 2017, ARA'S REVENUE RECOGNITION WAS THE SOLE RESPONSIBILITY OF A NON-PARTY, JOHN MCDONOUGH

For most of her career at ARA, Smith was not involved with the TSA process and had no need to learn or understand it. During her first eight years at ARA, she had the title "Controller," but that title did not mean she was involved with TSAs, and it is undisputed that she did not. (SOF ¶¶ 10-11.)

Before 2017, determining TSAs was the sole province of John McDonough, ARA's then-Chief Operating Officer. (SOF ¶¶ 5,-73-78.) McDonough resigned from ARA at the end of 2016, but he remained a consultant through February 2017 to train Wilcox and Boucher on his process for determining TSAs. (SOF ¶¶ 4, 86.) McDonough never trained Smith on TSAs because it was not contemplated that she would have any role in determining them. (SOF ¶¶ 85, 89.)

When McDonough determined the amount of TSAs, he used an analytic methodology in which he reviewed patient-level collection data as well as overall trends. (SOF ¶¶ 73-78.) He recorded his determinations by handwriting the amount of the TSA on a printout of ARA's profit-and-loss statement, which he handed to a company accountant to enter into ARA's general ledger. (SOF ¶ 77.) McDonough's handwritten notes were generally retained by ARA. (SOF ¶ 84.) Grant Thornton, ARA's outside auditor, was aware of McDonough's process and had seen his handwritten notes over the years. (SOF ¶¶ 80-84, 181.)

The SEC has not accused McDonough of any wrongdoing and has not alleged that the revenue misstatements during the years he was in charge resulted from misconduct.

III.    **DURING THE RELEVANT PERIOD, SMITH WAS NEVER
        <u>RESPONSIBLE FOR MAKING ARA'S TSA DECISIONS</u>**

During all relevant periods, Smith was never responsible for determining TSAs.

Documents produced by ARA revealed several drafts of an internal "process narrative" for

recognizing revenue that describe ARA's processes for aspects of revenue recognition including

TSAs. (SOF ¶¶ 62-72.) None identifies Smith as a "process owner" for revenue. (*Id.*)[2] Smith also

did not sign ARA's financial statements for any period in 2017 or 2018, was not responsible for

implementing internal controls for TSAs, and made no representations to ARA's external

auditors in 2017 or most of 2018. (SOF ¶¶ 61, 206, 207.)

After McDonough left ARA, revenue recognition became the responsibility of Boucher

and Wilcox. (SOF ¶ 89.) In March 2017, ARA hired a revenue manager, Michael Dineen, to help

Wilcox and Boucher with determining what revenue to recognize by analyzing potential TSAs

using patient-level detail. (SOF ¶¶ 14, 93.) When Dineen became revenue manager, he reported

to Smith on paper, but Dineen and his revenue accounting group worked directly with Boucher,

supporting the revenue recognition function that Boucher ran. (SOF ¶¶ 97-99.) After Dineen left,

ARA appointed a new revenue manager, who similarly analyzed potential TSAs at Boucher's

direction. (SOF ¶¶ 145.)

---

[2] A July 2016 revenue process narrative, still circulated as of March 2017, identifies three process owners
responsible for revenue, and none was Smith. (SOF ¶¶ 62-72.) A draft dated May 2017, circulated internally in
March 2018, identifies six revenue process owners, and none was Smith. (*Id.*) Another draft dated April 2018,
circulated internally in June 2018, identifies nine revenue process owners, and still, none was Smith. (*Id.*)

IV.    **DURING THE RELEVANT PERIOD, SMITH'S**
       <u>**INVOLVEMENT WITH TSAs WAS MINIMAL**</u>

    A.    **In 2017, Smith Sometimes Ran Reports from ARA's**
       <u>**Systems, But Did Not Analyze or Determine ARA's TSAs**</u>

Throughout 2017, Smith had no substantive role in revenue recognition. This fact has been confirmed by many witnesses, including the SEC's purported whistleblower Dineen, and its outside auditors at Grant Thornton. (SOF ¶¶ 23, 27-28, 34, 61, 62-72, 85, 119, 147.)

During discovery, the SEC has referenced Smith in connection with only two isolated events during 2017, but neither involved substantive work by Smith. First, the SEC has cited to a June 2017 email. (SOF ¶ 100.) In that email, Wilcox asks Dineen to let him "know when the revenue adjustments are done[.]" (*Id.*) His only request to Smith is to "please rerun tracker, etc.," a system report, when the adjustments were done. (*Id.*) Later in the email chain, Wilcox, not Smith, instructs Dineen to book TSAs for two specified clinics. (*Id.*) Smith's role is ministerial: to "rerun" a report from ARA's accounting system.

