UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 22-cv-10651-NMG |
| AMERICAN RENAL ASSOCIATES HOLDINGS, INC. et al., | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT KAREN SMITH'S STATEMENT OF UNDISPUTED
FACTS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Defendant Karen Smith sets forth the following undisputed facts in support of her Motion for Summary Judgment.

**I.     American Renal Associates Holdings, Inc. ("ARA")**

1.      As of December 31, 2018, ARA was the largest dialysis services provider in the United States focused on joint venture partnerships with physicians. Kotlier Decl. at ¶ 1, Ex. A (2018 10K at 10).

2.      As of December 31, 2018, ARA owned and operated 241 dialysis clinics in partnership with approximately four hundred nephrologists partners treating more than 16,500 patients in 27 states and the District of Columbia. Kotlier Decl. at ¶ 1, Ex. 1 (2018 10K at 10, 131).

3.      ARA's securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the ticker "ARA" from April 21, 2016, until January 25, 2021, when ARA was acquired by a private equity firm. Dkt. 67, Am. Compl. at ¶ 21.

## II.     Relevant ARA Personnel

### A.     John McDonough

4.     John McDonough was Chief Operating Officer ("COO") of ARA from at least 2011 until December 31, 2016, after which he served as a consultant for revenue recognition - topside adjustment decisions in January and February 2017. Dkt. 67, Am. Compl. at ¶27; Kotlier Decl. at ¶ 61, Ex. 59 (McDonough Dep. Tr. at 211:12-22).

5.     Starting before 2011 and continuing until December 31, 2016, McDonough was responsible for revenue recognition and topside adjustments ("TSA") at ARA. Dkt. 67, Am. Compl. at ¶27.

### B.     Johnathan Wilcox

6.     Defendant Jonathan Wilcox was a certified public accountant ("CPA") licensed in the Commonwealth of Massachusetts from February 17, 2000 until June 30, 2017. Wilcox was ARA's Chief Financial Officer ("CFO") from 2011 to September 2018. Dkt. 67, Am. Compl. at ¶ 22.

7.     From January 1, 2017 through his departure in September 2018, Wilcox was the ARA employee in charge of revenue recognition and TSA decisions. Dkt. 67, Am. Compl. at ¶ 53.

### C.     Jason Boucher

8.     Defendant Jason Boucher has been licensed as a CPA in the Commonwealth of Massachusetts for several periods between approximately 2000 and the present. Boucher was ARA's Vice President of Finance and Chief Accounting Officer ("CAO") from 2011 to September 2018. Boucher was ARA's CFO from October 2018 to March 2019. Dkt. 67, Am. Compl. at ¶ 23.

9.     From January 1, 2017 through September 2018, Boucher had a senior decision-

making role at ARA with respect to revenue recognition and TSAs, and he directed other employees to make accounting journal entries regarding these issues.

### D. Karen Smith[1]

10.    Defendant Karen Smith was ARA's Controller from August 2009 until September 2018. She was ARA's Vice President of Finance from September 12, 2018 to April 24, 2019. Dkt. 67, Am. Compl. At ¶ 24. Kotlier Decl. at ¶ 4, Ex. 2.

11.    While she was Controller, Smith oversaw approximately 40 ARA employees across the general ledger group, the accounts payable group, the payroll and contract administration group. Kotlier Decl. at ¶ 70, Ex. 68 (Smith SEC Inv. Tr. at 22:8-17). She had additional direct reports such as an assistant Controller who handled the leases for ARA's many locations and the manager of ARA's external financial reporting while the company was in the process of going public. She also had additional areas of responsibility such as managing the agreements with medical directors, preparing approximately tax returns for ARA's approximately 200 partnerships for a number of years and handling the leases for the many locations for ARA. Kotlier Decl. at ¶ 62, Ex. 60 (Smith Dep. Tr. at 30:2–31:12).

12.    After her promotion to Vice President of Finance on September 12, 2018, she was assigned direct reports in the cash posting group and treasury group for cash and debt transactions and became responsible for financial reviews with doctors on a monthly or a quarterly basis. Kotlier Decl. at ¶ 70, Ex. 68 (Smith SEC Inv Tr. at 26:1-15); Kotlier Decl. at ¶ 4, Ex. 2.

### E. Michael Dineen

13.    Michael Dineen is a certified public accountant, and he received his master's

---

[1] Karen Smith was known as Karen Veilleux when she worked at ARA.

degree in accounting in 2010. Kotlier Decl. at ¶ 57, Ex. 55 (Dineen Vo1. Dep. Tr. at 12:1-8).

14.    From March 27, 2017 until he was terminated on May 18, 2018, Dineen was the manager of ARA's revenue recognition department. Kotlier Decl. at ¶ 57, Ex. 55 (Dineen Vol. I at 19:5-7; 19:20–20:1; 21:19-23).

**III.    Grant Thornton (ARA's Auditor)**

15.    Grant Thornton is a PCAOB-registered accounting firm that audited ARA's financial statements from 2008 to 2019 to opine that those financial statements were fairly presented in conformity with generally accepted accounting principles ("GAAP"). Kotlier Decl. ¶ 81, Ex. 78 (ARA Form 10-K for the Year Ended December 31, 2019, at p. F-2; Dkt. 67, Am. Compl. At ¶ 28; Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. at 16-17).

16.    Over that time, Grant Thornton had more than fifteen accounting professionals work on ARA matters. Kotlier Decl. at ¶ 64, Ex. 62 (Strassman Vol. II at 341:7-349:9).

17.    Grant Thornton performed quarterly reviews and audits and attended audit ARA Audit Committee meetings. Through this work, Grant Thornton auditors were familiar with the company, its financial statements, and its revenue processes. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. at 16-17), Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 28:4-8).

18.    Before each audit, Grant Thornton auditors attended ARA Audit Committee meetings and conducted "walkthroughs" of ARA's revenue process to better understand ARA, its billing practices, recording of revenues in the General Ledger, billing statements, and revenue related adjustments. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. at 16-17).

19.    Grant Thornton auditors were routinely on site at ARA offices. Kotlier Decl. at ¶ 64, Ex. 63 (Strassman Vol. II at 333:9-11); Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 119:2-9).

**A.    Jeffrey Strassman**

20.    Jeffrey Strassman is a CPA and a partner at Grant Thornton. Kotlier Decl. at ¶

63, Ex. 61 (Strassman Vol. I at 29:9-25).

21.     Strassman worked on audits of ARA's financial statements since 2012 and as of 2017, he was the senior manager of the account. Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 49:12–51:10).

22.     After McDonough left ARA, Strassman considered Dineen, Boucher, and ARA employee Milena Georgieva to be his "point[s] of contact" at ARA regarding TSAs. Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 96:2-19).

23.     Strassman does not recall a single significant conversation with Smith about revenue recognition. Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 77:12-22); Kotlier Decl. at ¶ 64, Ex. 62. (Strassman Vol. II at 562:9-25).

24.     Strassman thought that Dineen worked directly for Boucher, and Strassman was never under the impression that Smith had had any substantial responsibility for revenue at ARA. Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 77:12-22; 96:2–97:9; 99-14-22).

**B.      Aieshia Jones**

25.     Aieshia Jones worked as an audit associate at Grant Thornton from 2013 to 2017. Kotlier Decl. at ¶ 60, Ex. 58 (Jones Dep. Tr. at 18:2-23l 20:18-20).

26.     Jones started working on Grant Thornton's annual audits of ARA's financial statements in or around November 2014. Kotlier Decl. at ¶ 5, Ex. 3.[2]

27.     Jones testified that Georgieva was her "primary contact [at ARA] on the audit work [she] did around revenue recognition" and "do[es] not recall speaking with Karen [Smith] about revenue recognition."  Kotlier Decl. at ¶ 60, Ex. 58 (Jones at 211:5-19).

