## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

v.

AMERICAN RENAL ASSOCIATES
HOLDINGS, INC., JONATHAN L.
WILCOX, JASON M. BOUCHER, and
KAREN J. SMITH,

       Defendants.

Civil Action No. 22-CV-10651-NMG

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT SMITH'S *DAUBERT* MOTION TO
## PRECLUDE CERTAIN PROFFERED EXPERT OPINIONS

Jonathan L. Kotlier (BBO# 545491)
jkotlier@nutter.com
Ian D. Roffman (BBO# 637564)
iroffman@nutter.com
Alex Rothschild (BBO# 704521)
arothschild@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210

*Counsel for Defendant Karen J. Smith*

## TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.     FEDERAL RULE OF EVIDENCE 702 AND THE 2023 AMENDMENT ...................... 2

II.    JOHNSON IS UNQUALIFIED GENERALLY TO OPINE ON ARA'S REVENUE
       RECOGNITION PROCESS BECAUSE HE LACKS HEALTHCARE EXPERTISE ..... 4

III.   JOHNSON SHOULD BE SPECIFICALLY PRECLUDED FROM OFFERING
       OPINIONS THAT FAIL TO MEET RULE 702 STANDARDS ...................................... 7

       A.    Johnson Should Be Precluded from Opining That ARA's
             Revenue Recognition Process Did Not Comply With
             GAAP or That ARA Lacked Adequate Internal Controls ..................................... 7

       B.    Johnson Should Be Precluded from Opining That TSAs
             Were Booked Without Any Support .................................................................... 11

       C.    Johnson Should Be Precluded from Opining That GAAP
             Required a Waterfall For Every TSA ................................................................. 13

       D.    Johnson Should Be Precluded from Opining That ARA
             Maintained A "Cookie Jar" ............................................................................... 14

       E.    Johnson Should Be Precluded from Opining About
             Smith's Role, Responsibilities, and Authority Or That
             Smith "Failed To Meet Those Responsibilities" ................................................. 16

       F.    Johnson Should Be Precluded from Opining That Smith
             Misled Grant Thornton During The 2017 Audit .................................................. 19

CONCLUSION ................................................................................................... 20

i

## **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Bourjaily v. United States*,
    483 U.S. 171 (1987)................................................................................3

*Champagne Metals v. Ken-Mac Metals, Inc.*,
    458 F.3d 1073 (10th Cir. 2006) ...........................................................10

*Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*,
    691 F. Supp. 3d 360 (D.N.H. 2023).....................................................10

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
    32 A.3d 456 (Md. Ct. App. 2011), *aff'd*, 56 A.3d 170 (Md. 2012)...........6

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ...............................................................20

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D. N.J. 2004) .....................................................10

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*,
    111 F.4th 125 (1st Cir. 2024)................................................................3

*Daubert v. Merrell Dow Pharma, Inc.*,
    509 U.S. 579 (1993).......................................................2, 3, 8, 14

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000).................................................................14

*Gayton v. McCoy*,
    593 F.3d 610 (7th Cir. 2010) .................................................................6

*Glover v. Ferrero USA, Inc.*,
    No. CV 11-1086 (D. N.J.)...............................................................12, 13

*Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*,
    54 F.4th 7 (1st Cir. 2022)..............................................................14, 17

*Huddleston v. United States*,
    485 U.S. 681 (1988)...............................................................................3

*Koken v. Black & Veatch Const., Inc.*,
    426 F.3d 39 (1st Cir. 2005)....................................................................9

*Lantec, Inc. v. Novell, Inc.*,
    306 F.3d 1003 (10th Cir. 2002) ........................................................................18

*LifeWise Master Funding v. Telebank*,
    374 F.3d 917 (10th Cir. 2004) ...........................................................................6

*MicroStrategy, Inc. v. Bus. Objects, S.A.*,
    429 F.3d 1344 (Fed. Cir. 2005)........................................................................20

*Poulis-Minott v. Smith*,
    388 F.3d 354 (1st Cir. 2004) .............................................................................2

*SEC v. ITT Educ. Servs., Inc.*,
    311 F. Supp. 3d 977 (S.D. Ind. 2018) .............................................................11

*United States v. Arney*,
    248 F.3d 984 (10th Cir. 2001) ...........................................................................5

*United States v. Deleon*,
    No. 07-cr-10277-NMG, 2016 WL 3747487 (D. Mass. May 9, 2016)....................10

*United States v. Luna*,
    649 F.3d 91 (1st Cir. 2011) ...............................................................................9

*United States v. Montás*,
    41 F.3d 775 (1st Cir. 1994) .............................................................................16

*United States v. Scop*,
    846 F.2d 135 (2nd Cir. 1988).........................................................................11

*United States v. Ward*,
    169 F.2d 460 (3rd Cir. 1948) ..........................................................................11

*United States v. Zajanckauskas*,
    441 F.3d 32 (1st Cir. 2006) .............................................................................16

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) .............................................................................9

## Other Authorities

Fed. R. Evid. 104 ...............................................................................................3

Fed. R. Evid. 702, Advisory Committee Notes ...............................................*Passim*

## INTRODUCTION

R. Larry Johnson ("Johnson") is a Certified Public Accountant ("CPA") and "independent consultant." He was retained by the SEC as an expert witness, but he has absolutely no experience with healthcare accounting and in reality is simply summarizing the SEC's interpretation of the facts. Johnson's testimony has previously been excluded by courts around the country for many of the same reasons that warrant the exclusion of all or much of his intended testimony here: he is attempting to opine on areas beyond his professional expertise; his so-called "opinions" amount to nothing more than credibility determinations and interpretation of out-of-court statements that, if permitted, would usurp the role of the jury; and he ignores evidence that runs contrary to his opinions. Just as other courts have done, this Court similarly should not permit testimony from Johnson that does not satisfy Rule 702.