Second, the SEC's expert witness referred to a September 2017 email chain, which Smith did not send or receive, in which Dineen writes to other ARA employees: "I actually talked to Karen about this," and then clarifies whether an adjustment would be booked as a TSA or a contractual allowance. (SOF ¶¶ 101.) On its face, this email addresses which general ledger account a revenue estimate adjustment should be booked to, a topic that is not an issue in this case because it is unrelated to the *amount* of revenue recorded by ARA. (*Id.*)

    B.    **In 2018, Wilcox or Boucher Determined TSAs**
       <u>**And All TSAs Were Based on Patient-Level Data**</u>

During the relevant period of 2018, Wilcox or Boucher determined the amount of TSAs, and Smith was never privy to the details of their final analysis or decision-making. (SOF ¶¶ 89, 119.) Additionally, all TSAs recorded by ARA during the relevant period 2018 were supported

by patient-level data of dialysis services and payments in ARA's books and records. (SOF ¶¶ 112.) The patient-level data was analyzed in spreadsheets called "waterfalls." (SOF ¶¶ 47-49.) Dineen and his successor, Angela Keithahn, supervised the revenue accountants who prepared the waterfalls. (SOF ¶¶ 92, 93, 95, 148.) No witness, including the purported whistleblower, disputes that patient-level analyses were performed for all TSAs in 2018.

### C.    Between January and May 2018, Smith Became a Messenger Between Boucher and Dineen Because They Didn't Get Along, But She Still Did Not Determine ARA's TSAs

In early 2018, the relationship between Boucher and Dineen began to deteriorate, and Boucher asked Smith to become more involved in interacting with Dineen. (SOF ¶¶ 116-117.) As a result, she was copied on a larger number of emails in 2018 than in 2017, but she was never asked to determine the amount of TSAs.

The SEC has identified two isolated events during this period on which it bases its claims against Smith. The first is an April 11, 2018 email sent from Smith's email account to Dineen, with an attached Excel spreadsheet, entitled "Direct MTD 03'18 4.11.18." (SOF ¶¶ 120-124.) The SEC has taken the position that Smith was instructing Dineen to book TSAs to meet a predetermined metric, "days sales outstanding," or DSO. But the metadata for the spreadsheet shows that it was created and modified by Boucher, not Smith. (*Id.*) After creating the spreadsheet, Boucher emailed it to Smith with a subject line, "my topside entries were not addressed," stating only, "stopping by." (*Id.*) Without editing it, Smith forwarded Boucher's spreadsheet to Dineen. (*Id.*)

Second, in May 2018, Boucher was determining TSAs to close the books for April 2018. (SOF ¶¶ 125-142.) Being the first month of the quarter, April financial results are not disclosed to investors. (SOF ¶ 142.) On May 10, Smith emailed Dineen asking, "Can you please find another $1 – 1.2m in topside?" (SOF ¶ 134.) In response to this email, Dineen reviewed a

document known as the contractual adjustments spreadsheet, or CAS, and other patient level data from several clinics, and based on his review, Dineen proposed TSAs for several clinics. (SOF ¶¶ 104-105, 134-142.) After some back-and-forth, Smith forwarded Dineen's analysis to Boucher. (SOF ¶¶ 134-142.) Boucher asked questions of Dineen, performed additional analysis, and ultimately determined which TSAs to book. (*Id.*)

### D.    After Dineen Left ARA, Smith Still Did Not Determine ARA's TSAs

In mid-May 2018, Dineen was fired from ARA. (SOF ¶ 143.) ARA's reason for his termination was lack of competence. (*Id.*) As of his termination, Dineen had not complained to Smith or any executive at ARA about any supposedly improper conduct. After Dineen left ARA, Keithahn became ARA's revenue manager, and eventually, she reported to Jillian Bernard, a CPA who became ARA's controller in September 2018. (SOF ¶ 145.)