---

[2] Aieshia Jones was formerly known as Aieshia Grant, and certain documents from her tenure at Grant Thornton identify her as Aieshia Grant. (Kotlier Decl. at ¶ 60, Ex. 58 (Jones at 12:1-8).

28.     Jones testified that Smith "was not a source of information for [her] for [her] audit work relating to revenue recognition or contract allowances" and "the topics [] that [she] spoke with Karen [Smith] about were areas of the audit that were unrelated to revenue recognition and contract allowances."  Kotlier Decl. at ¶ 60, Ex. 58 (Jones at 211:20–212:4).

### C.     Courtney Connors

29.     Courtney Connors worked as an audit associate at Grant Thornton from January 2016 to May 2018. Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 16:5-16:9).

30.     Connors worked on Grant Thornton's audit of ARA's financial statements for FY 2016 and FY 2017, which took place from January-March 2017 and January-March 2018 respectively. Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 19:1-11).

31.     For the 2016 Audit, Connors was supervised by Aiesha Grant (the Senior Audit Associate), and they both worked under Jeffry Strassman (Senior Manager). Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 19:22–20:5).

32.     For the 2017 Audit, Connors was the Senior Audit Associate, working under Strassman. Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 20:6-10).

33.     Connors never saw something that she "thought was being done wrong" at ARA while she was at Grant Thornton. Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 20:14-20).

34.     Connors had about 200 conversations with Smith during her tenure with Grant Thornton, but those conversations concerned audit areas other than revenue, such as cash, accounts payable, and fixed assets. Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 195:1-21).

## IV.    Revenue Recognition Accounting at ARA

### A.     Revenue Recognition in the Healthcare Industry

35.     Because of the various payors in the U.S. healthcare industry (e.g., Medicare, Medicaid, commercial insurance plans, etc.), accounting for revenue for healthcare entities is

unique and complex. Kotler Decl. at ¶ 74, Ex 72, (Stanton Rpt. at ¶ 22); Kotlier Decl. at ¶ 57, Ex. 55, (Dineen Vol. I at 114:25-115:19; 117:12-17).

36.     Although a company may bill at a usual and customary rate ("UCR") it charges for its services, few if any payors actually pay the UCR and instead pay a reduced rate. Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 22).

37.     Healthcare companies must record revenue and related accounts receivable at the amount they estimate will be collected at the time of the treatment, which necessitates the use of adjustments and allowances. Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 22).

38.      ARA's estimation process was especially complex for non-contracted commercial patients, for whom ARA had limited historical information on which to base its estimates. This estimation process was further complicated by the high volume of dialysis treatments; ARA recorded over two million treatments in 2017. Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 22).

39.     ARA's revenues were subject to multiple factors, including, among other things, changes in insurance coverage, geographic coverage differences, differing interpretations of contracts, uncertainty as to the amounts paid by various insurers (particularly those who had no contracts with ARA), changes to laws and regulations governing Medicare and Medicaid programs, and evaluating and determining available primary and secondary insurance coverage for patients. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. No. 5).

40.      Payments ARA received from third-party carriers were not necessarily revenues:  it was common for third-party payors to seek refunds and retractions for months (and even years) after the service. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Inst. No. 5).

41.     These complexities required ARA to estimate its revenues based on factors such

as its historical collections experience, ongoing trends, subsequent claims settlements or realizations, contract terms, and professional judgment. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. No. 5).

42.     ARA's revenue process involved three steps: first, recording the UCR for services; second, taking a "contractual allowance" to estimate of how much less ARA expected to collect on services; and third, recording a TSA to hone its estimate based on additional information obtained. Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 66); Kotlier Decl. at ¶ 75, Ex. 73 (Floyd Rpt. at 12-13).

## B.     TSAs Are Estimates

43.     ARA disclosed in its financial statements that: (1) there were significant risks associated with the estimation process; (2) its initial estimates may require adjustment in subsequent periods based on actual experience; and (3) any adjustments would be recorded and would impact revenue and accounts receivable in subsequent periods. Kotlier Decl. at ¶ 74 Ex. 72 (Stanton Rpt. at ¶ 22); Dkt. 67, Am. Compl. at ¶ 59.

44.     Formal accounting guidance emphasizes that judgment is involved in estimating third-party contractual adjustments and the approach to making such judgments will vary by company:

> Management's estimates relating to third-party contractual adjustments are based on subjective, as well as objective, factors. This requires judgment that normally is based on management's knowledge of, and experience with, past and current events and its assumptions about conditions that it expects to exist and courses of action that it expects to take.
>
> Approaches for making estimates of third-party contractual adjustments vary from entity to entity, depending on individual facts and circumstances.
>
> The nature and reliability of information available to management to support the making of an accounting estimate varies widely, which thereby affects the degree of estimation uncertainty associated with accounting estimates.

Kotlier Decl. at ¶ 75, Ex. 73. (Floyd Rpt. at 6).

45.     Grant Thornton auditors agree that ARA's management was entitled to "use its judgment [] to estimate its revenues." Kotlier Decl. at ¶ 60, Ex. 58 (Jones at 119:15-18); Kotlier Decl. at ¶ 5, Ex. 3.

46.     Instead of analyzing details of every patient, adjustments to contractual allowances are often made with broad categories or in the aggregate. Healthcare companies often use data analytics and other high-level metrics to assess the need for adjustments; these metrics necessarily present a consolidated-level analysis that looks at the company as a whole and not at patient-level data. As a result, adjustments are often made without specific tie-out to particular patients. Kotlier Decl. at ¶ 74, Ex, 72 (Stanton Rpt. at ¶¶ 95-97) (citing AICPA Health Care Guide ¶ 10.22).

47.     Patient level waterfall's are analyses that track subsequent cash collections against the net receivables recorded for a particular patient. Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 101).

48.     This type of analysis is designed to use subsequent information to evaluate the reasonableness of the accounts receivable and net revenue after factoring in contractual allowances and allowance for doubtful accounts. (Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 101).

49.     Preparing waterfalls was a very labor intensive and time-consuming process because it was performed manually on a patient-by-patient basis. Kotlier Decl. at ¶ 74, Ex. 72, (Stanton Rpt. at ¶ 101).

50.     Days Sales Outstanding ("DSO") is a calculation of accounts receivable average dived by average revenue per day. Kotlier Decl. at ¶ 65, Ex. 63 (Wilcox 53:17-22).

51. Grant Thornton understood that DSO was a metric that ARA would use to evaluate the business and report out to the users of financial information. Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 219:3-7).

52. Strassman "knew that DSO was an important metric that was evaluated as part of monthly reporting packages. So the shape and form and full distribution list, I couldn't speak to. But we understood that it was one of the key metrics that would be evaluated." Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 220:24 -221:4).

53. Strassman testified that using DSO as a metric, among other metrics and data points "to evaluate the sufficiency of [a] contractual allowance" is appropriate. Kotlier Decl. at ¶ 64, Ex. 62 (Strassman Vol. II at 534:18–535:1).

54. ARA evaluated DSO as only one of the factors, among others, in its revenue estimates. Kotlier Decl. at ¶ 77, Ex., 75, (Wilcox Resp. to Ints. at 12).

55. ARA regularly generated reports showing DSO by clinic in connection with its revenue recognition process. In addition, however, ARA generated several other reports—beyond DSO—in connection with its estimated revenues. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. at 12).

**C. ARA's Controls & Processes**

56. ARA had an Internal Audit Group, which was responsible for evaluating the efficacy of the company's internal controls and well as for conducting certain testing, compliance audits and operational audits. The Internal Audit Group reported directly to the Audit Committee. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. at 5-6).

57. ARA's revenues, including its TSAs, were subject to quarterly and annual review by the Audit Committee, as well as Grant Thornton.

58. ARA's Chief Executive Officer, Joseph Carlucci, was also responsible for

establishing and maintaining disclosure controls and procedures, as well as internal controls over financial reporting. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ins. at 5-6).