Johnson submitted an initial report and rebuttal report, and he was also deposed.[1] In those disclosures, he states that the SEC retained him to opine that (1) ARA's financial statements for FY 2017 and Q1-Q3 2018 were not prepared in accordance with GAAP and as a result contained material misstatements relating to the recognition of revenue, and (2) that "[m]aterial weakness in internal controls contributed to ARA's material misstatements." Rpt. at 1, 9. Johnson intends to opine that Defendant Karen Smith was responsible for the accuracy of ARA's financial statements and "failed to meet those responsibilities." *Id* at 9. He also intends to opine that Smith provided "false support" to Grant Thornton during the FY 2017 audit ("2017 Audit"), that "the information and support provided to the audit team was inaccurate," and that "[n]othing about"

---

[1] True and accurate copies of relevant excerpts are appended as Exhibit 1 for Johnson's Initial Report, dated June 28, 2024 ("Rpt."); Exhibit 2 for Johnson Rebuttal Report, dated August 23, 2024 ("Johnson Rebuttal"); and Exhibit 3 for Johnson Deposition Transcript, dated September 9, 2024 ("Johnson Tr.").

ARA's data provided during the 2017 Audit "notified the audit team that the support had not been prepared contemporaneously" with the time when TSAs were taken. *Id*. at 50, 65-66.

Johnson should be precluded from offering opinions under *Daubert* for two reasons. First, the SEC cannot establish by a preponderance of the evidence that Johnson is sufficiently qualified to assist the trier of fact with the specific technical accounting issues in this case, because he has no experience whatsoever with healthcare revenue recognition and the unique accounting challenges that this industry presents. Second, certain of Johnson's opinions are inadmissible under *Daubert*, because they are not based on an analysis that requires technical or specialized knowledge or are not based on sufficiently reliable methodology that will help the jury better understand the technical accounting evidence in this case. His opinions are based on unsupported assumptions about purported facts that are inconsistent with the evidentiary record, skewed interpretations of the limited information he bothered to review, and do not take into account contrary evidence.

## ARGUMENT

### I.     FEDERAL RULE OF EVIDENCE 702 AND THE 2023 AMENDMENT

Under Federal Rule of Evidence 702, judges must act as the gatekeeper for proffered expert testimony and permit expert testimony only where: (1) the proposed expert is qualified by "knowledge, skill, experience, training, or education"; (2) the proffered testimony concerns "scientific, technical, or other specialized knowledge" that will "assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) the expert's testimony is based on a reliable methodology applicable to the facts of the case. Fed. R. Evid. 702; *Poulis-Minott v. Smith*, 388 F.3d 354, 359-61 (1st Cir. 2004). Under Rule 702, a court must determine whether the "expert's proffered testimony both rests on a reliable foundation and is also relevant to the

task at hand." *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 111 F.4th 125, 140 (1st Cir. 2024) (citing *Carrozza v. CVS Pharm., Inc.*, 992 F.3d 44, 56 (1st Cir. 2021)).

The recent amendment to Rule 702 clarified that the party proffering the expert – here the SEC – has the burden to establish inadmissibility. Fed. R. Evid. 702, Advisory Committee Notes (2023 Amendment) ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."). The proponent must establish each requirement under *Daubert* by a preponderance of the evidence. *Id.* (observing that "many courts have incorrectly" evaluated "reliability-based requirements" under Rule 104(b), which is "more permissive" than the Rule 104(a) preponderance standard that applies under Rule 702).[2]

Additionally, the amendment clarifies that "the sufficiency of an expert's basis" is a question of the *admissibility* of an expert's opinion, not a question of weight to be evaluated by the factfinder. Fed. R. Evid. 702, Advisory Committee Notes (2023 Amendment) (stating that the amendment emphasizes "that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology"). As the Advisory Committee explained, "Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to

---

[2] The difference between Rule 104(a) and (b) is significant. For determinations made under Rue 104(a), the proponent bears the burden of establishing admissibility by a preponderance of the evidence. *See e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (whether out-of-court statements were made in course of conspiracy); *Daubert v. Merrell Dow Pharma, Inc.*, 509 U.S. 579, 592 (1993) (whether expert opinion will assist the jury under Rule 702). Rule 104(b) determinations apply a lower burden of proof: the proponent need only present proof sufficient to support a reasonable juror's finding that the fact does exist. *See, e.g.*, *Huddleston v. United States*, 485 U.S. 681, 690 (1988).

determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id*.