The SEC claims that in October 2018, Smith participated in an effort to improperly determine TSAs. Over a several-day period in October 2018, many ARA employees analyzed patient-level data in waterfalls to determine appropriate TSAs. (SOF ¶¶ 160-163.) The waterfalls resulted in TSAs that increased recorded revenue in some cases and decreased it in others. (*Id.*) This work culminated in an October 16 email from Bernard to Boucher (copying Smith). Bernard wrote that she "agree[s] that the topsides recorded were appropriate." (*Id.*)

## V.    SMITH PROVIDED TRUTHFUL AND ACCURATE INFORMATION ABOUT TSAs TO ARA'S OUTSIDE AUDITORS

During Grant Thornton's audit of ARA's 2017 financial statements, Grant Thornton conducted audit procedures on ARA's TSAs. (SOF ¶¶ 172-173.) Grant Thornton conducted a "substantive test" of the TSA entries, not a controls test. (SOF ¶¶ 168, 169.) This means that the auditors tested the reasonableness of the TSA amount, not the process that resulted in them. (*Id.*) The procedures began in September 2017 with a "walkthrough" in which the auditors

interviewed Dineen – not Smith – about ARA's TSA process. (SOF ¶¶ 170-171.) On January 30, 2018, a Grant Thornton auditor informed ARA that Grant Thornton would be testing TSAs and identified a sample of 54 specific TSAs (37 credits and 17 debits) for review.[3] (SOF ¶¶ 173.)

ARA personnel other than Smith compiled the data relating to the TSAs Grant Thornton initially selected for testing and put them into two spreadsheets, one each for credits and debits. (SOF ¶¶ 187, 191) Smith forwarded the spreadsheets to Grant Thornton. (SOF ¶¶ 184, 188.) Because several of the TSAs were originally recorded based on McDonough's analytic methodology described above, ARA personnel reviewed patient data that existed at the time of the journal entries to establish the reasonableness of those entries. (SOF ¶¶ 200-203.) In these instances, ARA expressly disclosed to Grant Thornton that the original entry was based on analytics: they included a "banner" on the detail for 13 entries, stating "Originally based on analytics – built better processes through out the year and add patient details." (SOF ¶¶ 186-190.) The banner was highlighted in yellow and written in red. (*Id.*) Grant Thornton's internal audit workpapers reveal that the data that the auditors ultimately used to test the reasonableness of TSAs was different from what Smith transmitted to them in 25 instances. (SOF ¶¶ 195-197.)

The SEC relies on a January 30, 2018 email from Smith to Dineen, in which she wrote, "Please do not provide McDonough's printed piece of paper to the auditors for support. We will have to provide an analysis of patient level support." (SOF ¶ 176.) "McDonough's printed piece of paper" refers to a printout of ARA's profit-and-loss statement by clinic on which McDonough handwrote the dollar amount of his TSA determination. (SOF ¶ 77.) Grant Thornton witnesses have testified that they were aware of and had seen McDonough's printed piece of paper. (SOF ¶¶ 80-84.) Grant Thornton's lead auditor acknowledged that if Smith had provided

---

[3] Grant Thornton later added 7 more TSAs to the review set. (SOF ¶ 197.)

McDonough's piece of paper to the auditors, they would have asked for patient level support. (SOF ¶¶ 180-182.) He stated that it was "reasonable for [Smith] to have anticipated that if she had handed the auditors McDonough's printed pieces of paper, they would just simply ask for the patient level support." (SOF ¶ 183.)

## ARGUMENT[4]

Summary judgment should be entered for Smith on all claims against her, including the First, Third, Tenth, Thirteenth, and Fourteenth Claims, which assert primary liability, and the Second, Fifth, Seventh, Ninth, and Twelfth Claims, which assert aiding and abetting claims. As to the First and Third Claims, no reasonably jury could find that Smith acted with scienter or negligence in connection with ARA's TSAs (Section I below) and the SEC's claims against Smith are barred because did not make or disseminate any false or misleading statements and there is no alleged scheme here that was distinct from the alleged misstatements (Section II). Judgment should be entered for Smith on the Thirteenth Claim because she was not responsible for ARA's internal controls nor did she enter any TSAs in circumvention of them (Section III.A). Judgment should be entered for Smith on the remaining primarily liability claims because no reasonably jury could find that Smith falsified any accounting records or made any false statements to auditors (Sections III.B and C). Finally, Judgment should be entered on all aiding

---

[4] Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." *Id.* at 248. The First Circuit requires that for factual inferences to "qualify" to be drawn in favor of the nonmoving party, they "must flow rationally from the underlying facts, [that is,] a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 137 (1st Cir. 2013); *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (non-moving party must establish "a trial worthy issue" through "submissions of evidentiary quality").

and abetting claims because the SEC lacks evidence that Smith had knowledge of and substantially participated in anyone else's violations (Section IV).