59.     As CFO of ARA, Wilcox was responsible for ensuring that internal accounting controls were operating effectively. Am. Compl. (Dkt. 67), ¶¶ 54, 63 ("As CFO, Wilcox was responsible for the adoption and implementation of these [internal accounting] controls").

60.     As CAO and later CFO of ARA, Boucher was responsible for ensuring that the accounting procedures were consistent with the procedures laid out in ARA's internal controls. Am. Compl. (Dkt. 67), ¶¶ 56, 63.

61.     Smith was not responsible for the design, adoption, or implementation of internal revenue controls. *See, e.g.*, Kotlier Decl. at ¶ 72, Ex. 70 (Wilcox Inv. Tr. at 40:6-24).

**D.      ARA'S Process Narratives**

62.     On March 13, 2017, Alison Lepore sent an email to Boucher – attaching what Ms. Lepore described as "the Revenue process narrative and flow charts updated last summer" ("2016 Process Narrative") – that Boucher forwarded to Jillian Bernard that same day. Kotlier Decl. at ¶ 8, Ex. 6.

63.     The 2016 Process Narrative specifically identifies the "process owner(s)" for revenue at ARA as Wilcox (CFO), Boucher (VP & Chief Accounting Officer), Milena Georgieva (Revenue Supervisor), Jen Cordeiro (VP of Payor Contracting & Reimbursement), and additional individuals per the chart below:


*The following individuals are responsible for the following processes:*

| Process | Name and Title |
|---|---|
| Admissions and Collections | Karen Crafts, Director of A/R |
| Payor Set Up | Marlene Biddiscombe, Director of Payor Contracting |
| Charge Entry | Heather Grant, Manager of Charge Entry |
| Cash Posting | Valerie Horgan, Cash Posting Manager |
| Revenue Month End Close | Milena Georgieva, Revenue Supervisor |
| Contractual Allowance Reserve | Jen Cordeiro, VP of Payor Contracting and Reimbursement |
| Bad Debt Reserve | Milena Georgieva, Revenue Supervisor |
| Revenue Analytics | Nick Carlucci, Manager of Corporate Development |

Kotlier, Decl. at 8, Ex. 6.

64.     Smith is not identified as a process owner anywhere in the 2016 Process

Narrative. *See* Kotlier, Decl. at 8, Ex. 6.

65.     From March 6-7, 2018, Dineen exchanged emails with ARA's internal audit

team members regarding the "Process Narrative – Revenue."  Kotlier Decl. at ¶ 9, Ex. 7.

66.     Attached to the above-referenced email thread, Dineen stated that he was

providing a "kind of updated but not nearly finalized" revision to a draft of the process

narrative for revenue dated May 2017 ("2017 Process Narrative"). Kotlier Decl. at ¶ 8, Ex. 7.

67.     Like the 2016 Process Narrative, the 2017 Process Narrative lists "Revenue"

as the "Process" and "CFO" as the "Process Owner."  Kotlier Decl. at ¶ 9 Ex. 7.

68.     Additional "Process Owner(s)" are listed on the second page of the 2017 Process

Narrative. Kotlier Decl. at ¶ 9, Ex. 7. Boucher and Dineen are both listed as "Process

Owner(s)" on the second page of the 2017 Process Narrative. *Id*. Smith is not listed as a

"Process Owner" on the second page of the 2017 Process Narrative. *See id*.

69.     The fourth page of the 2017 Process Narrative states as follows:

*The following individuals are responsible for the following processes:*

| Process | Name and Title |
|---|---|
| Admissions | Jessica Archambault, Senior A/R Director |
| Contracted Payor Set Up | Marlene Biddiscombe, Director of Payor Contracting |
| Non-Contracted Payor Set Up | Snezana Guduras, Billing Systems Manager |
| Charge Entry | Heather Grant, Manager of Charge Entry |
| Commercial and Contracted Collections | Jessica Archambault, Senior A/R Director |
| Government and Self Pay Collections | Penny Riley, Senior A/R Director |
| Cash Posting | Valerie Horgan, Cash Posting Manager |
| Revenue Month End Close | Michael Dineen, Revenue Manager |
| Contractual Allowance Reserve | TBD |
| Bad Debt Reserve | TBD |
| Revenue Analytics | TBD |

Kotlier Decl. at ¶ 9, Ex. 7.

70.     On June 4, 2018, Keithahn received an email to which a draft of the revenue process narrative that was "updated with process owner feedback for 2018" but was "not the final version" was attached. Kotlier Decl. at ¶ 10, Ex. 8. The attached draft process narrative was dated April 2018 ("2018 Process Narrative"). *Id.*

71.     Like the 2016 Process Narrative and 2017 Process Narrative, the 2018 Process Narrative lists "Revenue" as the "Process" and "CFO" as the "Process Owner." *Id.* at ARA_SEC_00032416.

72.     The second page of the 2018 Process Narrative states as follows:

**PROCESS OWNER(S)**

| Name and Title | Responsibility |
|---|---|
| Jon Wilcox, Chief Financial Officer | Oversees Finance Organization |
| Jason Boucher, Chief Accounting Officer | Oversees Accounting Organization |
| Jessica Archambault, Senior A/R Director | Oversees Admissions, Commercial and Contracted Collections |
| Heather Grant, Director of Government & Self Pay Collections | Oversees Government & Self Pay Collections and Charge Entry |
| Michael Dineen, Revenue Manager | Manages Revenue Month-End Close, Contractual Allowance Reserve and Bad Debt Reserve |
| Marlene Hurley, Director of Payor Contracting | Oversees Contracted Payor Set Up |
| Snezana Guduras, Billing Systems Manager | Oversees Government Payor Set Up |
| Valerie Horgan, Director of Cash Posting | Oversees Cash Posting |
| Jose Cabrera, Charge Entry Manager | Manages Charge Entry |

*Id.* at ARA_SEC_00032417. Smith is not listed as a "Process Owner" in the 2018 Process Narrative. *Id.*

## V.      TSAs Before 2017 Under McDonough

### A.      McDonough's Process

73.      Before 2017, McDonough was primarily responsible for revenue recognition, including making the initial contractual allowances and then determining whether any topside adjustments were necessary. McDonough worked with ARA's accounts receivable department to analyze historical payments for the non-contracted insurers to determine the initial estimate for each treatment. Dkt. 67, Am. Compl. at ¶ 67.

74.      To identify appropriate TSAs, McDonough would look at patient-specific information, such as "detailed financial information about" previous payments made on behalf of a patient, he would look at compiled information ("ongoing actual experience" and "trends, or subsequent settlements and realizations"), or analytics such as DSO. Kotlier Decl. at ¶ 80, Ex. 78 ARA's Form 10-K for FY 2017 at F-8,

75.      Then he would take "all that collective information together to come up with that best estimate of how much that bill charge would – our best estimate of how much that bill charge would become net realizable value."  Kotlier Decl. at ¶ 61, Ex. 59, (McDonough at 141:12–143:2; 147:24–148:7).

76.      After reviewing this "collage of information," he would decide on a TSA, which would typically be a round-dollar increments of $25,000 estimates. Kotlier Decl. at ¶ 73, Ex. 71 (McDonough SEC Invs. Tr. at 33:1-9); Kotlier Decl. at ¶ 75, Ex. 73 (Floyd Rpt. 13).

77.      The SEC has summarized the end result of McDonough's process as follows:

> [McDonough] would conduct a review to determine whether ARA should record
> topside adjustment for its clinics. The results of this review were only
> documented in the form of handwritten notes of what the topside adjustments

should be, and did not include any supporting documentation of the analysis he performed that went into determining each topside adjustment. No one at ARA reviewed [McDonough's] topside adjustments. . . . No one at ARA knew how [McDonough] had determined topside adjustments.

Dkt. 67, Am. Compl. at ¶ 68, 71.