## II.    JOHNSON IS UNQUALIFIED GENERALLY TO OPINE ON ARA'S REVENUE RECOGNITION PROCESS BECAUSE HE LACKS HEALTHCARE EXPERTISE

Johnson has no prior experience with the specific, niche accounting issues in this case. The American Institute of Certified Public Accountants' guidance, ARA's restated financial reporting, and every fact witness who has been asked, including the putative SEC whistleblower (Dineen), agree that revenue recognition in the healthcare industry presents unique, industry-specific complexities.[3] Even Johnson concedes that there "are significant challenges associated with estimating revenue with certain transactions taking several years to resolve." Johnson Tr. at 84:24-85:23.

Johnson has no prior experience with revenue recognition for a healthcare company. *See, e.g.*, Johnson Rebuttal at 20-21. *See* Johnson Tr. at 27:25-45:10; Rpt., Ex. B-2 ("Johnson CV"). Johnson worked at Ernst & Whinney for the first 18 years of his career, but he could not identify a single healthcare client account that he worked on during his tenure. *See* Johnson CV; Johnson Tr. at 31:24-32:20. In 1986, Johnson formed Johnson Lambert & Company, which "primarily" operated a "niche practice" for clients in the insurance industry. *Id*. at 32:21-33:7; 34:16-35:6. From 1986 until Johnson's departure in 2005, Johnson Lambert & Company had no clients that were healthcare providers. Johnson CV; Johnson Tr. at 35:7-36:10. Johnson then worked as Chairman and CEO of Veris Consulting, Inc. from 2000 until 2021. Johnson CV. Veris Consulting, Inc. did "some work that would be focused on economic assessments, profitability

---

[3] *See* Ex. 51 to Wilcox MSJ SOF (Dkt. 115-51) at 5 (AICPA: healthcare accounting is "subject to inherent uncertainties and complexities"); Ex. 1 to Boucher MSJ SOF (Dkt. 116-1) at 55 (ARA Restatement: "significant challenges associated with estimating revenue" at ARA; Ex. 55 to Smith MSJ SOF (Dkt. 127-54) (Dineen Vol. I at 114:25-115:19; 117:12-17); Ex. 75 to Smith MSJ SOF (Dkt. 127-74) (Wilcox Resp. to Ints. No. 2); Strassman Vol. II at 383:16-384:12 (Exhibit 4 hereto).

assessments, internal control structure assessments" for "a large multidiscipline company that was providing life insurance and banking and a couple other – ancillary financial services." Johnson Tr. at 39:4-11. In the "late 80s," Johnson had one engagement that looked at Medicare fraud but that "certainly didn't end up in any type of testimony or report." Johnson Tr. at 39:20-40:21. From 2021 to 2022, Johnson worked for Ocean Tomo, LLC but had no healthcare experience. *Id*. at 40:1-43:3. Ocean Tomo, LLC "did or do[es] a lot of work with intellectual property, valuation of intellectual property, disputes about intellectual property… [and] some other type of management consulting generally." *Id*. Since 2022, he has been a "independent contractor/consultant" for J.S. Held, LLC and currently has "probably four engagements that are [in] some form of process right now" but none in healthcare. *Id*. at 42:2-45:14. When asked about his work at J.S. Held, LLC and his prior experience as a testifying or consulting expert, Johnson could not recall any specific matter that involved revenue accounting for a healthcare provider. *Id.* at 54:11-57:5 ("I don't believe we have been retained as an expert by a provider, with one possible exception").

This case focuses on applying GAAP to the unique revenue recognition issues that healthcare companies face because of uncertainties around whether, how much, and when different third-party payors will pay for services provided to the thousands of patients enrolled in numerous commercial insurance policies and government programs across the country. Johnson relies on his general experience as a CPA. That is not enough. *See United States v. Arney*, 248 F.3d 984, 991 (10th Cir. 2001) (CPA's testimony excluded despite his professional experience and prior service as a board member of a credit union because his knowledge, though perhaps considerable in certain areas, did not extend to expertise regarding the documents on which banks rely when deciding whether to extend credit, which was the subject matter of the case).

Here, Johnson lacks the "scientific, technical, or other specialized knowledge" required to help jurors understand the evidence and determine the <u>specific</u>, technical accounting issues they may need to decide in this particular case. *See also Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."); *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) ("The heart of expert testimony is the foundation. Whether a witness can parrot the results of a model does not mean that he is qualified to explain how the model works or to opine on the statistical validity or interpretation of the results.").

This is not the first time that Johnson has been proffered to opine on matters beyond his area of expertise. In *CR-RSC Tower*, Johnson attempted to opine about real estate projections – another subject that may be peripherally related to his work as a CPA, but certainly outside his areas of expertise. The trial court excluded his opinions and the Maryland Court of Appeals and Supreme Court of Maryland affirmed the trial court's decision because Johnson lacked "expertise, training, or education" in the specialized area at issue in that case. *See CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 32 A.3d 456, 487 (Md. Ct. App. 2011), *aff'd*, 56 A.3d 170 (Md. 2012). This Court likewise should not permit Johnson to testify "about facts and information upon which he ha[s] no expertise" just because the topic involves financial accounting. *See id*. The Court should find that the SEC has failed to meet its burden to show that Johnson is qualified to testify as to the healthcare accounting issues in this case.