## I.    NO REASONABLE JURY COULD FIND THAT SMITH PARTICIPATED IN A FRAUDULENT SCHEME TO MISSTATE ARA'S REVENUE

No reasonable jury could find that Smith, acting with scienter or negligence, participated in a scheme to overstate ARA's revenue through fraudulent TSAs. The SEC's First and Third Claims against Smith require proof of scienter, which this Circuit defines as either "conscious intent to defraud" or "a high degree of recklessness." *SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008). If there is no genuine issue of disputed fact about scienter, summary judgment is appropriate. *Ficken*, 546 F.3d at 51.[5] The SEC's First Claim also encompasses Securities Act Sections 17(a)(2) and (3), which require a showing of negligence, not scienter. *Id.*, at 47.

### A.    The SEC Cannot Show that *Anyone* Intentionally Misstated Revenue at ARA

The SEC faces an existential lack of proof on its fundamental theory: that anyone at ARA *fraudulently* overstated its revenue in 2017 or 2018. The Restatement, itself, concludes only that ARA's "methodology for reserving for contractual allowances did not reconcile revenue and accounts receivable to [its] collection experience and actual cash collections." (SOF ¶¶ 204, 212.) It does not state that ARA's prior revenue statements were fraudulent or that any previously reported revenue was fictitious.[6] (*Id.*) The Audit Committee of ARA's Board of Directors conducted a thorough investigation, assisted by a leading national law firm, Milbank

---

[5] The SEC may not rely on the mere existence of a material misstatement or omission to establish scienter. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("Of course, more than mere proof that the defendants made a particular false or misleading statement is required to show scienter."). A violation of GAAP standards, alone, will not support an inference of scienter. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203-204 (1st Cir. 1999); *see DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) (admonishing courts to "separate fraud from the benefit of hindsight" because "[t]here is no 'fraud by hindsight'" under U.S. securities law).

[6] To the contrary, ARA's total revenue for the restated periods was about the same as in the original statements, and all cash flows remained the same.

LLP, working with a leading national forensic accounting firm, Ankura Consulting Group LLC, and concluded that "there was no intentional wrong-doing on the part of management, and that the misstatement was the result of inadequate processes and controls." (SOF ¶ 209.)

The SEC's star witness, a purported whistleblower who was fired from ARA for incompetence, claims that ARA operated a "cookie jar" – that it held back revenue from being recognized. (SOF ¶ 211.) But this allegation cannot sustain a reasonable jury verdict for three reasons. First, a "cookie jar" would cause an *understatement* of revenue and that is <u>directly contradicted</u> by the restatement, which states that ARA *overstated* revenue. (SOF ¶ 222.) Second, neither the restatement nor the Audit Committee's investigation files mention the discovery of any purported "cookie jar." (SOF ¶ 215.) And third, the purpose of a "cookie jar" would be to smooth out ARA's earnings to meet analyst expectations, but the objective evidence shows ARA did not have smooth earnings or meet analyst expectations in any of the seven relevant quarters. (SOF ¶¶ 221-226.)

In short, the SEC's theory that *anyone* at ARA intentionally overstated revenue is overwhelmingly contradicted by the evidence.

### B.    The Isolated Events Involving Smith Do Not <u>Support a Securities Fraud Claim Against Her</u>

Lacking evidence of an overarching scheme to defraud, the SEC seeks to place blame on Smith based on a handful of isolated events. But none is sufficient to support a securities fraud verdict against her from any reasonable jury. *See SEC v. Durgarian*, 477 F. Supp. 2d 342, 348, 353 (D. Mass. 2007) (court must "disentangle the allegations" to examine claims against each defendant individually).

    1.  <u>Smith Was Not Responsible for Determining TSAs</u>

Smith was not the decision-maker for TSAs during any period. She was also not identified as a "process owner" for TSAs for any part of the relevant period.

    2.  <u>The Evidence Cannot Support a Fraud Verdict for 2017 TSAs</u>

All witnesses acknowledge that Smith had no role in the process for determining TSAs during 2017.  The June and September 2017 emails do not alter this conclusion. The plain language of the June email shows that Dineen, not Smith, analyzed the potential TSAs, and Smith's only role was to run a report from ARA's systems to provide to Wilcox. The September email does not involve the *amount* of an adjustment, only how to account for it. This determination did not affect the amount of revenue reported by ARA and thus is irrelevant to the SEC's claim that ARA overstated revenue.