78.     McDonough's process "did not change [and was p]retty consistent though all 13 years" that he was at ARA. Kotlier Decl. at ¶ 75, Ex. 73. (Floyd Report at p. 13)

79.     The SEC "has not alleged that topside adjustments made prior to January 1, 2017, were inconsistent with GAAP."  Kotlier Decl. at ¶ 78 Ex. 76; Dkt. 67, Am. Compl. at ¶ 67.

**B.      Grant Thornton Was Aware of McDonough's Process and Documentation**

80.     Grant Thornton auditors were aware that ARA frequently recorded round dollar amount TSAs, both credits and debits. Kotlier Decl. at ¶ 64, Ex. 62 (Strassman Vol. II at 390:22 – 392:24).

81.     Strassman does not think its "not unusual for estimates to be made in [] round dollar amounts," and when he saw these round number adjustments in the 551000 account, he understood that to mean that the TSA had been "made with an estimate."  Kotlier Decl. at ¶ 63, Ex. 61 (Strassman at 390:1 – 392:24); *see also* Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 91).

82.     Strassman was "familiar with the concept of McDonough making handwritten notes on spreadsheets that would ultimately be reflected in topside adjustments by ARA." Kotlier Decl. at ¶ 63, Ex. 61, (Strassman at 153:25–154:5; 155:8-23).

83.     Strassman had seen McDonough's handwritten notes as early as 2014 and "certainly pre-2017," and he understood they were a "summary . . . [of] the results of underlying analysis, you know, such as the waterfall analysis. Kotlier Decl. at ¶ 63, Ex. 61

(Strassman at 155:8-23, 156:2-13).

84.     Jones was also aware of McDonough's handwritten notes and had seen them during the 2016 audit. Kotlier Decl. at ¶ 11, Ex. 9; Plaintiff's Deposition Exhibit 15, 2/01/17 Email Chain, ARA_SEC_00194575 Kotlier Decl. at ¶ 60, Ex. 58 (Jones at 214:10-13, 215:11-17); Kotlier Decl. at ¶ 59, Ex. 57 (DiSipio at 48:13–49:18; 85:4-18; 94:18–95:4).

## VI.     Revenue Recognition at ARA During 2017

### A.     McDonough Stays Through February 2017

85.     John McDonough testified that he could not recall ever having a conversation with Smith about TSAs. Kotlier Decl. at ¶ 61, Ex.59 (McDonough at 228:8-11).

86.     McDonough resigned from ARA on December 31, 2016, but he agreed serve as a consultant to ARA for up to six months. Dkt. 67, Am. Compl. at ¶ 69.

87.     McDonough proposed topside adjustments through at least February 2017, Dkt. 67, Am. Compl. at ¶ 70; Kotlier Decl. at ¶ 6, Ex. 4.

88.     McDonough continued to follow "at least a similar process" when determining "proposed topside adjustments, meaning [he] look[ed] at patient-level data, clinic-level data, waterfalls, other analyses, specific data and reports and analyses, before arriving at a proposed topside adjustment."  Kotlier Decl. at ¶ 61, Ex. 59 (McDonough at 211:12-22).

### B.     Wilcox and Boucher's Effort to Improve the Process

89.     After February 2017, Wilcox and Boucher took over ARA's revenue recognition process. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Int. No. 5).

90.     Wilcox believes that ARA's revenue recognition processes – including TSAs adjustments – from January 1, 2017 through September 30, 2018 were proper. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints at at 12).

91.     When considering potential TSAs, Wilcox and Boucher would review a series of

at least six reports generated by the revenue team, including the DSO clinic report and a consolidated waterfall analysis, and consider "other information" that may be pertinent. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. No 5).

92.     Wilcox and Boucher took steps to improve ARA's TSA process by requesting more documentation (including waterfalls), more patient-level detail, better communication between the revenue and the accounts receivable team. Kotlier Decl. at ¶ 66, Ex. 64 (Georgieva at 56:23-57:25; 125:14-126:3); Kotlier Decl. at ¶ 65, Ex. 63, (Wilcox at 110:18-112:4).

93.     They also expanded the revenue department, including hiring Dineen to manage the revenue recognition group. Kotlier Decl. at ¶ 65, Ex. 63, (Wilcox at 110:18-112:4).

94.     Dineen had experience preparing and supporting financial reporting, managing monthly financial reviews, and maintaining policies to ensure the correct application of accounting principles. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. at 4).

95.     While at ARA, Dineen was responsible for, among other things, analyzing cash collections, revenue recognized, and identifying, preparing and recording top-side adjustments. Kotlier Decl. at ¶ 77, Ex. 75 (Wilcox Resp. to Ints. at 4-5).

96.     Dineen had no revenue recognition experience in the healthcare sector before he started at ARA. Kotlier Decl. at ¶ 57, Ex. 55 (Dineen at 189:10-14). Dineen also has not worked in healthcare revenue recognition since he was terminated from ARA. Kotlier Decl. at ¶ 57, Ex. 55, (Dineen at 189:10-14).

97.     Dineen was technically Smith's direct report in ARA's organizational chart; however, Boucher gave Dineen "revenue-related instruction" and taught Dineen the TSA process at ARA. Kotlier Decl, at ¶62 Ex. 60 (Smith at 244:3-5, 244:17-19; *see also* Kotlier Decl. at ¶ 57, Ex. 55 (Dineen Dep. Tr. at 258:8-23).

98.     Boucher was the primary driver of TSAs throughout Dineen's tenure. Kotlier Decl. at ¶ 57, Ex. 55 (Dineen Vol. I at 330:5-16).

99.     Strassman thought that Dineen reported directly to Boucher. Kotlier Decl. at ¶ 63, Ex. 61, (Strassman at 99:14-22).

### C.     June 27, 2017 Email

100.    On June 27, 2017, Wilcox sent an email to Dineen and Smith. Kotlier Decl. at ¶ 7, Ex. 5. Dineen responded that same day and sends "the updated reports." *Id*.

### D.     September 13, 2017 Email

101.    On September 13, 2017, Dineen sent an email to Vincenzo Disipio (ARA), copying Milena Georgieva (ARA) that was part of a larger email exchange with the subject line "contractuals" that began on September 11, 2017. Kotlier Decl. at ¶ 12, Ex. 10.

102.    Smith was not a party to any of the emails in this email thread. *See id.*

### E.     Dineen's CAS Spreadsheet

103.    Dineen acknowledges that during his tenure at ARA, "the analyses and the adjustments became better, the reconciliations became better."  Kotlier Decl. at ¶ 57, Ex. 55 (Dineen at 230:6-15).

104.    Around September or October 2017, Dineen created a spreadsheet called the contractual adjustments spreadsheet that the revenue team would populate with information as they built additional waterfalls ("CAS Spreadsheet"). Kotlier Decl. at ¶ 57, Ex. 55 (Dineen at 133:20–135:9); Kotlier Decl. at ¶ 57, Ex. 55 (Dineen at 59:16-21, 172:23–173:3).

105.    The CAS Spreadsheet was used to collect patient level detail. *See* Kotlier Decl. at ¶ 13 Ex. 11; see also Kotlier Decl. at ¶ 58, Ex. 56 (Dineen at 238:11–239:25).

106.    The CAS Spreadsheet continued to be used after Dineen was terminated. Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 39:2-15).

107. Smith's understanding is that the CAS Spreadsheet "did not contain all of the data and information that Wilcox and Boucher would analyze to decide what topside adjustments to make to revenue at a month or a quarter-end." Kotlier Decl. at ¶ 79, Ex. 77 (Smith Resp. to 2nd Set of Int. at 7).

108. ARA shared the CAS Spreadsheet with Grant Thornton. Kotlier Decl. at ¶ 14, Ex. 12.

109. Connors discussed the CAS Spreadsheet with Dineen. Kotlier Decl. at ¶ 56, Ex. 54 (Connors 39:2-24, 100:18-101:21; and 105:19-106:24).