### III.    JOHNSON SHOULD BE SPECIFICALLY PRECLUDED FROM OFFERING OPINIONS THAT FAIL TO MEET RULE 702 STANDARDS

In addition to being unqualified generally to testify as an expert on healthcare revenue recognition, Johnson should be precluded from offering specific opinions that fail to meet the requirements of Rule 702. Specifically, Johnson should be precluded from:

- Opining that ARA's revenue recognition process in 2017 and Q1-Q3 2018 did not comply with GAAP because he has not performed any independent analysis to arrive at that opinion;

- Opining that ARA's TSAs were booked without any support to achieve specific DSO targets because it is an opinion about Defendants' "state of mind" which is not an appropriate topic for expert testimony;

- Opining that GAAP required a waterfall for every TSA at ARA because his basis for this opinion is incongruous with the factual record in this case;

- Opining about Smith's role, responsibilities, and authority at ARA – and whether she failed to meet those responsibilities – because these are factual determinations that do not require scientific or technical analysis and in addition to usurping the role of the jury, he ignores key evidence; and

- Opining that Smith misled Grant Thornton during the 2017 Audit because he has not performed any independent analysis of the Audit.

### A.    Johnson Should Be Precluded from Opining That ARA's Revenue Recognition Process Did Not Comply With GAAP or That ARA Lacked Adequate Internal Controls

Johnson should be precluded from opining that ARA's revenue recognition practices did not comply with GAAP, resulting in "material misstatements in [ARA's] financial statements for 2017 and the first three quarters of 2018" or opining that "[m]aterial weaknesses in internal control contributed to ARA's material misstatements." *E.g.*, Rpt. at 9. These opinions are inadmissible because they are based on a methodology that is too unscientific, too unobjective, and too unreliable to satisfy the SEC's burden under Rule 702. Johnson performed no

independent analysis of ARA's TSA process during the relevant period, and thus his opinions are not based on an analysis that requires technical or specialized knowledge.

When assessing reliability, this Court must "scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case," and "*any* step that renders the analysis unreliable … renders the expert's testimony inadmissible … *whether the step completely changes a reliable methodology or merely misapplies that methodology*." *See* Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendment) (emphasis in original). There are multiple steps in Johnson's methodology that do not meet the "intellectual rigor" required by *Daubert*.[4]

Johnson did not perform any analysis that requires technical, specialized expertise. ████████████████████████████████████████████████ ██████████████████████████████████████████████████ *See, e.g.*, Johnson Tr. 137:1-140:15, 181:18-184:15, 259:23-261:11, 275:24-277:5. He also *assumes* that ████████████████████████████████████████████ every TSA made during the restated periods violated GAAP. *Id.* at 105:9-106:12; 139:2-140:15, 259:16-25, 261:2-11. But ████████████████████████████████████████ Johnson did not work to independently assess whether it was true. The Advisory Committee warned about permitting an expert to testify in exactly this situation: where the testimony is based on a methodology that "unjustifiably extrapolate[s]… to an unfounded conclusion." *Id.* ("[I]n some cases… there is simply too great an analytical gap between the data and the opinion proffered." Fed. R. Evid. 702, Advisory

---

[4] Even though he is not a scientist, Johnson's testimony "should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist," and must be based on the same "intellectual rigor" that an auditor looking at ARA without presuppositions would actually employ – as if they were not retained solely for purposes of this litigation. *See* Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendment).

Committee Notes (2000 Amendment) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

When asked whether he did an independent review of <u>any</u> TSAs that ARA took during the relevant period, Johnson claimed he "looked at some data" and that was "enough." Johnson Tr. at 137:24-139:2. When asked "[h]ow many transactions do you consider were enough to look at," he responded: "I don't even think that's a rational question. It's certainly not one that I care to answer." *Id*. at 139:3-7. Johnson's unwillingness to disclose information about his methodology is inherently unscientific. *Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39, 47 (1st Cir. 2005) (affirming exclusion of testimony where expert "failed to articulate any methodology for determining the appropriateness of a fire blanket for particular operations."); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418-19 (7th Cir. 2005) ("He was relying on intuition, which won't do… [He] may be the world's leading student of [the subject matter], but if he could or would not explain how his conclusions met the Rule's requirements, he was not entitled to give expert testimony. As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'").