    3.  <u>The Evidence Cannot Support a Fraud Verdict for 2018 TSAs</u>

In 2018, Smith still was not responsible for determining TSAs, and she played only a minimal role in the process. Importantly, the SEC alleges that Wilcox and Boucher implemented a "top-down" system for making TSA that was "not based on patient-level detail," (e.g., AC ¶¶ 79, 83, 84), but as discovery has revealed, it is undisputed, even by the SEC's whistleblower, that ARA had patient-level waterfalls for each TSA in 2018.

The three isolated events in 2018 cannot be the basis for any reasonable verdict against Smith. Although the April 2018 spreadsheet on which the SEC bases its arguments appears to be from Smith, it was not. Metadata shows that the spreadsheet was not written by Smith.  This is corroborated by the fact that the spreadsheet was emailed to Smith shortly before she forwarded it, unchanged, to Dineen.

As for the May 2018 email, it is undisputed that the TSAs booked after Smith asked Dineen to "find" revenue were appropriate. Dineen admits that they reflected "real revenue that

should be recognized" and fit Dineen's own criteria for proposing TSAs. Moreover, Smith was acting at Boucher's direction and was ultimately uninvolved in the conclusion of this process: on May 11, the day after her request to Dineen to "find" revenue, Boucher emailed Dineen (copying Smith) attaching his comments and changes to Dineen's proposed TSAs. Smith was not involved in making the final decision.

The October events are no different. The emails reveal that the TSA analysis was driven not driven by Smith. TSAs were booked in both directions; some increasing and some decreasing prior revenue estimates. Bernard, a CPA who was not alleged to have engaged in any misconduct, performed the TSA analysis and does not believe there was anything wrong with the process. These undisputed facts directly contradict the SEC's theory that Smith intentionally or negligently overstated ARA's revenue.

4.    Smith Did Not Mislead Grant Thornton
       During its Audit Testing of ARA's 2017 TSAs

Finally, the SEC has proffered two theories to support its claim that Smith misled ARA's auditors, but neither holds up to the undisputed evidence.

First, the SEC contends that Smith deliberately misled ARA's auditors when during Grant Thornton's testing of 2017 TSA entries, she emailed to Dineen, "Please do not provide McDonough's printed piece of paper to the auditors for support. We will have to provide an analysis of patient-level support." Four of the 54 TSA entries initially selected for testing were based on McDonough's analysis, for which the only documentation was McDonough's handwritten notes on the profit-and-loss statements. Every Grant Thornton witness testified that they were aware of McDonough's handwritten notes. All witnesses also agreed that the auditors were looking for patient-level support to test the reasonableness of TSA amounts. Even Dineen, the SEC's whistleblower, told Smith not to provide McDonough notes to the auditors because

they were not "the type of support that the auditors would want to see as support," and Grant

Thornton's lead auditor said the content of Smith's email was "reasonable." In short, SEC's

claim that Smith improperly concealed "McDonough's printed piece of paper" from the auditors

is contradicted by the undisputed facts that it was known to them, not useful to them, and

reasonable for Smith to say so to Dineen.

Second, the SEC contends that Smith improperly forwarded spreadsheets to Grant

Thornton that were not created when the TSAs were originally booked. But this claim is also

unsupported. There is no dispute that the data in the spreadsheets provided to Grant Thornton

reflected actual patient services and payments as of the time of the original TSA entries –

nothing was fictious about it. Grant Thornton already knew that 2017 TSA entries were initially

booked based on analytic procedures, not patient-level waterfalls. And the spreadsheets disclosed

this fact visibly – with yellow highlighting and in red print. In other words, the very fact that the

SEC alleges was concealed from the auditors was both known to them and disclosed in writing

and highlighted.[7]

Under these facts, no reasonable jury could find that Smith intentionally or negligently

deceived Grant Thornton during its testing of 2017 TSAs.