110. Dineen did not have any concerns about ARA's waterfall processes before May 10, 2018. Kotlier Decl. at ¶ 57, Ex. 55 (Dineen Vol. I at 183:1-14).

111. Dineen now alleges that the CAS Spreadsheet is the "cookie jar" from which "ARA could find topside revenue when needed." Kotlier Decl. at ¶ 75, Ex. 73 (Floyd Rpt. 34, n.116).

## VII. Revenue Recognition at ARA During 2018

### A. ARAS Waterfalls for Every TSA In 2018

112. From January 2018 to at least September of 2018, ARA prepared patient-level waterfalls for every TSA it recorded. Kotlier Decl. at ¶ 74, Ex.72 (Stanton Rpt. at ¶ 107); Kotlier Decl. at ¶ 57, Ex. 55 (Dineen Vol. I at 238:23–239:2).

113. None of the TSAs that ARA recorded in 2018 were round amount adjustments of $25,000, $5,000 or even $1,000. *See* Kotlier Decl. at ¶ 50, Ex. 48.

114. The SEC's proffered expert witness, Larry Johnson, stated that when "DSO is used as a 'reasonableness test' to determine whether to undertake a waterfall or other analysis to support a topside adjustment, then the waterfall analysis is the basis for the adjustment and not DSO." Kotlier Decl. at ¶ 76, Ex. 74 (Johnson Rebuttal Rpt. at 2).

115.    Johnson did not perform any independent analysis to evaluate whether ARA's revenues were actually smooth from quarter to quarter. Kotlier Decl. at ¶ 67, Ex. 75 (Johnson at 161:1-7).

**B.      Dineen and Boucher's Relationship**

116.    Dineen had a "falling out" with Boucher in January 2018. Kotlier Decl. at ¶ 58 Ex. 56 (Dineen Vol. II at 383:7-10).

117.    Boucher asked Smith to become "the go-between" intermediary between him and Dineen because Boucher did not "want to deal with [Dineen] directly anymore."  Kotlier Decl. at ¶ 62, Ex.60 (Smith at 250:4-7; 251:17–252:17).

118.     On January 26, 2018, Smith emailed ARA's human resources and stated, among other things, that "Jon Wilcox and Jason [Boucher] do not trust [Dineen] with his responses to their questions."  Kotlier Decl. at ¶ 53, Ex. 51.

119.    While Smith became "more familiar" with the revenue recognition process at ARA during 2018, she was never "a decisionmaker when it came to revenue recognition." Kotlier Decl. at ¶ 62, Ex. 60 (Smith at 318:1-9).

**C.      April 11, 2018 Spreadsheet**

120.    At 9:47 pm on April 11, 2018, Boucher sent Smith an email with the subject line, "my topside entries were not addressed" and an attachment to the email with the file name, "Direct MTD 03'18 4.11.18 pm4.xlsx."  The message in the body of the email said, "Stopping by". Kotlier Decl. at ¶ 15, Ex. 13.

121.    At 10:19 pm on April 11, 2018, Smith forwarded the same file to Dineen ("Direct MTD 03'18 4.11.18 pm4.xlsx") with a request to revise and rerun the reports. *See* Kotlier Decl. at ¶ 16, Ex. 14.

122.     The attachment to Smith's email was produced in this litigation with metadata,

and that metadata shows that the spreadsheet was modified by Boucher, not Smith. Kotlier Decl. at ¶ 17, Ex. 15; Kotler Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 383:18–384:15).

123.    Smith did not prepare the attachment to her email and the entries reflected that were discussed in that email thread were proposed by Boucher. Kotler Decl. at ¶ 62 Ex. 60 (Smith at 404:23–406:5).

124.    With respect to the cover email, Boucher came over to Smith's office, they discussed Boucher's proposed entries, and then Smith sent Dineen the 10:19 pm on April 11, 2018 cover email based on her conversation with Boucher. Kotler Decl., at ¶ 62 Ex. 60 (Smith at 405:4-8).

**D.    May 9-10, 2018, Emails**

125.    On May 9, 2018, Dineen sent an email to Smith to which he attached, among other things, an excel spreadsheet he called the "TSA file." Kotler Decl. at ¶ 18 Ex. 16.

126.    The "TSA file" discussed in Dineen's message is an Excel spreadsheet. *See Id.*

127.    The "TSA file" lists 14 clinics for which Dineen was proposing a TSA. *See Id.*

128.    There is a note in the "Explanation" column for each clinic that provides the criteria Dineen used as the basis for his proposed TSAs: "Selected because (1) DSO is outside threshold (20-60 days) (2) we have identified adjustments for these clinics, and (3) Revenue Without Topsides was greater than AR." *See Id.*

129.    Regarding the first criteria, Dineen testified that there was a DSO "threshold" (outside of 20 to 60 days) that he generally would "target" for adjustments. Kotlier Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 330:6–331:11).

130.    Regarding the second criteria, Dineen testified that the phrase "we have identified adjustments for these clinics" meant that he believed, based on his CAS Spreadsheet, that the clinic "had previously unrecognized adjustments." Kotlier Decl. at ¶ 58, Ex. 56

(Dineen Vol. II at 332:9–333:4).

131.    The last column in the chart was  "Accounts for All Known Adjustments?" Kotlier Decl. at ¶ 18, Ex. 16.

132.    Dineen testified that this column indicated whether, based on the three criteria upon which he relied, a larger adjustment than what he proposed could be supported. Kotlier Decl. at ¶ 58, Ex. 56 (Dineen at 335:5-20).

133.    Dineen's initial proposed adjustments did not take "all known adjustments" for some of the 14 clinics. Kotlier Decl. at ¶ 18, Ex. 16.

134.    On May 10, 2018, Smith asked Dineen if there was additional revenue that could be recognized: "Can you please find another $1 – 1.2m in topside?"  Kotlier Decl. at ¶ 19, Ex. 17.

135.    Approximately an hour later, Dineen emailed Smith an updated chart of proposed adjustments. Kotlier Decl. at ¶ 20, Ex 18.

136.    In the updated chart, Dineen now recognized "all known adjustments" for all 14 clinics (except for one), which increased the proposed adjusted revenue. *Id.*

137.    Dineen testified that the additional revenue was "real revenue" that could be recognized. Kotlier Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 345:25 -346:1).

138.    On May 10, 2018, Smith forwarded Dineen's proposed TSAs to Boucher. Kotlier Decl. at ¶ 19, Ex. 17.

139.    On May 11, 2018, Boucher sent Dineen an email (copying Smith) to which he attached an updated spreadsheet containing his "top-side comments." Kotlier Decl. at ¶ 22, Ex. 20.

140.    Boucher asked additional questions of Dineen, who provided additional

information, and Boucher decided on the "late adjustments" he wanted to include for Wilcox's review. *See* Kotlier Decl. at ¶ 23, Ex. 21; ¶ 24, Ex. 22; ¶ 25, Ex. 23.

141. Smith's understanding at the time was that Wilcox and Boucher would perform additional review and consider additional information, information she did not review or analyze, before deciding what topside adjustments to make to revenue for the April 2018 month-end close. Kotlier Decl. at ¶ 79, Ex. 77 (Smith Resp. to SEC 2nd Set of Interrog. at 5).

142. The April close was not the end of the quarter and therefore, TSAs taken during this period were subject to future review before quarter-end. Kotlier Decl. at ¶ 79, Ex. 77 (Smith Resp. to SEC 2nd Set of Ints. at 5); Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. at ¶ 122).

143. On May 18, 2018, Dineen was terminated because his performance was not "where it needed to be." Kotlier Decl. at ¶ 55, Ex. 53 (Boucher at 303:18-23); Kotlier Decl. at ¶ 57, Ex.55X (Dineen Vol. I at 19:5-7); Kotlier Decl. at ¶ 62, Ex. 60 (Smith at 347-348).