Faced with these shortcomings, Johnson submitted a rebuttal report citing five instances of specific TSAs that he opines were somehow improper, but cannot even say whether these TSAs increased or decreased revenue. Johnson Tr. 183:15-184:15 (admitting he did no analysis "to measure the impact of the top-side adjustments" on ARA's revenue). ███████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████ █████████████████████████

████████████████████████████████████

Similarly, ███████████████████████████████████████████

██████████████████████████████ Johnson did no independent

work to assess ARA"s internal controls during the relevant period; ████████

█████████████████████ *Compare* Johnson Tr. at 145:7-14, 261:2-11 *with* Ex. 1 to

Smith MSJ SOF (Dkt. 127-1) at 6-7, 121-122. ███████████████████████

██████████████████████████████████████████

██████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████

        Again, this type of opinion appears to be straight from Johnson's playbook: a federal

court in New Jersey once precluded Johnson from doing the same thing. In *Crowley v. Chait*, the

court precluded Johnson from "offering hearsay testimony, summarizing evidence, and opining

on the credibility or consistency of testimony." 322 F. Supp. 2d 530, 552 (D. N.J. 2004) ("[A]n

expert may not be used simply as a vehicle for the admission into evidence of otherwise

inadmissible hearsay testimony."). The same result should be reached here.

**B.      Johnson Should Be Precluded from Opining
         That TSAs Were Booked Without Any Support**

Johnson should be precluded from opining that Defendants booked TSAs without any

support "to achieve specific DSO targets." Rebuttal at 2. First, this is an opinion about

Defendants' "state of mind" (because it attributes a specific motivation to Defendants), which is

exactly what Johnson expressly (and appropriately) claimed he would not provide in this case.

Johnson Tr. at 68:11-14. Johnson may not "usurp" the role of the factfinder by opining on the

mental state of any Defendant. *United States v. Deleon*, No. 07-cr-10277-NMG, 2016 WL

3747487, at *12 (D. Mass. May 9, 2016), report and recommendation adopted, No. 07-10277-

NMG, 2016 WL 3766289 (D. Mass. May 9, 2016) (credibility determinations are "not …

necessary or even appropriate" for an expert witness.").[5] Again, Johnson's testimony has been

excluded on this basis before. A federal court in Indiana precluded Johnson from testifying about

the defendant's state of mind and motivations. *SEC v. ITT Educ. Servs., Inc.,* 311 F. Supp. 3d

977, 998-999 (S.D. Ind. 2018) (barring Johnson from testifying about defendants' conduct in

"keeping" certain items off a company's balance sheet).

Second, Johnson's "methodology" for reaching the conclusion that TSAs were booked

without support is fundamentally flawed. Johnson does not know the number of TSAs for which

Defendants are allegedly responsible or even the amount or proportion of TSAs from the relevant

period that supposedly lacked contemporaneous support. *See* Johnson Tr. 133:4-137:23. Johnson

testified that he "looked" at only a handful of TSAs, and as to these, the term "look" is generous.

For instance, Johnson emphasizes a June 2017 email, in which Wilcox indicates that ARA

---

[5] *United States v. Scop*, 846 F.2d 135, 142 (2nd Cir. 1988) (expert witnesses may not opine as to credibility of
another witness's testimony – this is a determination left solely to the jury); *United States v. Ward*, 169 F.2d 460,
462 (3rd Cir. 1948) ("[E]xpert may not go so far as to usurp the exclusive function of the jury to weigh the evidence
and determine credibility.").

should enter a TSA for Lakewood because the "DSO is too low," as an example of a TSA made without any support. *Id.* at 302:15-307:12. But Johnson admitted that he does not know "what was happening in the business of Lakewood" or what "the DSO was at Lakewood." *Id.* at 303:3-17. During his deposition, Johnson was confronted with the fact that Lakewood's DSO at the time was listed as a negative number, which reveals that there was likely an error because it would mean that on average payment was received *before* services were rendered. Johnson refused to concede that a below zero DSO was "too low" and claims (without any support) that the TSA adjustment at Lakewood was to "achieve specific DSO targets." *Id.* at 307:7-23; Johnson Rebuttal at 2. Johnson insisted the instruction to book a $200,000 adjustment for Lakewood "sounds like a predetermined metric" even though he concedes that "[b]eyond reading those words [in the email]," he has "<u>no basis</u>" for that opinion. *Id.* at 313:18-314:12 (emphasis added).

Johnson acknowledges authoritative accounting guidance that TSAs can be booked based on "subjective as well as objective factors," "management's knowledge of and expertise with past and current events," "management's… assumptions about conditions in the future," and the process "can vary from entity to entity." Johnson Tr. at 277:16-279:1. He acknowledges reviewing testimony describing the many pieces of information that Wilcox and Boucher reviewed in exercising their judgments as required by the AICPA. *Id.* at 296:18-297:21. Yet he simply disregards that information and assumes that Wilcox and Boucher did not engage in a good faith analysis. *Id.* at 297:22-298:11; *see id.* at 136:13-21, 137:14-19, 295:1-296:17. While Johnson conceded that he does not know much about the process that Wilcox and Boucher actually used to determine TSAs (*id.* at 324:9-12) – he nonetheless asserts summarily (and incorrectly)

that "[t]here is no evidence that any further analysis was performed [by Wilcox and Boucher] to support topside adjustments based on DSO." Johnson Rebuttal at 5.