## II.    SCHEME LIABILITY AGAINST SMITH IS PRECLUDED AS A MATTER OF LAW BECAUSE THE LAW DOES NOT RECOGNIZE A SCHEME TO MISSTATE REVENUE

Judgment must be entered for Smith on the First and Third Claims for the additional and

independent reason that she cannot be held primarily liable for an alleged misstatement that she

---

[7] What's more, the data that Grant Thornton ultimately used to test the TSA entries was *different* from the data that Smith provided. There is no record of why or how Grant Thornton changed the data that they were looking at. But it is undisputed that the auditors worked onsite at ARA and could ask ARA personnel to pull patient-level data in ARA's accounting systems to test the reasonable of the TSA amounts.

did not make. In *Janus Capital Group*, the Supreme Court held that only the "maker" of a misstatement can be liable for securities fraud under Exchange Act Rule 10b-5(b), and that individuals who merely participate in "creating" or "preparing" the statement cannot. *Janus Capital Group, Inc. v. First Deriv. Traders*, 564 U.S. 135, 142, 144 (2010). It is undisputed that Smith did not "make" any misstatements, and the SEC, appropriately, did not charge her in the Fourth Claim under Rule 10b-5(b). *See* Am. Compl ¶¶ 236-38.

But under *Janus Capital Group*, the SEC cannot do what it is attempting to do here: recharacterize a "misstatement" case as a "scheme" case to assert a claim under Securities Act Sections 17(a)(1) and (3) (First Claim) and Exchange Act Rule 10b-5(a) and (c) (Third Claim). In *Lorenzo*, the Court held that a person who did not "make" a misstatement could be liable for a "scheme" if they disseminated misstatements in a separate effort to defraud investors. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100-01 (2019). The Court stated that *Janus Capital Group* "would remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates* false information — provided . . . that the individual is not involved in some other form of fraud." *Id.* at 1103 (emphasis in original).

That "some other form of fraud" is exactly what is missing here. Since *Lorenzo*, courts routinely hold that "[w]here the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission," plaintiffs cannot circumvent *Janus* "by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'" *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020). In *SEC v. Kelly*, for example, the defendants allegedly schemed to inflate revenue and instructed employees to hide transactions from accountants to avoid detection. *SEC v. Kelly*, 817 F. Supp. 2d 340, 343-344 (S.D.N.Y. 2011) ("*Kelly II*") (applying *Janus* to enter judgment for defendants); *SEC v. Kelly*, 765 F.Supp. 2d

301, 322-323 (S.D.N.Y. 2011) ("*Kelly I*") (describing factual allegations). Applying *Janus*, the court entered judgment for defendants because the purpose of the alleged scheme was to misstate revenue, and there was no "inherently deceptive act" that was "*distinct from* an alleged misstatement." *Kelly II*, 817 F. Supp. 2d at 343-344 (emphasis added); s*ee also SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (no scheme liability where defendant "corrupt[ed] the auditing process," "fail[ed] to correct [mis]statements to the Audit Committee and auditors," and "concealed information from auditors" but did not "make" the misstatement); *SEC v. SolarWinds Corp.*, 23 Civ. 9518 (PAE), 2024 WL 3461952, *42 & n. 48 (S.D.N.Y., July 18, 2024) (no scheme liability against defendant who was responsible for the "technical content and accuracy" of misstatements because alleged deceptive acts were not "*distinct* from an alleged misstatement"); *SEC v. Hwang*, 692 F. Supp. 3d 362, 379 (S.D.N.Y. 2023) (no scheme liability when the defendant "participate[d] in the creation" company financials, but was not the "maker").

Here, the alleged scheme and the misstatement are the same: to allegedly overstated ARA's revenue. Even if Grant Thornton were misled – and it was not – the "primary purpose and effect" would have been to enable ARA to misstate its revenue. Thus, like in *Rio Tinto, SolarWinds, Mindbody,* and *Kelly*, the SEC should not be permitted to recast misstatements as a scheme to avoid the plain application of *Janus Capital Group*.[8]

---

[8] Securities Act Section 17(a)(2) is equivalent to Exchange Act Rule 10b-5(b), except that Section 17(a)(2) also requires the SEC to prove that the defendant "obtain[ed] money or property by means of" the alleged misstatement or omission. 15 U.S.C. § 77q(a)(2). Some courts apply the "maker" requirement of *Janus Capital Group* to Section 17(a)(2). *See, e.g.*, *SEC v Kelly*, 817 F. Supp. 2d at 345 (the two provisions "have the same functional meaning" in creating primary liability).