144. On May 24, 2018, days after he was terminated, Dineen filed a Tips, Complaints, and Referrals form ("TCR") with the SEC to report "fraud" he purportedly first discovered on May 10, 2018. Kotlier Decl. at ¶57, Ex. 55 (Dineen Vol I at 65:25–66:3).

**E. Post-Dineen: New Personnel in Revenue Recognition**

145. After Dineen was terminated, Angela Keithahn was promoted to take over Dineen's role. Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 17:5-7).

146. Keithahn held Dineen's former position until October 2018 when she left ARA to become Controller at another company. Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 17:16-24).

147. Boucher "was the primary person who trained" Keithahn in revenue recognition and TSAs. Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 93:6-8).

148. While revenue supervisor, Keithahn oversaw five other people. Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 25:2-11). The revenue group she supervised spent "at least probably

50 percent" of its time doing waterfalls for clinics. Kotler Decl. ¶ 84, Ex. 82 (Keithahn at 24:10-17).

149.    While Keithhan was the revenue recognition manager, "there were waterfall analyses done for every topside adjustment that was taken."  Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 43:4-8).

150.    Keithahn "inherited" the CAS Spreadsheet from Dineen's tenure, and after completing each waterfall, her revenue team would put its proposed adjustments in the CAS Spreadsheet. Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 42:3-21).

151.    The clinics ARA picked to analyze for waterfalls "were [] pretty much divided in half between the clinics with low DSO and the clinics with high DSO."  Kotlier Decl. at ¶ 84, Ex. 82 (Keithahn at 32:1-14).

152.    In September 2018, Jillian Bernard was promoted from inside ARA to Controller after Boucher was promoted to CFO and Smith was promoted to VP of Finance. Kotlier Decl. at ¶ 54, Ex. 52 (Bernard at 289:2-6).

153.    Bernard was ARA's Controller until September 2019. Kotlier Decl. at ¶ 54, Ex 52 (Bernard at 37:06–38:02; 38:23-24).

154.    In that role, Bernard oversaw Keithahn's revenue group, in addition to other ARA accounting teams such as general ledger, monthly close, accounts payable, and external reporting. Kotlier Decl. at ¶ 54, Ex.52 (Bernard at 38:17-25, 39:8-16).

155.    Bernard testified that she was never asked to do anything never asked to do anything improper at ARA, never thought there was anything improper going on at ARA, and never had an instance where she did not have the support for a journal entry. Kotler Decl. ¶ 54, Ex.52 (Bernard at 103:1:24, 109:18-111:18; 275:1-6).

156.	Neither Boucher nor anyone else ever asked her to manufacture support to meet any financial metric, including RPT or DSO. Kotlier Decl. at ¶ 54, Ex. 52 (Bernard at 109:18-111:18).

157.	Bernard does not believe that Boucher instructed her or anyone else to make DSO equal to a certain number if the revenue team's accounting analysis did not support it; and she would not have made any adjustments or told others to make any adjustments to make the DSO into a particular number if it lacked accounting support. Kotlier Decl. at ¶ 54, Ex. 52 (Bernard at 80:3-81:25).

158.	Bernard testified that Keithahn's revenue team typically did waterfalls on certain clinics that were either higher or lower than a 40-day DSO that they were considered outliers that could be suitable for an adjustment. Kotlier Decl. at ¶ 58, Ex. 66 (Bernard SEC Inv. Tr. 67:10-67:16).

159.	The revenue team would do waterfalls and record both positive and negative TSAs, regardless of whether the adjustment affected analytics such as DSO. *See* Kotlier Decl. at ¶ 68, Ex. 66 (Bernard SEC Inv. Tr. at 70:15-25, 76:1-15).

**F.	October 2018 Emails**

160.	Boucher became ARA's CFO in October 2018 after Wilcox's departure. In October and November 2018, and he became "the ARA employe in charge" of revenue recognition and TSAs. Dkt. 67, Am. Compl. at ¶ 23, ¶ 55.

161.	Between October 6 and 17, 2018, several emails were exchanged between ARA personnel analyzing potential TSAs.  (Kotlier Decl. at ¶ 24, Ex. 22; ¶ 26, Ex. 24; ¶ 27 Ex. 25; ¶ 28, Ex. 26; ¶ 29, Ex. 27; ¶ 31, Ex. 29; ¶ 32, Ex. 30; ¶ 33, Ex. 31; ¶ 34, Ex. 32; ¶ 35, Ex. 33

162.	Bernard said that she "agree[s] that the topsides recorded were appropriate and it is reflected in the normalized 3-month DSO." Kotlier Decl. at ¶ 32 Ex. 30.

163.    As of October 18, ARA was forecasting a revenue shortfall of $17.5M. Kotlier, Decl. at ¶ 36 Ex. 34.

## VIII.    Grant Thornton's Revenue Recognition Audit for FY 2017

### A.    The Scope of Grant Thornton's Audit

164.    ARA recorded TSAs in the "551000" account of its general ledger.

165.    During audits before the 2017 Audit, Grant Thornton tested the 55100 Account where TSAs were recorded as part of its annual "broader journal testing," which means that if there was "a journal entry that was recorded to the 551000 account . . . then [Grant Thornton] would have made that selection [for testing], which was recorded to that account."  Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 92:18–93:8; Kotlier Decl. ¶ 62, Ex. 60 (Smith at 108:4-11).

166.    Strassman testified that, for the 2017 Audit, Grant Thornton "added a[n] incremental test to essentially . . . test a sample of the entries, separating debits from credits, because that account was made of entries going in both directions[.] . . . So we would separate the – that population into its debits and credits and sample that population. When we sample a population, it is then obtaining the underlying support to ensure the appropriateness of that entry."  Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 94:8-24).

167.    Grant Thornton conducted a substantive test of the 551000 account. This means that it was testing the reasonableness of the entries in that account. Kotlier Decl. at ¶ 74, Ex. 72.

168.    Grant Thornton did not audit ARA's internal controls for the 551000 account during the 2017 Audit. Kotlier Decl. at ¶ 63, Ex.61 (Strassman Vol. I at 107:11-15); Kotlier Decl. at ¶ 74, Ex. 72 (Stanton Rpt. ¶¶ 153, 186-87).

169.    Grant Thornton's Report of Independent Registered Public Accounting Firm in ARA's Form 10-K for FY 2017 states:

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

American Renal Associates Holdings, Inc. Form 10-K for the period ended December 31, 2017, p. F-2 (Report of Independent Registered Public Accounting Firm).

170.    During its 2017 Audit walkthrough, Grant Thornton interviewed Dineen regarding ARA's "contractual rate adjustments and retroactive settlements" on September 13, 2017. Kotler Decl. at ¶ 37, Ex. 35.

171.    Smith was not interviewed during Grant Thornton's walkthrough on TSAs. [*See generally* Kotlier Decl. Kotlier Decl. at ¶ 63, Ex. 61; ¶ 37, Ex. 35.

**B.      Grant Thornton's Testing of TSA**

172.    On January 30, 2018, Connors sent an email to ARA requesting information concerning "new test we are performing this year around Account #551000 – the C/A topside adjustments." Kotlier Decl. at ¶ 38, Ex. 36.

173.    Grant Thornton initially selected a sample of 54 TSAs for testing, consisting of 37 credit selections and 17 debit selections from ARA's 551000 account. Dkt. 67, Am. Compl. at ¶ 145; Kotlier Decl. at ¶ 57, Ex. 55 (Dineen Vol. I at 271:2-11).

174.    A few hours later after Connors' January 30, 2018 email, Smith sent Dineen an email in which she asked, "What is your timing on below?  [H]ave you run into any support issues?"  Kotlier Decl. at ¶ 39, Ex. 37.