Again, Johnson has been precluded from offering an opinion at trial precisely because of his failure to consider alternative explanations for a result. *See Glover v. Ferrero USA, Inc.*, No. CV 11-1086 (D. N.J.) (July 9, 2012 Hrg. Tr.) (Exhibit 5 hereto). In *Glover*, the court struck the report that Johnson had submitted. *Glover* Hrg. Tr. at 7. In that case, Johnson opined that "based on quarterly sales figures, … there was a higher average annual increase in sales now as opposed to before the campaign [and] assumed some amount of that increase was attributable to the allegedly deceptive statements or advertising messages." *Id*. at 8. The court struck Johnson's report, stating that Johnson's report was "speculative and based on conjecture" and that he "apparently chose to completely ignore" relevant evidence. *Id*. at 9-10. As in *Glover*, Johnson should not be permitted to "completely ignore" critical facts here.

### C.    Johnson Should Be Precluded from Opining That GAAP Required a Waterfall For Every TSA

Johnson opines that even though there is no *per se* accounting requirement for a waterfall analysis that supports every TSA, GAAP nonetheless required a waterfall for every TSA at ARA. Johnson Tr. at 289:5-292:4. According to Johnson, ARA was required to have waterfalls for each TSA because waterfalls were mentioned in a July 2016 draft version of ARA's Process Narrative for revenue – a document that Johnson never saw or reviewed until he was asked about it during his deposition and after he rendered his opinion. *Id*. at 289:22-292:4. Johnson's rationale is arbitrary and non-technical – contrary to the fact that ARA's outside auditors were aware that adjustments were taken without waterfalls – and assumes, without justification, that ARA's process

did <u>not</u> consider things beyond waterfalls, including "historical experience, current circumstances, current trends" all of which were permissible. *See id.*

Moreover, up until his deposition, Johnson had been relying exclusively on a different draft version of a process narrative from March 2018 which Dineen described as "not nearly finalized" and which describes a different TSA process than that contained in the July 2016 Process Narrative. *See id.* at 282:15-20, 284:18-285:2.[6] Accordingly, Johnson's opinion is also based on assertions that lack foundation in the record. *Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 14 (1st Cir. 2022) ("Neither *Daubert* nor Rule 702 permits expert opinions grounded only in the unsupported assertions of the expert."); *Elcock v. Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000) (holding that economist should not have been permitted to testify about the plaintiff's earning power that was based on unfounded assumptions that "lack[ed] foundation in the record"). The SEC cannot establish by a preponderance of the evidence that the intended testimony from this witness could satisfy Rule 702 and appropriately assist the jury.

**D.    Johnson Should Be Precluded from Opining
That ARA Maintained A "Cookie Jar"**

Even though he purportedly has "no opinion" about any Defendant's state of mind, Johnson opines that ARA maintained a "cookie jar" to smooth ARA's earnings. Johnson Tr. at 68:11-14, 159:20-160:24; Rpt. at 34. This opinion should be excluded.

---

[6] Relatedly, Johnson testified that the March 2018 process narrative was a "not nearly finalized" draft had no effect on his "point of view," and he also testified that it was immaterial that he did not know whether anyone at ARA had approved Dineen's revisions or who was even aware of his "work in progress" revisions. Johnson Tr. at 149:3-151:14.

Dineen is the only witness who claims that ARA used a "cookie jar," and Johnson assumes that Dineen is credible and all other witnesses, including Defendants, are not. Without performing his own analysis of the data, Johnson simply assumes that the document Dineen purports to be the "cookie jar" – a lengthy spreadsheet that reflects potential revenue from thousands of individual patient services – reflects revenue that meets the GAAP requirements for recognition.[7] *See* Johnson Tr. at 174:1-4 ("I've not done an evaluation."). Johnson's opinion that there was a "cookie jar" is not based on a reliable application of technical accounting expertise. Johnson also has no knowledge of Dineen's competence as a revenue recognition manager, job performance reviews, or why he "separated from ARA." *Id.* at 153:20-154:23.

Johnson speculates that the purpose of the "cookie jar" was to "**hide[] a failure to meet analysts' consensus expectations**" regarding ARA's DSO. Rpt. at 14, 40 (emphasis in original). However, during his deposition, Johnson did not know whether analysts had any expectations whatsoever regarding ARA's DSO. Johnson Tr. at 360:14-361:3 ("It's not something I precisely looked at."). In fact, ARA was consistently missing analyst forecasts in 2017. MacDonald Dep. Tr. at 117:2-119:9 (Exhibit 6 hereto). Moreover, Johnson never bothered to analyze whether ARA's revenues were actually "smooth," but he could not think of any other reason to hold off recording revenue "other than to smooth." Johnson Tr. at 160:1-161:17. Essentially, Johnson parrots Dineen's opinion, but did no analysis of his own and disregarded any evidence to the contrary. That sort of credibility determination should be within the purview of a juror and cannot be the basis for expert testimony under Rule 702.

---

[7] He did not validate whether entries in the spreadsheet were booked into the general ledger because it would have been "pretty hard" to confirm that an adjustment was not in the ledger. Johnson Tr. at 142:1-143:22. He never doubted the accuracy of the spreadsheet because he "assumed there was a process where that was accurate." *Id.* at 144:11-25.