### III.    JUDGMENT SHOULD BE ENTERED FOR SMITH ON THE SEC'S OTHER PRIMARY LIABILITY CLAIMS

The SEC's proof on the other primarily liability claims against Smith fares no better. The SEC asserts three miscellaneous claims against Smith: that she knowingly circumvented internal controls, falsified books and records, and misled auditors. The SEC commonly pleads these claims in all accounting fraud cases, but as to Smith, they suffer from a fundamental lack of evidence to sustain any reasonable jury verdict.

#### A.    No Reasonable Jury Could Find That Smith Knowingly Circumvented ARA's Internal Controls

The SEC's Thirteenth Claim requires it to prove that Smith "knowingly" circumvented or "knowingly" failed to implement a system of internal controls under Exchange Act Section 13(b)(5). 15 U.S.C. § 78m(b)(5); *see SEC v. Goldsworthy*, No. 06-10012-JGD, 2007 WL 4730345, at *15, 18-19 (D. Mass. Dec. 4, 2007) (granting summary judgment for CFO of public company). Smith could not possibly have violated Section 13(b)(5). She was not responsible for implementing internal controls on TSAs. She was not responsible for making TSA determinations. She was not a "process owner" on revenue. There is no evidence that she circumvented any internal control by, for example, keeping information from her supervisor, Boucher, or that she knew or believed she was doing anything inappropriate. For these reasons, judgment should be entered for Smith on the Thirteenth Claim.

#### B.    No Reasonable Jury Could Find that Smith Falsified ARA's Books

The SEC's Tenth Claim alleges that Smith falsified ARA's books or records in violation of Exchange Act Rule 13b2-1. Primary violations of Rule 13b2–1 do not require a finding of scienter, but they are "predicated on standards of reasonableness." *SEC v. Espuelas*, 905 F. Supp. 2d 507, 525-526 (S.D.N.Y. 2012). There is no evidence that Smith knew or believed that any of the TSAs were improper. She was neither the decisionmaker nor the analyst on any TSA. There

is also no evidence that any patient level data of services and payments were false. Under these facts, there simply is no basis to assert that Smith falsified any books or records.

### C.  No Reasonable Jury Could Find that Smith Misled Auditors

The SEC's Fourteenth Claim alleges that Smith misled Grant Thornton in its testing of TSAs during its audit of ARA's 2017 financial statements in violation of Exchange Act Rule 13b2-2(a). The rule does not impose a duty on corporate officers to report all information to auditors; it "merely requires them not to make false statements" or omissions to accountants. *SEC v. Patel*, No. 07-39-SM, 2008 WL 781914, at *15 (D.N.H. Mar. 24, 2008). For the reasons detailed above, Smith did not mislead Grant Thornton.

## IV.  SMITH DID NOT AID AND ABET SECURITIES LAW VIOLATIONS

Finally, the SEC's Second, Fifth, Seventh, Ninth, and Twelfth Claims assert that Smith aided and abetted ARA's violations of various securities law provisions. To establish aiding and abetting liability, the SEC must prove that Smith "knowingly and substantially assisted" the primary violator. *SEC v. Tambone*, 417 F. Supp. 2d 127, 136 (D. Mass. 2006); *see also S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 361, 367-68 (D.N.J. 2009) (granting summary judgment for "middle finance manager" on aiding and abetting claims). The knowledge and substantial assistance requirements exist for aiding and abetting claims even when the underlying violation has no state of mind requirement. *Lucent Techs., Inc.*, 610 F. Supp. 2d at 369.

For the same reasons that the SEC cannot prove that Smith intentionally violated the antifraud provisions, it cannot prove that she aided and abetting violations of those provisions or of the books and records provisions. *See Lucent Techs., Inc.*, 610 F. Supp. 2d at 369 ("The same analysis for granting or denying defendants' summary judgment motion as to aiding and abetting liability under Section 10(b) are equally applicable to the SEC's claims of aiding and abetting violations under Section 13.").

## **CONCLUSION**

For these reasons, this Court should enter judgment for Smith on all claims.

Respectfully submitted,

*/s/ Jonathan L. Kotlier*
Jonathan L. Kotlier (BBO# 545491)
jkotlier@nutter.com
Ian D. Roffman (BBO# 637564)
iroffman@nutter.com
Alex Rothschild (BBO# 704521)
arothschild@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:    (617) 439-2000
Facsimile:    (617) 310-9000

Dated: September 30, 2024                     *Counsel for Defendant Karen Smith*

## **CERTIFICATE OF SERVICE**

I certify that, on September 30, 2024, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

 /s/ Jonathan L. Kotlier

20

6886027