175.    Dineen responded to Smith's email explaining that, for certain TSAs from "earlier in the year," Dineen could find only McDonough's handwritten notes. *Id.*

176.     In response to Dineen's email, Smith responded: "Please do not provide McDonough's printed piece of paper to the auditors for support. We will have to provide an analysis of patient level support." *Id.*

177.     On January 30, 2018, Boucher emailed Smith, writing that if she or Dineen had questions about the 551000 account selections to let him know. Kotlier Decl. at ¶ 40, Ex. 38 at 71. Smith then identified a selection McDonough adjustment for which she "told [ Dineen] to provide analytic support." *Id.* Boucher responded and asked to see the adjustment because "[McDonough] did not do random entries he just did not communicate why." *Id.*

178.     On January 31, 2018, Dineen sent an email to Boucher in which he wrote, "I know we need a patient-level analysis for the auditors . . . so if you want I can build one." Kotlier Decl. at ¶ 41, Ex. 39.

179.     Dineen knew McDonough's handwritten notes were not "the type of support that the auditors [were] looking for." Kotlier Decl. at ¶ 58, Ex. 56 (Dineen at 361:17-21).

180.     Strassman was expecting "patient-level or clinic-level financial information that would support an adjustment to the 551000 account." Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 250-13-24).

181.     Strassman had seen McDonough's handwritten notes in prior years, and he testified that would want for underlying analysis and patient-level support if he had been given those notes. Kotlier Decl. at ¶ 64, Ex. 62 (Strassman Vol. II at 568:23–569:6-9).

182.     Smith knew Strassman had seen McDonough's handwritten notes before, and she believed that McDonough's handwritten notes would not be useful to him. Kotlier Decl. at ¶ 62, Ex. 60 (Smith at 367:15-22).

183.     Strassman testified that, given these circumstances, it was "reasonable for Karen

Smith to have anticipated that if she had handed the auditors McDonough's printed pieces of paper, they would just simply ask for the patient level support."  Kotlier Decl. at ¶ 64, Ex. 62 (Strassman Vol. II at 569:10-16).

**C.  ARA Provides Two Spreadsheets that Contain Authentic Company Data**

184.    On February 1, 2018, Smith notified Connors via email that ARA's "support for the debit selections has been uploaded in the client space."  Kotlier Decl. at ¶ 42, Ex. 40. This information was provided as an Excel spreadsheet ("Debit Selections Spreadsheet"). *See Id*; Kotlier Decl. at ¶ 44, Ex. 42; s*ee* Kotlier Decl. at ¶ 62, Ex. 60 (Smith at 406:7–407:13).

185.    The Debit Selection Spreadsheet contains a separate tab for each of the 17 TSA debits selected for the 2017 Audit. *See* Kotlier Decl. at ¶ 42, Ex. 40 and ¶ 44, Ex. 42.

186.    Six tabs in the Debit Selection Spreadsheet contain a banner in red, bold, italic font with a yellow highlight at Row 7, Column B that says "Originally based on analytics – built better processes through out [sic] the year and add patient details":

- Selection 1 – 1/31/2017 for $175,000
- Selection 2 – 3/31/2017 for $25,000
- Selection 3 – 5/31/2017 for $25,000
- Selection 4 – 5/31/2017 for $25,000
- Selection 9 – 7.31.2017 for $50,000
- Selection 15 – 10/31/2017 for $25,000

*See Id*.

187.    Smith did not create the Debit Selections Spreadsheet. Kotlier Decl. at ¶ 58 Ex. 56. (Dineen Vol. II at 364:1-7).

188.    On February 2, 2018, Smith sent an email to Connors to which she attached an Excel spreadsheet Smith described as "the credit selections" ("Credit Selections Spreadsheet"). *See* Kotlier Decl. at ¶ 38, Ex. 36; ¶ 43, Ex. 41.

189.    The Credit Selection Spreadsheet contains a separate tab for each of the 37 TSA

credits selected for the 2017 Audit. *See Id.*

190.     Like the Credit Selection Spreadsheet, seven tabs in the Debit Selection

Spreadsheet contain the same banner in red, bold, italic font with a yellow highlight that says

"Originally based on analytics – built better processes through out [sic] the year and add patient

details":

- Selection 1 – 1/31/2017 for $25,000
- Selection 3 – 2/28/2017 for $50,000
- Selection 7 – 3/31/2017 for $25,000
- Selection 8 – 4/30/2017 for $700,000
- Selection 9 – 4/30/2017 for $400,000
- Selection 13 – 5/31/2017 for $250,000
- Selection 14 – 6/30/2017 for $53,630

*See Id.*

191.     Smith did not create the Credit Selections Spreadsheet. *See* June 13, 2024

Kotlier Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 364:1-7).

192.     Strassman testified that he "would interpret that [the banner] in the context of

analysis being performed or additional analysis being performed after the original entry was

created."  Kotlier Decl. at ¶ 63, Ex. 61 (Strassman Vol. I at 283:18–284:5).

193.     Connors believes she "had a conversation" with ARA about the meaning of the

banner, "Originally based on analytics – built better processes through out the year and add

patient details."  Kotlier Decl. at ¶ 56, Ex. 54 (Connors at 135:4-10).

194.     Connors further testified that "it [was her] process if [she] didn't understand

something that was given to [her] by a client to talk to them about it."  Kotlier Decl. at ¶ 56, Ex.

54 (Connors at 133:12-18).

**D.     Grant Thornton's Final Work Paper**

195.     Grant Thornton's Final Work Paper for its testing of the 551000 account ("Final

Work Paper") explains Grant Thornton's testing of Account 551000 during the 2017 Audit. Kotlier Decl. at ¶ 64, Ex. 62 (Strassman Vol. II at 507:17-23); s*ee generally* Kotlier, Decl. at ¶ 51, Ex. 49.

196.     The patient-level data upon which Grant Thornton relies in the Final Work Paper is identified, by individual selection, starting on the second page of the Final Work Paper. *See Id.*.

197.     The patient-level data in the Final Work Paper is different than the data provided by ARA in the Credit Selection Spreadsheet and the Debit Selection Spreadsheets for at least the following selected entries:

| Debit | Credit |
|-------|--------|
| 1, 3, 9, 13, 14 17 | 1, 9, 10, 13 14 19 20 27 32, 37 |

[*Compare* Debit Journal Entries at Kotlier Decl. at ¶ 51, Ex. 49 at 2-6 *with* ¶ 44, Ex. 42; *compare* Credit Journal Entries at Kotlier Decl. at ¶ 51, Ex. 49 at 8, 11, 13-16, 18, 20, 22 *and* ¶ 43, Ex. 41; Kotlier Decl. at ¶ 64, Ex. 62 (Strassman Vol. II at 518-25–519:9; *see generally* 515:14–529:15.

198.     Dineen told Smith that McDonough's handwritten notes should <u>not</u> be given to the auditors. Kotlier Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 259:23–260:12).

**E.     Patient-Level Detail**

199.     Boucher knew that Grant Thornton wanted patient-level detail for each of the selections, and that is "the support [ARA] provided them."  Kotlier Decl. at ¶ 55. Ex. 53 (Boucher at 268:16–269:4); Kotlier Decl. at ¶ 69, Ex. 67 (Boucher SEC Inv. Tr. at 181:23–182:6); Kotlier Decl. at ¶ 55. Ex. 53 (Boucher at 282:22–283:3); Kotler Decl. ¶ 69, Ex. 67 (Boucher SEC Inv. Tr. at 183:14-17).

200.    The information that ARA provided Grant Thornton was patient-level data that was already documented in ARA's QMS system. Kotlier Decl. at ¶ 55, Ex. 53 (Boucher at 279:18-23).

201.    Boucher considers ARA's response to Grant Thornton's request a "proper thing to do."  Kotlier Decl. at ¶ 55, Ex. 53 (Boucher at 314:13-315:1).

202.    Dineen agrees that when he was compiling this data, his team provided information about "real patients," to account for "real revenue," earned on "real dates of service," for services that were actually provided. Kotlier Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 364:1-7).

203.    Dineen gathered "real data" that "existed at the time that the journal entry was made."  Kotlier Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 364:8–365:1).