**E.    Johnson Should Be Precluded from Opining**
**About Smith's Role, Responsibilities, and Authority**
**Or That Smith "Failed To Meet Those Responsibilities"**

Johnson should be precluded from opining that Smith was responsible for the accuracy of ARA's financial statements and for internal controls regarding revenue recognition and that she failed to meet her responsibilities. Rpt. at 9; Johnson Tr. 206:5-17. Johnson's opinions about Smith are divorced from any accounting expert analysis and untethered from the factual record. He displays no interest in considering "obvious alternative explanations," and these opinions are not the product of any level of "intellectual rigor." *See* Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendment).

Johnson concedes that his assessment of Smith's responsibilities and whether she was a decision maker regarding TSAs is not the opinion of an expert but rather his interpretation of the facts of the case. Johnson Tr. at 208:6-209:21. Whether Smith was a decision maker and what, if anything, was her responsibility for TSAs is not an appropriate topic for expert opinion. *United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) ("Expert testimony does not assist where the trier of fact has no need for an opinion because it can be derived from commonsense, common experience, the trier of fact's own perceptions, or simple logic"); *United States v. Montás*, 41 F.3d 775, 784 (1st Cir. 1994) ("Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value.").

Aside from being inappropriate for expert opinion, Johnson lacks a reasonable basis to have formed an opinion. He cannot articulate how much time he spent evaluating Smith's "individual conduct." Johnson Tr. at 202:20-205:16. Johnson's assumption that Smith was a decisionmaker from 2017 through Q3 2018 is not supported by evidence and shows willful disregard of relevant facts. When asked whether Smith was a decision maker regarding TSAs, Johnson testified:

16

[S]ometimes it looked like **perhaps she was**. Other times **maybe** she was just providing her recommendation to someone else….

If I see her comment that says, "Looks too high. Back off 400,000," and 400,000 gets backed off. Looks like to me she made the decision. Was I there, no. Can I say with absolute certainty that it was only her, no. Can I say, reading as -- just reading **common sense** that she was the one that says, that's too much, back off, she looks like a decision-maker. **Was it her decision to use that metric, I don't know. She doesn't know where it comes from**. But when she applies it, when she applies that metric to inform the amount of adjustment, is she the decision-maker? If the adjustment got made, I would say yes.

*Id*. at 233:9-236:19 (emphasis added); *see also id*. at 237:2-15 ("[W]as she the decision-maker? She certainly participated. Was she the ultimate, no one overwrote it, so whether someone else said, yeah, I agree with you, so they shared it, **I don't know**[.]") (emphasis added).

Johnson admits he does not know "when exactly and to what extent exactly" Smith became "involved in the revenue recognition process." *Id*. at 222:7-223:23. In fact, he did not even consider the entire discovery record before forming an opinion. *Id*. at 180:14-24. He ignores the fact that Wilcox, Boucher, and Smith uniformly testified that Wilcox and Boucher – not Smith – were responsible for TSA decisions. *See* Wilcox MSJ SOF (Dkt. 112) ¶ 48, 50-51; Smith SOF Resp. (Dkt. 152) ¶ 12, 54-56.) Smith was not a decision maker, nor was she privy to Wilcox and Boucher's TSA decision-making process. (Wilcox MSJ SOF (Dkt. 112) ¶ 46, 48, 50-51; Boucher MSJ SOF (Dkt. 117) ¶ 16.) And when he was challenged about his failure to review the transcripts of Smith's deposition and Dineen's second deposition before rendering an opinion, he claimed that "nothing" in that testimony "influenced [his] opinions" – including, apparently, Smith's statement under oath that she was never "a decisionmaker when it came to revenue recognition." Johnson Rebuttal at 21; Ex. 60 to Smith MSJ SOF (Dkt. 127-59) Smith Dep. Tr. at 318:1-19. *See Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 15

(1st Cir. 2022) (affirming exclusion of expert who based opinions on "assumptions" about records but did not actually review the pertinent records).

Johnson's claims that Smith is broadly responsible for ARA's financial statements and internal controls is based on his speculative and shifting assumptions about what "perhaps" or "maybe" took place. Johnson's report bases his opinion about Smith's level of responsibility <u>exclusively</u> on Johnson's own interpretation of a few summary lines in Smith's resume (despite the testimony, interrogatory responses, and emails that are probative of Smith's lack of responsibility). Johnson Tr. at 215:1-5. At his deposition, Johnson backtracked and stated that he does not "care whether her [resume] did or didn't say that she was responsible for the accuracy of the financial statements. What is clear is she was involved in revenue recognition[.]… I believe her fingerprints are all over the issues with regard to revenue recognition." *Id.* at 213:5-21.

When pressed further on the subject, he asserted that the responsibilities he imputes to Smith arise from her responsibilities, generally, as a CPA. *Id.* at 217:10-218:19. He expressly did not rely on the fact that Smith did not sign any of ARA's financial statements for FY 2017 and Q1-Q2 2018 in forming his opinion about Smith's responsibilities. *Id.* at 218:20-219:8. Further, he incorrectly believes that Smith signed ARA's Q3 2018 financial statements and, what is more, bases his "view of her responsibilities" on this factually incorrect understanding of the record. *Id.* at 219:11-18.