## IX.    ARA's September 2019 Restatement

### A.    ARA's Public And Internal Assessment of Its Controls

204.    On March 8, 2019, ARA disclosed that it had initiated a review of the "revenue recognition methodology and related accounting matters, including internal control over financial reporting related to revenue recognition and related matters."  Kotlier Decl. at ¶ 3, Ex. 1 (2018 10K at 4). *See also* Kotlier Decl. at ¶ 82, Ex. 80, (ARA Form 8-K, filed March 8, 2018).

205.    On March 21, 2019, ARA announced that its Form 10-Ks for 2014, 2015, 2016, and 2017 filings and Form 10-Qs filings for Q2 2016 through Q3 2018 "should be restated and should no longer be relied upon." ("Non-Reliance Periods"). Kotlier Decl. at ¶ 3, Ex. 1 (2018 10-K at 4);  Kotlier Decl. at ¶ 83. Ex. 81 (Form 8-K, filed March 21, 2019, p. 2).

206.    Smith did not sign any of ARA's Form 10-Q or 10-K filings covering any period of time in 2017, 2018, or the other Non-Reliance Periods. Dkt. 67, Am. Compl. at ¶¶ 193-94.

207. Smith did not sign any of ARA's Form 10-Q, 10-K or 8K filings covering any period of time in 2017, 2018 . Dkt. 67, Am. Compl. at ¶¶ 193-94; *Kotlier,Decl. at ¶* 3, Ex. 1.

208. The Audit Committee of ARA's Board of Director's engaged Milbank LLP ("Milbank"), to conduct ab internal investigation into the areas that appeared to be subject to the SEC inquiry. Milbank engaged Ankura Consulting Group, LLC to assist with forensic-related aspects of the investigation. Kotlier Decl. at ¶ 52, Ex. 50 (Grant Thornton Report at 2).

209. After its investigation, ARA's Audit Committee "concluded that there was no intentional wrong-doing on the part of management, and that the misstatement was the result of inadequate processes and controls." *Id*.

210. On September 5, 2019, ARA filed its annual financial statements for the year ended December 31, 2018, which include restated financial statements for the Non-Reliance Periods ("Restatement"). Kotlier Decl. at ¶ 3, Ex. 1 (2018 10K at 4).

211. The Restatement stated that ARA did not "design and maintain effective controls" with respect to monitoring controls for compliance" or "maintain[ing] an effective control environment in connection with the revenue recognition process, accounting for income taxes and noncontrolling interests and review and approval of journal entries." Id. at 6.

212. The Restatement further stated:

 As our Company grew, this was evidenced by our failure to: (i)(a) invest in, prioritize and support an adequate environment of controls, (b) establish and support adequate controls relating to compliance with appropriate accounting policies and procedures, and (c) implement controls that were adequately designed and operating effectively, thereby enabling our preparation of financial statements to be in accordance with GAAP; and (ii) employ personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with the increasing size of the entity and nature and complexity of our financial reporting requirements.

Id at 7.

213.     The Restatement stated that ARA "did not design and maintain effective controls over information and communication. Specifically, we did not have an adequate process for internally communicating information within the accounting department and between and among other groups, such as the groups responsible for revenue recognition, accounts receivable and income taxes, necessary to support the proper functioning of internal controls impacting these accounts. These material weaknesses led to misstatements in our accounting for revenue recognition, accounts receivable and income taxes." *Id.* at 121-22.

214.     The Restatement contains a Remediation Plan stating that ARA has, will, or intends to, among other things, "augment its personnel with qualified consulting services," "provide training to employees across [the] Company," replace Boucher with an Interim CFO and Interim CAO, and enhance[] the communication around revenue recognition." *Id.* at p. 123.

215.     The four "materials weaknesses" ARA identified in the Restatement are control issues – there is no mention in ARA's public filings or internal investigation report of an improper use of analytic metrics, the existence of a "cookie jar," or any intentional misstatements. *See Id.* at 120-23; Kotlier Decl. at ¶ 52, Ex. 50 (Grant Thornton Report].

**B.     The Restated Financials**

216.     The Restatement disclosed a net increase to revenue of $6.2 million over the aggregate period of previously reported income before income taxes.

| Restatement Impact on Revenue Recognition and Accounts Receivable (Income Before Income Taxes) | |
|---|---|
| **Period of Time** | **Adjustment (in thousands)** |
| FY 2013 & Prior Years | $20,013 |
| FY 2014 | ($1,656) |
| FY 2015 | $13,715 |
| FY 2016 | $17,012 |
| FY 2017 | ($16,103) |
| Q1, Q2, Q3 2018 | ($26,790) |

| Cumulative Pre-Tax Impact | $6,191 |
|---|---|

Kotlier Decl. at ¶ 3, Ex. 1 at 9.

217. ARA's reported cash flows from operations and reported cash balances did not change due to the Restatement. *Id*. at 29.

218. The Restatement adjustment to ARA's accounts receivables as of December 31, 2016, equals the sum of the restatement revenue adjustments made for the year ended December 31, 2016, and prior years. *Id*. at 29.

219. The methodology used to restate ARA's revenue for Q1-Q3 2018 is different from the methodology used for the early periods of time in the Non-Reliance Period. *Id*. at 15-16. 27.

220. The SEC's proffered expert witness, Johnson did not perform any independent analysis of the restated revenue amounts. Kotlier Decl. at ¶ 67, Ex.65 (Johnson at 145:7-14).

## C. Additional Revenue Data from Restatement

221. Dineen claims that ARA maintained a "cookie jar" of revenue; and as a result, the company understated its revenue by $10 million. Kotlier Decl. at ¶ 58, Ex. 56 (Dineen Vol. II at 345:25–348:18.

222. The purpose of a so-called "cookie jar" is to not report revenue in well-performing quarters for use in subsequent poor-performing quarters. Kotlier Decl. at ¶ 64, Ex. 62 (Stanton Rpt. at ¶ 214).

223. The Restatement discloses that ARA overstated its revenue during the relevant time period. Kotlier Decl. at ¶ 64, Ex. 62 (Stanton Rpt. at ¶ 73).

224. Further, a company utilizing a "cookie jar" typically would not (i) beat or (ii) fail to meet consensus revenue estimates by a significant margin because excess revenue could be banked in the "cookie jar" for future periods. Kotlier Decl. at ¶ 64, Ex. 62 (Stanton Rpt. at ¶

214).

225.     The following chart compares ARA's originally reported revenue, restated revenue, and the consensus revenue estimates for each quarter from Q1 2016 through Q3 2018:



Figure VI.1: ARA Original and Restated Revenue and Consensus Estimates, 2016 – Q3 2018[248]

(Kotlier Decl. ¶ 64, Ex. 62 (Stanton Rpt. ¶ 214); Stanton Rpt., Exhibit C: ARA Revenue and EBITDA Consensus Estimates, 2016 – Q3 2018.

226.     The following chart compares ARA's originally reported EBITDA, restated EBITDA, and the consensus EBITDA estimates for each quarter from Q1 2016 through Q3 2018:



**Figure VI.2: ARA Original and Restated EBITDA and Consensus Estimates, 2016 – Q3 2018**[249]

Kotlier Decl. at ¶ 64, Ex. 62 (Stanton Rpt. ¶ 215; Stanton Rpt., Exhibit C: ARA Revenue and EBITDA Consensus Estimates, 2016 – Q3 2018).

Respectfully submitted,

*/s/      Jonathan L. Kotlier*
Jonathan L. Kotlier (BBO# 545491)
jkotlier@nutter.com
Ian D. Roffman (BBO# 637564)
iroffman@nutter.com
Alex Rothschild (BBO# 704521)
arothschild@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: (617) 439-2000
Facsimile: (617) 310-9000

Dated:  September 30, 2024                 *Counsel for Defendant Karen Smith*

## CERTIFICATE OF SERVICE

I certify that, on September 30, 2024, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

 /s/ Jonathan L. Kotlier