Johnson intends to emphasize a May 10, 2018 email where Smith asks whether it is possible to "find another $1 to 1.2 million" in waterfall-supported revenue adjustments, characterizing it as an unambiguous example where Smith used a predetermined metric. *Id.* at 246:13-17; Rpt. at 60. However, Johnson concedes he does not know the context of this email.

*Id*. at 246:20-247:16. He did not perform any analysis to evaluate whether Dineen "finding" an additional $1-1.2 complied with GAAP – he just assumes the worst. *Id*. at 248:13-249:14 ("It looks like it was targeting a metric, so to the extent that's the case, that would not be appropriate application of GAAP."). Without having conducted any analysis, Johnson intends to usurp the role of the jury and speculate that Smith "should have known" that "ARA's financials were materially misstated" based on his (and not the jury's) interpretation of an email in isolation. Rpt. at 58. Johnson should not be permitted to testify to these speculative opinions and conclusions. *See Lantec, Inc. v. Novell, Inc*., 306 F.3d 1003, 1026 (10th Cir. 2002) (acknowledging a number of flaws with the expert's methodology but noting that the court of appeals was "particularly troubl[ed]" by the expert's attempts to "spin" a handful of conversations with two or three firms into evidence of a worldwide software market).

### F.      Johnson Should Be Precluded from Opining That Smith Misled Grant Thornton During The 2017 Audit

Despite testifying that he is "not expressing any opinion in this case regarding Karen Smith's motivations, intent, and beliefs" and is not "relying on any assumptions about Karen Smith's motivations, intent, or beliefs," Johnson intends to opine that Smith misled Grant Thornton during the 2017 Audit. *See* Johnson Tr. at 202:1-14; 68:11-14.

Johnson should be precluded from offering any opinions about the 2017 Audit. Simply put, Johnson did not review the evidentiary record concerning the 2017 Audit and thus, he lacks a sufficient factual basis to form a reliable opinion. Johnson did not review ***any*** audit workpapers for 2017. *Id*. at 253:7-10. He never reviewed Grant Thornton's final work paper on TSA testing, and he never reviewed or "evaluated" the allegedly "inaccurate support" provided for any of the TSAs that were tested during the 2017 Audit. *Id*. at 255:5-20; 259:12-261:11 (claiming, incorrectly, that there "would be no way of being able to tell whether [the data provided to Grant

Thornton] was contemporaneous" and adding that "[a]ll indications are that it wouldn't have been because of these massive failings of internal control…, but I can't give you that opinion with respect to these adjustments").[8] Johnson also did not review the testimony of two out of the three Grant Thornton auditors deposed in this case, including the auditor (Connors) who performed the audit procedures relating to TSAs. Johnson Tr. at 349:15-19. He has never seen or considered ARA's communications to the auditors and explanations about that information, and he never analyzed the information that the SEC alleges should have been provided to the auditors. *Id*. at 262:21-264:154, 256:11-23, 268:5-269:20. Johnson admits he has no "understanding of Grant Thornton's understanding" of the information it received from ARA. *Id*. at 264:19-265:15.

Without having reviewed the TSA workpapers and deposition testimony from the auditors, he has no foundation to assert that anyone at Grant Thornton was misled by anything.[9]

## CONCLUSION

For the reasons stated above, this Court should exclude Johnson from testifying because he has no experience with the complicated accounting issues in healthcare. The Court should exclude certain proffered opinions because the specific opinions identified above are not based on a reliable, technical analysis but are rather based on conjecture, credibility opinions, and a one-sided view of only part of the relevant factual record.

---

[8] Even Dineen, the SEC's whistleblower, testified that data provided to Grant Thornton reflected actual patient services and payments as of the time of the original TSA entries. *See* Smith MSJ SOF ¶¶ 200, 202-03 (Dkt. 129).

[9] *See MicroStrategy, Inc. v. Bus. Objects, S.A*., 429 F.3d 1344, 1355-56 (Fed. Cir. 2005) (affirming exclusion of damages expert in infringement/business tort litigation who ignored other potential factors contributing to MicroStrategy's business misfortunes, including, but not limited to, severe financial difficulties associated with 'dot com' bubble burst); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (damages expert excluded because he "*assumed* that Craftsmen's alleged lost growth from 1995 through 1998 was caused by defendants' alleged conspiracy [but] did not determine whether other factors, including the emergence of two direct competitors, may have affected Craftsmen's growth rate.").

Respectfully submitted,

*/s/ Jonathan L. Kotlier*
Jonathan L. Kotlier (BBO# 545491)
jkotlier@nutter.com
Ian D. Roffman (BBO# 637564)
iroffman@nutter.com
Alex Rothschild (BBO# 704521)
arothschild@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: (617) 439-2000
Facsimile: (617) 310-9000

Dated: December 3, 2024                    *Counsel for Defendant Karen J. Smith*

## CERTIFICATE OF SERVICE

I certify that, on December 3, 2024, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

 */s/ Jonathan L. Kotlier*
 Jonathan L. Kotlier

6966159

21